Page 1

1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2
3   DOUGLAS JOHNSON,                    )
                                        )
4        Plaintiff,                     )
                                        )
5        vs.                            )   No. 22-cv-03718
                                        )
6   COOK COUNTY SHERIFF THOMAS          )
    DART, in his official              )
7   capacity, ANTWAUN BACON, a         )
    CCDOC officer, and COOK            )
8   COUNTY, a municipal                )
    corporation,                        )
9                                       )
         Defendants.                    )
10
11                  Deposition of ANTWAUN BACON, taken
12   before Rhonda K. Weiland, CSR, by Zoom
13   videoconference, pursuant to the Federal Rules of
14   Civil Procedure for the United States District Court
15   pertaining to the taking of depositions, commencing
16   at 10:32 o'clock A.M., on the 14th day of February,
17   2024.
18
19
20
21
22
23
24

```
                                              Page 2

 1       PRESENT:
         DVORAK LAW OFFICES, LLC
 2       111 West Washington Boulevard
         Suite 1611
 3       Chicago, Illinois 60602
         BY:  MR. ADRIAN BLEIFUSS PRADOS
 4       (773)641-4667
         ableifuss@gmail.com
 5                 Appeared on behalf of the Plaintiff;
 6
         COOK COUNTY STATE'S ATTORNEY'S OFFICE
 7       50 West Washington Boulevard
         Suite 500
 8       Chicago, Illinois 60602
         BY:  MR. JAMES O'CONNOR
 9       (312)603-1880
         james.oconnor@cookcountysao.org
10                 Appeared on behalf of Defendant Cook
                   County Sheriff Thomas Dart and Cook
11                 County;
12
         DEVORE RADUNSKY LLC
13       230 West Monroe Street
         Suite 230
14       Chicago, Illinois 60606
         BY:  MR. ZACHARY STILLMAN
15       (312)300-4479
         zstillman@devoreradunsky.com
16                 Appeared on behalf of Defendant
                   Antwaun Bacon.
17
18
19
20
21
22
23
24
```

Page 3

1                              INDEX

2       February 14th, 2024

3       ANTWAUN BACON

4       EXAMINATION

5       ATTORNEY                                    PAGE

6       By Mr. Bleifuss Prados                        4

7       By Mr. Stillman                              66

8       Further by Mr. Bleifuss Prados               68

9                            EXHIBITS

10                       ANTWAUN BACON

11      NUMBER        DESCRIPTION                    PAGE

12      Exhibit 1                                    54

13      Exhibit 2                                    56

14      Exhibit 3                                    59

15

16                  (Exhibits not tendered.)

17

18

19

20

21

22

23

24

Page 4

1          THE COURT REPORTER:  Before we proceed, I

2     will ask counsel to agree on the record that there

3     is no objection to this deposition officer

4     administering a binding oath to the witness

5     remotely.

6          Please state your agreement on the record,

7     beginning with the taking attorney.

8          MR. BLEIFUSS PRADOS:  The plaintiff

9     agrees.

10         MR. STILLMAN:  Defendant Bacon agrees.

11         MR. O'CONNOR:  We agree.

12                    (Witness sworn.)

13                    ANTWAUN BACON,

14    after being first duly sworn, testified as follows:

15                    EXAMINATION

16    BY MR. BLEIFUSS PRADOS:

17         Q.  Good morning, sir.  Could you please state

18    your full name and spell it for the record.

19         A.  Antwaun Bacon, A-n-t-w-a-u-n, Bacon,

20    B-a-c-o-n.

21         Q.  And are you currently employed by the Cook

22    County Sheriff?

23         A.  Yes.

24         Q.  What is your position within the sheriff's

                                                    Page 5

1    office?

2         A.   I works external ops, operation.

3    Basically we work, patrol the outside perimeter of

4    the jail and hospitals.

5         Q.   And what is your rank?

6         A.   Officer.

7         Q.   Have you ever been deposed before?

8         A.   Say again.

9         Q.   Have you ever testified in a deposition

10   before?

11        A.   No.

12        Q.   I'll just explain a few basic ground

13   rules.  I think you're doing a very good job, but

14   sometimes it's easy to jump in when you hear a

15   question because you know what the lawyer is about

16   to ask you, and so it's natural in human

17   conversation to jump in.  But it's important for you

18   to wait for the question to be completed before you

19   answer.

20             Does that make sense?

21        A.   Yes.

22        Q.   And that's in part to help the court

23   reporter have a clean record as she's taking down

24   everything we are saying.

Page 6

1           Does that make sense?

2      A.   Yes.

3      Q.   If I ask a question in a way that is at

4  all confusing to you, I ask that you please just ask

5  me to restate it.  Otherwise, I will assume that you

6  understood the question.

7           Does that make sense?

8      A.   Yes.

9      Q.   Also, you can take a break wherever you'd

10 like.  I'd just ask that you not take a break while

11 a question is pending.

12          Does that make sense?

13     A.   Yes.

14     Q.   And again, you're doing a good job so far,

15 but it's important that you answer verbally as

16 opposed to nodding the head or saying uh-huh just to

17 make it easier for the court reporter.  Okay?

18     A.   Yes.

19     Q.   All right.  When were you first hired by

20 the sheriff's department?

21     A.   March 2nd, 1999.

22     Q.   Is there a rank that you attained when you

23 first enter, like probationary officer or anything

24 like that?

Page 7

1      A.    Yes.  You first come in, you on probation
2  for a year.
3      Q.    Okay.  And then after that you're a full
4  officer?
5      A.    Yes.
6      Q.    Have you been a full officer since then?
7      A.    Yes.
8      Q.    And have you worked at any facilities
9  other than the Cook County jail in your capacity as
10  an employee of the sheriff?
11      A.    As of right now, I do work some outside
12  hospitals.
13      Q.    And does that work involve transporting
14  persons who are detained at the jail to hospitals?
15      A.    Yes.
16      Q.    Have you worked in external operations for
17  your entire career at the sheriff's office?
18      A.    No.
19      Q.    Where did you first work?
20      A.    I first worked, I worked in Division 11.
21      Q.    And what were your duties there?
22      A.    I was a officer, so basically a
23  correctional officer.  Basically you assigned to
24  tiers working with detainees and IICs.

1     Q.   Where did you work after your stint at

2  Division 11?

3     A.   That's when I came to ex ops, external

4  operations.

5     Q.   Did you -- have you graduated from high

6  school?

7     A.   Yes.

8     Q.   And what high school did you attend?

9     A.   Calumet High School.

10     Q.   And do you have any college education?

11     A.   No.

12     Q.   Have you ever been a member of the armed

13  forces?

14     A.   No.

15     Q.   Have you ever served in any law

16  enforcement agency apart from the sheriff's office?

17     A.   I work some part-time, security guards.

18     Q.   And when did you work as a security guard?

19     A.   Say maybe five years ago.

20     Q.   Okay.  And that was concurrent with your

21  work at the sheriff's office?  It's okay to work a

22  security job on the side?

23     A.   Yes.

24     Q.   And when did you move from Division 11 --

```
                                                    Page 9
 1    I'm sorry.  Go ahead.
 2            A.    Say again.
 3            Q.    I thought you were about to say something.
 4            A.    No.  I was coughing, clearing my throat.
 5            Q.    When did you move from Division 11 to
 6    external operations?
 7            A.    It was either in 2019 or 2020.
 8            Q.    In July of 2020, were you working in
 9    external operations?
10            A.    Yes.
11            Q.    And without getting into the substance of
12    anything that you may have said to your lawyer or
13    that your lawyer has said to you, how have you
14    prepared for this deposition, if at all?
15            A.    Nothing.  Just by memory.
16            Q.    When you say "just by memory," what do you
17    mean?
18            A.    When I was told about the case, I met with
19    a lawyer that came and told me about the case and be
20    prepared for it.  That's it.
21            Q.    Okay.  Did you review any documents in
22    preparation for this deposition?
23            A.    No.
24            Q.    Have you read the complaint in this
```

```
 1    lawsuit?
 2          A.    I was told about it.
 3          Q.    Okay.  Do you have a recollection of the
 4    incidents described in the complaint?
 5          A.    Yes.
 6          Q.    Are your duties in external operations
 7    today, as we sit here in 2024, more or less similar
 8    to your duties in July of 2020?
 9          A.    Yes.
10          Q.    When does your shift begin?
11          A.    0545.
12          Q.    5:45?
13          A.    Yes.
14          Q.    Okay.  And when does it end?
15          A.    At 1400.
16          Q.    And where do you first report for work?
17    Where physically in the jail or the complex there on
18    California do you report to work?
19          A.    MHTC.
20          Q.    I'm sorry, can you say that again?
21          A.    MHTC.
22          Q.    MHTC.  And what does that stand for?
23          A.    That I really don't know.  It's like the
24    old boot camp.
```

1      Q.   Are there lockers there?  What's the
2   facility like?
3      A.   Where we report at, it's at the front
4   hallway.  There are gun lockers there that people
5   can secure their weapon and a desk where officer
6   sits and that's it.
7      Q.   Okay.  And I've been in the jail during
8   shift changes, and a lot of people are coming in and
9   out with clear plastic backpacks.
10           Is that part of the process?
11      A.   Yes.
12      Q.   Okay.  And where do people store those
13   backpacks?
14      A.   I don't know.  It depends on wherever
15   they're working at.  I can't answer where everyone
16   store their backpacks, you know.  It's different
17   parts of the jail that people works.
18      Q.   Are there different lockers available to
19   correctional personnel throughout the jail?
20      A.   Yes.
21      Q.   And when you show up at the MHTC, are you
22   given a particular assignment, or do you know what
23   you're doing that day, or how does that work?
24      A.   We show up at MHTC.  That's where we have

Page 12

1   roll call.  And for roll call, that's where we get

2   our assignment.  And from there, we leave out of

3   roll call and go to your particular destination

4   assignment.

5           When working with external operation, it

6   can be too because if I'm working at, you know, like

7   I said, we work some hospitals.  So I might be

8   assigned to Stroger Hospital one particular day and

9   I have to report to Stroger Hospital.  So...

10      Q.   Okay.  And on those days you don't even go

11  to the MHTC?

12      A.   No.

13      Q.   You go straight to the hospital?

14      A.   Yes.

15      Q.   Okay.  And when you transport inmates or

16  detainees to and fro between the jail and the

17  hospital, what sort of vehicle do you use?

18      A.   You use a Cook County sheriff squad car or

19  it can be a van.

20      Q.   Okay.  And do you drive those, or are

21  there particular drivers assigned to do that?

22      A.   If you're assigned to that particular

23  assignment, we drive them.

24      Q.   Okay.  So do you recall where you were

Page 13

1   assigned to work on July 19th, 2020?

2       A.   July 19th, 2020?

3       Q.   Yes.

4       A.   It depends on what shift.  I was normally

5   at my -- working ex ops.  My particular assignment,

6   I don't know where I was at that morning.

7       Q.   Do you recall where you were assigned to

8   work when you interacted with Douglas Johnson, the

9   plaintiff in this lawsuit, in July of 2020?

10      A.   Yeah.  I was working divisions in

11  Division 1.

12      Q.   Okay.  What were your duties at

13  Division 1?

14      A.   I was to transport IICs back and from

15  their particular division.  I was assigned to RTU,

16  and my assignment was to transport IICs to and from

17  the visits in Division 1 back to their division to

18  RTU.

19      Q.   And what does RTU stand for?

20      A.   Division 8.

21      Q.   Division 8?

22      A.   Uh-huh.

23      Q.   Division 8 is the medical division;

24  correct?

Page 14

1      A.   Yes.

2      Q.   Okay.  How far is Division 1 from the

3  medical division?

4      A.   That I don't (audio distortion).

5      Q.   I'm sorry.  I couldn't hear you.

6      A.   I don't know.  Could be a block or two.

7      Q.   A block or two?

8      A.   Yeah.

9      Q.   Okay.  And have you been -- prior to

10 July 19th, 2020, had you been assigned that job

11 before, transporting people in Division 1 from the

12 medical division?

13     A.   It depends on what assignment.  To that

14 particular unit, no.  I can be assigned to different

15 ones.  They don't give you every day because that's

16 not my regular unit.  I was over there doing

17 overtime, so they can give you different ones to

18 assign you every day when you do come over.

19     Q.   So that was -- I'm sorry.  I interrupted.

20 I apologize.

21     A.   Uh-huh.

22     Q.   Go ahead.

23     A.   I said no, that's -- when I worked over

24 there, it was like a volunteer assignment.

Page 15

1      Q.   So that was not your regular duty;

2  correct?

3      A.   No.  No.

4      Q.   Now, do you recall where you first saw

5  Douglas Johnson on July 19th, 2020?

6      A.   In Division 8 in RTU in the hallway.

7      Q.   And if you remember, was he standing or

8  sitting when you first saw him?

9      A.   Standing.

10      Q.   And you said "in the hallway."  Did I hear

11  that correctly?

12      A.   Yes.

13      Q.   Okay.  And do you recall that he had a

14  cane at the time?

15      A.   Yes.

16      Q.   Do you recall any words exchanged, any

17  conversation you had with him initially?

18      A.   I -- when they come to the hallway, I went

19  to handcuff him, and he stated that he has a no

20  handcuff order.  I asked him to produce it, I have

21  to see it.  He couldn't produce it, so I told him he

22  has to be handcuffed when you're walking through the

23  tunnels of the jail.  It's procedures.

24      Q.   Okay.  In terms of handcuffs, do you have

1    handcuffs on you while you're working at the jail?

2         A.    Yes.

3         Q.    Okay.  And are there different types of

4    handcuffs or do you -- are you familiar with

5    different types of handcuffs, I guess is my

6    question?

7         A.    No.  We're -- jail, we use one particular

8    handcuff.

9         Q.    Okay.  And is that, are those the

10   handcuffs that you carry on your person?

11        A.    Yes.

12        Q.    Okay.  And can you describe the handcuffs

13   in any more detail in terms of how they work?

14        A.    Particular handcuffs, they're two metal

15   cuffs that go around your wrist, and they also have

16   a little circle in there.  It's like a secondary

17   security device to wear.  Once you handcuff the

18   person, you hit the little switch so the handcuff

19   cannot move or tighten up as they're being

20   transported or walked around.

21        Q.    And the handcuffs can be either loose or

22   tighter depending on how they're adjusted,

23   correctly -- correct?

24        A.    Once we adjust them and once we hit the

Page 17

1    little switch, no, they cannot be moved.

2        Q.   But I'm saying that you can choose, when

3    you apply the handcuffs initially, you can decide

4    how tightly or loosely they are fastened about the

5    subject's wrists; correct?

6        A.   Correct.

7        Q.   Okay.  And how do you gauge how tightly

8    the individual should be handcuffed?

9        A.   Normally once you put the handcuffs on

10   someone, if you can take two of your fingers and

11   insert them into the handcuff, that's how you know

12   they have -- it's not tight and they can be -- they

13   have room in there to move around.

14       Q.   And where you -- can you describe where

15   you insert the fingers?

16       A.   Just anywhere within the handcuffs.

17       Q.   Okay.  And do the handcuffs click as they

18   get progressively tighter?

19       A.   Yes.

20       Q.   Okay.  Do -- is there any certain

21   number of clicks that you're looking to hear?

22       A.   No.

23       Q.   And, all right, so you applied the

24   handcuffs to Mr. Johnson.  Did you then click on the

Page 18

1    additional security measure?

2        A.   Yes.

3        Q.   Okay.  And do you recall you did that just

4    because you always do that or because you have a

5    specific recollection of that?

6        A.   I always do that.

7        Q.   Okay.  Is it your testimony that you put

8    your fingers in there and tested how loose the

9    handcuffs were?

10       A.   Yes.

11       Q.   Okay.  And do you specifically recall

12   doing that, or is that just something that you're

13   saying because you always do that?

14       A.   It's something that I would always do.

15       Q.   Okay.  And what, what happened next, I

16   guess is my question?

17       A.   He lined up, and we walked over to

18   divisions.

19       Q.   Can I ask that you just speak up a little

20   bit.  I'm sorry.

21       A.   I had the IICs line up, and we walked over

22   to the division, to Division 1 visiting.

23       Q.   Okay.  When you say "IICs," what does that

24   mean?

```
 1        A.    They're called individual in custody.  We
 2   no longer refer to them as detainees or inmates.  We
 3   refer to them as IICs.  It's individual, individual
 4   in custody.
 5        Q.    Okay.  All right.  Is there -- is
 6   Division 8 and Division 1 connected by a tunnel?
 7        A.    Yes.
 8        Q.    Okay.  And when you first encountered
 9   Mr. Johnson, was he at the tunnel level or was he
10   above tunnel level?
11        A.    Above.
12        Q.    Okay.  And how did he get down to the
13   tunnel level?
14        A.    We walked.
15        Q.    Okay.  Down stairs?
16        A.    No, took elevator.
17        Q.    Okay.  And what, if anything, was
18   Mr. Johnson saying to you?
19        A.    Nothing.
20        Q.    If you recall?
21        A.    Nothing.  Once he stated to me that he had
22   a handcuff order and I asked him to produce it and
23   he couldn't produce it and he have to be handcuffed
24   and all that, I tell him it's procedures that I --
```

Page 20

1   that you must be handcuffed when you walk through

2   the tunnels.

3       Q.   And when you applied the handcuffs, were

4   there any other sheriff's office personnel around

5   there?

6       A.   I believe his tier officer.

7       Q.   Do you believe his tier officer would have

8   witnessed you put the handcuffs on him?

9       A.   I can't say to what he might have

10  witnessed or not.

11      Q.   Did you discuss handcuffing Mr. Johnson

12  with any other sheriff's personnel?

13      A.   No.

14      Q.   And when you got down to the tunnel level,

15  is this a trajectory that you do frequently enough

16  that you can remember it, or is this, was this a

17  very unusual event for you?

18      A.   No.  It's the way there, I can remember

19  it.

20      Q.   You can remember it?

21      A.   Yes.

22      Q.   So when you get out of the elevators at

23  the lower level, where do you turn; or do you go

24  straight?

```
                                              Page 21
 1        A.    No.  You get off and you turn probably to

 2    the right.

 3        Q.    Okay.  And then how far do you walk

 4    towards the right?

 5        A.    That I don't recall.

 6        Q.    Okay.  Can you estimate in feet?

 7        A.    Couple feet.  I don't...

 8        Q.    So fewer than 10 feet?

 9        A.    That I don't recall.  I don't work over

10    there on a regular.

11        Q.    Okay.  And was Mr. Johnson walking with

12    his cane?

13        A.    Yes.

14        Q.    Okay.  And now I think you said he's

15    designated as a IIC.  Is that the right terminology?

16        A.    Yes.

17        Q.    Okay.  And I think you used the plural.

18    So were there other people you were transporting --

19        A.    Yes.

20        Q.    -- to -- okay.

21              How many people were you transporting at

22    that time?

23        A.    Yes, I don't recall.

24        Q.    Okay.
```

Page 22

1      A.    No.

2      Q.    Was it more than three?

3      A.    It was more than three.

4      Q.    Okay.  And did any of those other people

5   have canes or other visible disabilities?

6      A.    No.

7      Q.    And so after walking to the right, do you

8   then turn?

9      A.    I believe so.

10      Q.    Okay.  Which direction do you turn?

11      A.    You have to head north.  It's north

12   towards the Division 1.

13      Q.    Okay.  And how far do you walk in that

14   direction?

15      A.    That I don't know.

16      Q.    Would it be a matter of blocks?

17      A.    That I don't know.

18      Q.    Would it be more than a hundred feet?

19      A.    Could be.

20      Q.    Okay.  How many times do you estimate

21   you've escorted people down that passageway?

22      A.    Like I said, that's not a regular

23   assignment, so I don't know.  I just go down on a

24   volunteer-type thing.

1      Q.   So would it be fair to say that you don't

2   have a very good recollection of what that hallway

3   looks like?

4      A.   How the tunnel look like?

5      Q.   Yes.

6      A.   Yes.  Yes.

7      Q.   It would be fair to say you don't have a

8   good recollection of that; is that correct?

9      A.   No.

10     Q.   Okay.  You do have a recollection of it.

11  Okay.

12          Can you describe what the walls look like

13  or the floor looks like?

14     A.   Made out of cement.  I believe they're

15  painted yellow.  And the -- that we walk on is a

16  dark color.

17     Q.   All right.  And did you observe

18  Mr. Johnson as he moved down this hallway?

19     A.   Yes.

20     Q.   Did he appear to be having difficulty as

21  he was moved down the hallway?

22     A.   Nope.

23     Q.   Your testimony is no?

24     A.   No.

1      Q.    Okay.  Did Mr. Johnson complain about the

2   tightness in his handcuffs?

3      A.    No.

4      Q.    Okay.  And is it fair to say that so far

5   this is a relatively uneventful and ordinary

6   transport of a detainee between divisions?

7      A.    Yes.

8      Q.    Okay.  Then at the end of this hallway,

9   what happens physically in terms of your trajectory?

10  Do you turn?  Do you go upstairs?  What do you do?

11     A.    I believe you do have to make a series of

12  turns to get to Division 1, and then when you do get

13  to Division 1, you have to walk up a little hill to

14  get to the actual division.

15     Q.    Okay.  And when you say walk up a hill, do

16  you mean up a ramp --

17     A.    Yes.

18     Q.    -- or up stairs?  What do you mean?

19     A.    Like a ramp.

20     Q.    Up a ramp?

21     A.    Uh-huh.

22     Q.    Okay.  And how steep is that ramp?  Can

23  you estimate it by degree?

24     A.    That I don't know.

```
                                          Page 25
 1       Q.    Okay.  Is it basically you're going up one
 2   story?
 3       A.    Going up one story?
 4       Q.    You're going up one story in terms of
 5   levels?
 6       A.    Yes, perhaps so.
 7       Q.    Okay.  So is the meeting -- is the meeting
 8   area in Division 1 on the ground level?
 9       A.    Is the meeting -- what do you mean, "the
10   meeting area"?  Explain.
11       Q.    The area where inmates meet with visitors,
12   the visiting center?
13       A.    No.  No, you have a -- once you get up
14   into Division 1, then when you have to go out into
15   the yard where they visit because the visit was in
16   the outside yard, you have probably a couple stairs
17   you have to walk up.
18       Q.    Okay.  How many steps are on those stairs?
19       A.    Probably three, four.
20       Q.    Is it your testimony that at no point
21   along this walk did Mr. Johnson complain about his
22   handcuffs?
23       A.    No, he didn't.
24       Q.    And it's your testimony that at no point
```

Page 26

 1   along this walk he had any difficulty walking?

 2        A.   No.

 3        Q.   Okay.  This is the summer of 2020, so is

 4   it fair to say that there were specific

 5   COVID-related regulations in place?

 6        A.   Yes.

 7        Q.   And what was expected at the time, if you

 8   recall, in terms of masks and masking of detainees,

 9   staff, and visitors?

10        A.   When you're walking through the hallway,

11   you must wear a mask.  That's about it.

12        Q.   Okay.  And what about when you're not --

13   well, first of all, for staff, are they expected to

14   wear -- were they expected to wear masks at all

15   times?

16        A.   Yes.

17        Q.   Okay.  And inmates were expected or

18   detainees were expected to wear masks when they

19   walked down the hallways?

20        A.   Yes.

21        Q.   Is that your testimony?

22        A.   Yes.

23        Q.   What about visitors, if you recall?

24        A.   At that time I believe so, yes.

Page 27

```
1       Q.    They were required to wear masks?
2       A.    Yes.
3       Q.    Okay.  And so when you get up to the
4   Division 1, the visiting area is in the yard.  Is
5   that your testimony?
6       A.    Say again.
7       Q.    The visiting area is in the yard.  Is that
8   your testimony?
9       A.    Yes.
10      Q.    And how big is that yard?
11      A.    It's very big I can say.
12      Q.    Like bigger than a baseball -- I'm sorry.
13  Go ahead.
14      A.    No, not bigger than a baseball field.
15      Q.    Okay.  Is it as big as the infield of a
16  baseball field?
17      A.    I don't know how big the infield of a
18  baseball field is.
19      Q.    Okay.
20      A.    It's in a field in a tent, so it's pretty
21  spacey.
22      Q.    Okay.  And was there -- okay.  And are
23  there paved walkways or is it grassy?  Can you
24  describe it at all?
```

Page 28

1    A.   So when you walk up to where the tent is,

2   well, I believe it's a paved walkway right there;

3   but when they go into the tent, they're in the

4   grass.

5    Q.   And again, you -- it's your testimony that

6   you don't recall how many people you were

7   transporting in that trip?

8    A.   No, I don't.

9    Q.   Okay.  And so when -- at what point are

10   they -- you escort them up through, up the stairs

11   through the Division 1 building and then to this

12   yard where they visit people; is that correct?

13    A.   Correct.

14    Q.   And then when they get to the yard, are

15   they free to walk around wherever they want to go --

16    A.   No.

17    Q.   -- or do you take them to -- okay.

18         So what happens?

19    A.   Once we bring them to the tent, basically

20   there's a officer and a supervisor that sits there.

21   The family are assigned to a table, and then

22   they're, the IIC is instructed to go to whatever

23   table that their family is assigned to.

24    Q.   Okay.  So you -- do you take them to these

Page 29

1    tables one by one, or how does that work?

2        A.   No.   They lined up.   The officers that's

3    at the table assign them, tell them what table to go

4    to, and they walk there on their own.

5        Q.   Okay.   And do you recall observing

6    Mr. Johnson walk through the yard?

7        A.   No.

8        Q.   You have no recollection of that?

9        A.   No.

10       Q.   Do you recall who was visiting him?

11       A.   No.

12       Q.   Do you recall what they looked like?

13       A.   No.

14       Q.   Do you recall whether it was one person or

15   more than one person?

16       A.   No.   I don't sit at the table.   I just

17   transport them.

18       Q.   Okay.   And is it fair to say that you

19   don't recall because for you -- well, it's your

20   testimony this is a pretty ordinary event, not

21   something that would stick out in your mind?

22       A.   Say again.

23       Q.   Is it fair to say that your testimony is

24   that you don't recall because this was a pretty

1   ordinary event that doesn't stick out in your mind?

2        A.   Yes.

3        Q.   Okay.  And how long are these visits

4   supposed to be?

5        A.   They can be from 15 minutes to 20 minutes,

6   25.

7        Q.   Okay.  Does the inmate get to decide how

8   long the visits are?

9        A.   No.

10       Q.   The inmate is basically dependent on the

11  escort's schedule to get back and -- to get back and

12  forth from their housing to Division 1; is that

13  correct?

14       A.   No, it's no escort schedule.

15       Q.   They're dependent on the sheriff's

16  personnel that are escorting them to go back and

17  forth; correct?

18       A.   To take them back and forth?

19       Q.   (Nodding head.)

20       A.   Yes.

21       Q.   And while -- do you remember what you did

22  while these detainees were meeting with people in

23  the yard?

24       A.   Basically I'm probably going back and sit

1  with other coworkers that was working other

2  divisions.

3          Q.    Okay.  And so do you recall specifically

4  who you were sitting with?

5          A.    That I don't know.

6          Q.    Do you recall discussing Mr. Johnson with

7  any other sheriff's personnel on that day?

8          A.    No.

9          Q.    Okay.  And then do you recall at some

10  point taking Mr. Johnson back to Division 8?

11          A.    Once they're done with their visit, I have

12  to -- everybody that I was assigned to, yes, we took

13  them back to their division.

14          Q.    Okay.  And do you have a specific

15  recollection of taking them back?

16          A.    No.

17          Q.    Okay.  You just assume that that's

18  something that would have happened?

19          A.    If I'm assigned to Division 8, yes, I'll

20  have to take them back.

21          Q.    Okay.  But you don't specifically remember

22  taking him back in your mind's eye?

23          A.    No.

24          Q.    Okay.  So is it fair to say that you don't

Page 32

1    remember him complaining about his cuffs on the way

2    back?

3         A.    He never complained.

4         Q.    Okay.  So you do remember?

5         A.    I would -- I would remember if somebody

6    would have complained to me, but no one ever said

7    anything to me about no handcuffs.

8         Q.    Okay.  So it's your testimony that you

9    would have remembered if someone had complained and

10   you don't really remember, therefore you assume that

11   nobody complained.  Is that fair to say?

12        A.    No.

13        Q.    Can you correct me?

14        A.    In my job with escorting people to and

15   from, you know, if someone would have complained

16   about the handcuffs, I would have remembered that.

17        Q.    Okay.

18        A.    But in my movement at that time, no one

19   ever said anything to me about their handcuffs.

20        Q.    But you don't actually remember the

21   specifics of taking him back to Division 8.  Is that

22   fair to say?

23        A.    Basically far as when I take them back, I

24   have to take them back to their assigned tier,

Page 33

1    unhandcuff them, and their officer that's working

2    the tier have to come and receive them back.  So we

3    have their ID because they can't go back without

4    their ID.  So once I give the ID to the officer, the

5    officer basically kind of like, I guess they checks

6    them in and go back to their tier.

7         Q.   Okay.  And that's your understanding of

8    sheriff's policy; correct?

9         A.   Yes.

10        Q.   But it's -- I think you testified earlier

11   that you don't remember in your mind's eye actually

12   taking him back?

13        A.   If I -- I had several inmates with me that

14   day, so he probably was one of them that was -- if

15   he's assigned to Division RTU, then yes, I took him

16   back.

17        Q.   Okay.  And I understand that as a fact of

18   history you took him back.  I'm just saying do you

19   actually remember taking him back, and it seems to

20   me the answer is no; correct?

21        A.   Yes, I took him back.

22        Q.   You took him back, but do you remember

23   taking him back?

24        A.   Yes.

Page 34

1      Q.   Okay.  And what do you remember about

2  taking him back?

3      A.   Basically once he was done with his visit,

4  we walked back through the tunnel, back to RTU, and

5  me unhandcuffing him and giving him back to his

6  assigned tier officer.

7      Q.   Okay.  And do you remember who his

8  assigned tier officer was?

9      A.   No, I don't.

10     Q.   Did you discuss anything about the

11  handcuffs with the assigned tier officer?

12     A.   No.

13     Q.   Okay.  And did you ever hear anything

14  about that handcuffing of Mr. Johnson on

15  July 19th, 2020, in the following days?

16     A.   No.

17     Q.   Okay.  Did you hear anything about that in

18  the following weeks?

19     A.   No.

20     Q.   Is the first time you -- that came back to

21  mind after the filing of this lawsuit?

22     A.   Yeah.

23     Q.   Okay.  So you had -- is it fair to say

24  that you played no role in any investigation into

Page 35

1  any grievance that Mr. Johnson submitted relating to

2  this incident?

3      A.   Yes, I paid no role in it.

4      Q.   Okay.  And you were not even aware of that

5  grievance.  Is that your testimony?

6      A.   Correct.

7      Q.   Okay.  How many -- how many inmates do you

8  believe or detainees -- what terminology do you use?

9  Inmates or detainees?

10     A.   No.  IICs.

11     Q.   IIC.

12     A.   Uh-huh.

13     Q.   How many IICs do you think you moved

14  around the prison on that day in -- on July 19th,

15  2020, if you can estimate?

16     A.   That I can't recall.

17     Q.   Would it have been more than ten?

18     A.   Yes.

19     Q.   Would it have been more than 20?

20     A.   That I can't recall.

21     Q.   Okay.  In any given week in July of 2020,

22  would you have moved more than 50 people?

23     A.   Within a week?

24     Q.   Yeah.

Page 36

1    A.   Depends on the business of the jail.  You

2  know, that I can't answer because I don't work that

3  particular day.  Like I said, I could.  I work my

4  normal assignment, doesn't always consist of me

5  transporting detainees.

6    Q.   Okay.  It seems that you do this sort of

7  work relatively frequently, and I'm trying to figure

8  out why you remember at least part of your

9  interactions with Mr. Johnson when this is such an

10  ordinary occurrence.

11    A.   Because that particular day when I was

12  assigned to transporting back and forth, I

13  remembered that I didn't have no one complain to me

14  about handcuffs.  I think that day basically was a

15  regular particular day that went normally and

16  smoothly as --

17    Q.   Okay.

18    A.   -- any.

19    Q.   Do you recall, do you know whether you

20  worked the following day, on July 20th?

21    A.   No, I don't.  I was worked back into my

22  regular external operations.

23    Q.   The following day?

24    A.   Yes.

Page 37

1    Q.   Okay.  And do you recall what your duties
2  were on July 20th?
3    A.   That I don't know.
4    Q.   Do you recall what your duties were the
5  day before, on July 18th?
6    A.   That I don't.
7    Q.   Okay.  And I assume that the same, that
8  same would be true of the 17th?
9    A.   Yes.
10    Q.   And the same would be true of the 16th?
11    A.   Yes.
12    Q.   Okay.  But you do recall what you were
13  doing on July 19th, 2020; correct?
14    A.   Yes.
15    Q.   Okay.  Again, I'm just trying to figure
16  out if you can, you can explain why you have a
17  distinctive recollection of that day.
18    A.   Because like, again, I don't normally work
19  visits.  It's not my normal assignment.  My regular
20  assignment is external operations.  So that
21  particular day when I was transporting for visits, I
22  volunteered for overtime and was working visits, not
23  my regular duties as external operations.  So that
24  particular one day, in order for me to be over there

Page 38

1    transporting visitors, that's where I witnessed

2    something outside of my regular duties.

3        Q.   All right.  When you were first -- when

4    you first began working -- and I apologize if you

5    can hear some chainsaw.  There's a city crew cutting

6    trees out here.

7             When you first were hired by the sheriff's

8    office, did you receive training in putting

9    restraints on IICs or detainees?

10       A.   Yes.  When you're first hired, you had to

11   go through the academy process.

12       Q.   And is the academy run by the sheriff's

13   office?

14       A.   Yes.

15       Q.   Okay.  And are you trained in applying

16   different kinds of restraints on persons detained by

17   the Cook County jail?

18       A.   Yes.

19       Q.   Okay.  And what types of restraints are

20   there?

21       A.   We have handcuffs, we have leg shackles,

22   and it's a blue box.

23       Q.   Can you describe the last one?

24       A.   The blue box?

Page 39

1      Q.    Yes.

2      A.    The blue box is like a little square blue

3   box with a metal piece that comes in the middle.  So

4   once you blue boxing a person, it takes the blue box

5   and handcuffs and a chain.  And basically once you

6   blue box them, their arms are like this (indicating)

7   and the blue box goes in the middle and you bring it

8   to they chest and you wrap the chain around their

9   waist.

10     Q.    Is that like a more high security method

11  of restraint?

12     A.    Yes.

13     Q.    Okay.  And have you transported in your

14  career at the -- well, strike that.

15          Since you started working at the sheriff's

16  office, do you receive additional training in

17  applying restraints?

18     A.    Yes.  Because once you in sheriff's

19  office, we have to go to this thing called

20  in-service training.  We go there once a year.  And

21  once a year in that in-service training, you do --

22  it's almost like a refresher course that you takes

23  and you learn basically, you know, like refresher

24  course of like requalifying with your weapon.  You

Page 40

1  have defense tactics where you are training with

2  some type of defense tactics if someone is trying to

3  attack you.

4         Then you have a segment where we do have

5  handcuffing where they train you on how to secure

6  properly a IIC.  So as part of our training, we have

7  to go there once a year.

8         Q.   And how long does that training period

9  last, that yearly retraining period?

10        A.   Normally it be a week that you will have

11  to go in for that training period; but now recently

12  they have cut it down to like three days.

13        Q.   Okay.  And do you know when the -- do you

14  recall when the transition from a week to three days

15  happened?

16        A.   That I don't recall.

17        Q.   Okay.  And when you transport people to

18  and fro from the jail to Stroger Hospital, is that

19  something you do relatively frequently?

20        A.   Yes.

21        Q.   Is that something you do on more than once

22  a week on average?

23        A.   If I'm assigned to that assignment, once

24  again, I said I'm in external ops, so I could be

Page 41

1   assigned to Stroger Hospital.  So if I'm assigned to

2   Stroger Hospital, we are just at the hospital.

3       Q.   Okay.

4       A.   And we transport IICs from our office to

5   their doctor's appointment, if you're assigned to

6   Stroger Hospital.

7       Q.   So you have an office in --

8            MR. BLEIFUSS PRADOS:  Can we go off the

9   record for just a quick second.

10                        (WHEREUPON, an off-the-record

11                         discussion was held.)

12           MR. BLEIFUSS PRADOS:  If we can go back on

13  the record.

14  BY MR. BLEIFUSS PRADOS:

15      Q.   So is there a office -- so you were

16  testifying about an office that the sheriff has

17  inside of Stroger Hospital; is that right?

18      A.   That's correct.

19      Q.   And does that function kind of as a

20  waiting room for the IICs?

21      A.   Yes.

22      Q.   And it's I-I-C, not I-C-C?

23      A.   IIC, individuals in custody.

24      Q.   Individuals in custody.  Okay.

Page 42

1            And when an IIC has to go from that office
2     to their doctor's office or whatever the clinical
3     setting is, are they in restraints?
4          A.   Yes.
5          Q.   Okay.  And what kind of restraints are
6     they in?
7          A.   They're in leg shackles, and they are also
8     are in handcuff with the blue box and chain.
9          Q.   Okay.  And that's a more secure method
10    that is used in Stroger?
11         A.   Yes.
12         Q.   Okay.  And so ordinarily a less secure
13    method is used in -- within divisions of the jail
14    itself.  Is that fair to say?
15              MR. O'CONNOR:  Objection.
16              THE WITNESS:  Did somebody say something?
17              MR. BLEIFUSS PRADOS:  Was there an
18    objection?
19              MR. O'CONNOR:  Yes, but you can answer.
20              MR. BLEIFUSS PRADOS:  Okay.
21    BY THE WITNESS:
22         A.   Can you repeat the question?
23    BY MR. BLEIFUSS PRADOS:
24         Q.   Yes.  Is there typically a less, a lower

Page 43

1  security method is used for transporting IICs within

2  the divisions of the jail?

3      A.   Depends on the security level of the IIC,

4  I guess.  So you can say yes.

5      Q.   Do you recall, know or recall what

6  Douglas Johnson's security level was on July 19th,

7  2020?

8      A.   No.

9      Q.   Okay.  Is there any particular policy or

10 protocol you're aware of for adjusting -- I'm sorry,

11 for transporting IICs or detainees with canes?

12     A.   With canes?

13     Q.   Yes.

14     A.   No, there's no particular policy.

15     Q.   Okay.  And are there certain IICs or

16 detained persons that have special permission to

17 have canes?

18     A.   Yes, you do have to have special

19 permission to have a cane.

20     Q.   Okay.  Do you recall whether you asked

21 Mr. Johnson on July 19th, 2020, whether he had

22 permission to use a cane?

23     A.   Yes.

24     Q.   You did ask him?

Page 44

1    A.    Yes.

2    Q.    And what did he say?

3    A.    When he came out, he stated, yes, that

4    was -- this is his cane.  On the cane, he has a

5    sticker with his name and ID on it to let you know

6    that that is his particular cane, belongs to him.

7    Q.    Okay.  And is there like a bar code on the

8    sticker, anything like that?

9    A.    I believe so.

10   Q.    Is that something you would scan or you

11   just look at it?

12   A.    No, just look at it, since it have his

13   name and ID number on it too.

14   Q.    Do you recall checking that it was his

15   cane?

16   A.    Yes.

17   Q.    Do you recall that because you actually

18   have a memory of that, or is that just something you

19   would do in the normal course of affairs?

20   A.    I actually remember that.

21   Q.    Okay.  And is it your testimony that in

22   the -- throughout the entire, your entire

23   interaction with Mr. Johnson, he never once

24   complained about the tightness of the handcuffs?

Page 45

1      A.    No.

2      Q.    That is, that is what your testimony;

3  correct?

4      A.    My testimony, he never complained to me,

5  no.

6      Q.    And the only comment he made about the

7  handcuffs, according to your recollection, is that

8  he said he had a no handcuff order; is that correct?

9      A.    Yes.

10      Q.    Apart from that, is there anything else

11  distinctive or at all memorable about your

12  interaction with Mr. Johnson on that day?

13      A.    No.

14      Q.    What discretion do you have -- first of

15  all, in terms of the policies of applying restraints

16  to IICs or detainees, have those policies changed at

17  all since 2020 and the present day?

18      A.    My recollection, no.

19      Q.    I'm sorry, I didn't hear that.

20      A.    To my recollections, no.

21      Q.    Okay.  And what discretion do sheriff's

22  personnel have in when and whether to apply

23  handcuffs to an IIC?

24      A.    Explain what you mean by "discretion."

Page 46

1      Q.   I mean what kind of room is there for

2   making a judgment call as to, one, when handcuffs

3   are appropriate versus when they are not

4   appropriate?

5      A.   When a IIC is being transported or moved,

6   it's they must be handcuffed.

7      Q.   Okay.  Have you ever observed -- have you

8   ever waived that requirement?

9      A.   No.

10     Q.   Have you ever observed other sheriff's

11  personnel transport a person without handcuffs?

12     A.   I can't testify what other personnels

13  would do.

14     Q.   Could you speak up.  I'm sorry.

15     A.   I said, I can't testify about what other

16  personnels might do.

17     Q.   I'm saying, I'm asking have you observed

18  other people transport persons between divisions

19  without handcuffs?

20     A.   Without handcuffs?  Yes.

21     Q.   You have seen that happen?

22     A.   Not between divisions but inside if I'm

23  inside the division or something like that, yes.

24     Q.   Okay.  And so it's your testimony that

Page 47

1   never -- you would never have someone transported

2   from Division 8 to Division 1 without handcuffs?

3         A.   Without handcuffs, no.

4         Q.   Okay.  And it's your testimony that use of

5   a -- the use of a cane has no influence on whether

6   or not or how a person is handcuffed?

7         A.   No.

8              MR. BLEIFUSS PRADOS:  Okay.  We are almost

9   at the hour mark.  I just ask to take a ten-minute

10   break.  I may have to relocate because this is an

11   incredible circus out here.

12             Okay.  Could we just go off the record for

13   ten minutes.

14                       (WHEREUPON, a short break was

15                        taken.)

16             MR. BLEIFUSS PRADOS:  We are back on the

17   record.  Thanks again for your patience.  I've

18   relocated.

19   BY MR. BLEIFUSS PRADOS:

20        Q.   Officer, have you ever transported an IIC

21   with a no handcuffs order?

22        A.   No.

23        Q.   Never in your career?

24        A.   No handcuffs order?  No.

Page 48

1      Q.   Do you know how a no handcuffs order would

2  be communicated to you or how you would be alerted

3  to a no handcuffs order?

4      A.   If IIC has a no handcuff order, normally

5  they would notify us, state it to us if they have

6  one.  And if they do have one, they will have to

7  produce it.

8      Q.   So it would be a piece of paper that IIC

9  would have on their person?

10      A.   Yes.

11      Q.   Okay.  Have you ever seen a no handcuffs

12  order?

13      A.   No.

14      Q.   So as far as you know, there's no system

15  that by which sheriff's personnel would alert you

16  about a no handcuffs order.  Is that fair to say?

17      A.   Correct.

18      Q.   Is there any system that would alert you

19  to a inmate having any kind of special needs with

20  respect to being transported?

21      A.   Yes.

22      Q.   What is that system?

23      A.   As far as -- well, pertaining to female

24  IICs, if they are pregnant, they are not to be

Page 49

1    handcuffed or shackled.

2         Q.    What about male IICs?

3         A.    No.

4         Q.    Is the answer no?

5         A.    No, I never seen one.

6         Q.    Have you ever in your career loosened

7    handcuffs because they were too tight?

8         A.    Yes.

9         Q.    Okay.  And how did you determine that they

10   were too tight?

11        A.    The IIC might have stated to me that, you

12   know, he felt that the handcuffs were a little too

13   tight.  If I come over and once again do the

14   two-finger check to see if I can stick my finger

15   there, if I can't get my finger in there, then I

16   would assume they might be a little tight and I

17   would loosen them up until I can get my fingers in

18   there, then I would leave it there.

19        Q.    Okay.  Is it ultimately a judgment call

20   that you have to make as to whether the handcuffs

21   are too tight or tight enough?

22        A.    Basically, yes.

23        Q.    And when you say sticking two fingers in

24   there, what does that mean exactly?  Is that where

Page 50

 1  there's -- you're able to squeeze your finger under
 2  the handcuff?
 3      A.   If you're able to squeeze your two fingers
 4  in between the handcuff and the person's wrist, it
 5  let's you know that there's enough space, room in
 6  there for the handcuff and not extra tight, you
 7  know.
 8      Q.   Is it your responsibility to apply
 9  handcuffs in such a way that the IIC is not injured?
10      A.   In such a way that they're not injured?
11  Yes, how you apply them, yes.
12      Q.   Can you just repeat that answer because I
13  didn't hear it very clearly.
14      A.   Yes.
15      Q.   Okay.  Have you ever been disciplined for
16  any of your -- for your treatment of a detainee at
17  the Cook County jail?
18      A.   For treatment of a detainee?  I would say
19  no.
20      Q.   Are you aware of specific written policies
21  regarding the use of restraints?
22      A.   Am I aware of policies?
23      Q.   About written policies about the use of
24  restraints?

1     A.   Yes.

2     Q.   Okay.  And have you reviewed those

3 policies in preparation for today's deposition?

4     A.   No.

5     Q.   Are those policies shown to you at

6 trainings, or how are you aware of these policies?

7     A.   We get policies and procedures through

8 e-mail, and every e-mail, you know, you read your

9 e-mail and you read if there's been a update on

10 anything procedure.  So basically through e-mails.

11    Q.   Okay.  And are they posted anywhere, are

12 written policies posted anywhere, on a bulletin

13 board or anything like that?

14    A.   Pertaining to handcuffing?

15    Q.   Yes, pertaining to handcuffing.

16    A.   Not to my knowledge, no.

17    Q.   Okay.  Have you ever been a defendant in

18 any civil lawsuit apart from this one?

19    A.   Yes, I have.

20    Q.   Do you recall when that lawsuit was filed?

21    A.   It was many years ago.  I don't recall

22 exact time but it was --

23    Q.   Okay.

24    A.   -- close to beginning of my career.

Page 52

```
 1       Q.   Did you say it was at the beginning of
 2   your career?
 3       A.   Yes.
 4       Q.   Do you recall what was alleged in that
 5   lawsuit?
 6       A.   Yes.  The detainee was suing for spoiled
 7   milk.
 8       Q.   Okay.  And apart from that, have you been
 9   a defendant in any other civil suits?
10       A.   I didn't answer.  No.
11       Q.   Okay.  And I can narrow that down to any
12   civil suits related to your work as a sheriff's
13   employee.
14       A.   Not a defendant but maybe a witness.
15       Q.   Not as a defendant but as a witness, is
16   that what you said?
17       A.   Yes.  Yes.
18       Q.   And have you testified in any trials?
19       A.   Yes.
20       Q.   In civil suits?
21       A.   I guess it was a civil suit.
22       Q.   Okay.  Do you recall when that, when you
23   testified in the civil suit?
24       A.   I don't remember when it was.
```

Page 53

1      Q.   Do you recall the names of the parties in
2   that civil suit?
3      A.   No, I don't.
4      Q.   Do you recall the allegations in that
5   civil suit?
6      A.   I believe it was a witness to like sexual
7   harassment or something like, something like that.
8      Q.   Okay.  Did you actually testify in court?
9      A.   Yes.
10      Q.   Do you know whether you were called by the
11   plaintiff or the defense?
12      A.   The defense.  No, it was the plaintiff.
13      Q.   Okay.  And have you been disciplined on
14   some occasion for bringing contraband into the jail?
15      A.   Yes.
16      Q.   And what was that contraband?
17      A.   A cell phone.
18      Q.   And were you briefly suspended for that?
19      A.   I received five days, but it was with
20   options so.
21      Q.   Did you say "with options"?
22      A.   Yes.
23      Q.   What does with options mean?
24      A.   Basically instead of being suspended, I

Page 54

1    can give them like some time in lieu of being
2    suspension, give some time so I still came to work.
3         Q.   Am I right that you testified that on
4    July 19th, 2020, you were working overtime?
5         A.   Yes.
6         Q.   And is that the time and a half in terms
7    of your pay?
8         A.   Correct.
9         Q.   Okay.  And so you had volunteered to do
10   that time --
11        A.   Yes.
12        Q.   -- to work that shift?
13             And again, I'm sorry.  I'm sometimes
14   cutting you off.  I will try to wait for you to
15   finish your answer before I ask my next question,
16   and if you could do the same.
17             I'm going to show you what I'm going to
18   designate as Bacon Exhibit 1.  Do you see this
19   document?
20        A.   Yes.
21                       (WHEREUPON, Exhibit 1 was
22                       identified.)
23   BY MR. BLEIFUSS PRADOS:
24        Q.   And are you familiar with this document?

Page 55

```
1        A.    It's a policy and procedure.
2        Q.    Do you have a specific recollection of
3   ever seeing this document?
4        A.    I've seen it.
5        Q.    When do you think you saw it last?
6        A.    That I can't remember.
7        Q.    Okay.  And do you think you've seen it
8   because it's the kind of thing that would be
9   e-mailed to you?
10       A.    Yes.
11       Q.    Okay.  Do you have a specific recollection
12  of reviewing this document?
13       A.    No.
14       Q.    Okay.  I'm now turning to the second page
15  of Exhibit 1, and I'm highlighting a section here,
16  Inmates should be restrained during movement based
17  on individual security classification with higher
18  risk inmates in handcuffs, waist chains, and leg
19  irons.  An exception to this procedure is when an
20  inmate has a physical disability where restraint
21  devices may cause injury.
22            Did I read that correctly?
23       A.    Yes.
24       Q.    And are you aware of that exception being
```

Page 56

1   a part of the written policy?

2         A.   Yes.

3         Q.   Have you received any training in how to

4   make an assessment as to whether that exception

5   should apply?

6         A.   No specific training, no.

7         Q.   Could you repeat that answer, please.

8         A.   No specific training, no.

9         Q.   Okay.  I am now showing you what I would

10  designate as Bacon Exhibit 2.  This is policy 709,

11  and the Bates number is Bates 156 on the starting

12  page.

13                      (WHEREUPON, Exhibit 2 was

14                      identified.)

15  BY MR. BLEIFUSS PRADOS:

16        Q.   Is it fair to say that this is also a

17  written policy that may have been e-mailed to you

18  but that you don't recall specifically reviewing?

19        A.   It's possible [audio distortion] yes.

20        Q.   Could you please repeat that answer.

21        A.   Yes.

22        Q.   Okay.  I'm turning now to the third page

23  of this exhibit 709.3.1, Use of Restraints on

24  Disabled Subjects, and I'm looking at these last

1    paragraphs here.  When applying restraints to a

2    disabled inmate, the responsible sworn member shall

3    promptly notify his or her immediate on-duty

4    supervisor.

5             Did I read that correctly?

6        A.   Yes.

7        Q.   Do you recall ever receiving any training

8    on this specific feature of this policy?

9        A.   No.

10       Q.   Okay.  When restraints are used on a

11   disabled inmate, the appropriate incident report

12   shall be completed by the assigned sworn member.

13   The report shall document the totality of the

14   circumstances.

15            Do you recall ever being specifically

16   trained in this feature of this policy?

17       A.   No.

18       Q.   And just to round out this subsection,

19   this is subsection 709.3.1, Use of Restraints on

20   Disabled Subjects, can you take a moment to read

21   this highlighted portion?  First of all, is it large

22   enough for you to read, or would you like me to make

23   it bigger?

24       A.   It's okay.

1      Q.    Is it big enough?

2      A.    Yes.  You want the whole thing?

3      Q.    If you can just read it to yourself and

4   let me know when you're finished reviewing it.

5      A.    Oh, okay.  I'm done.

6      Q.    Okay.  Thanks.  And do you recall

7   specifically receiving any training in the

8   implementation of this subsection of this policy?

9      A.    No.

10     Q.    Meaning the Section 709.3.1?

11     A.    No training, no.

12     Q.    Okay.  And am I right that you testified

13  that you didn't write any report about the

14  handcuffing of Mr. Johnson; correct?

15     A.    Correct.

16     Q.    And you didn't discuss the handcuffing of

17  Mr. Johnson with any other sheriff's personnel;

18  correct?

19     A.    Correct.

20     Q.    Okay.  I'm going to stop sharing.

21           I'm now sharing with you what we'll call

22  Bacon Exhibit 3.

23                      (WHEREUPON, Exhibit 3 was

24                       identified.)

```
                                                      Page 59

 1   BY MR. BLEIFUSS PRADOS:

 2        Q.    Can you see this document?

 3        A.    Yes.

 4        Q.    Have you ever seen this document before?

 5        A.    Yesterday.

 6        Q.    Okay.  So you saw this document in

 7   preparation for this deposition?

 8        A.    Yes.

 9        Q.    And prior to yesterday, had you never seen

10   this before?

11        A.    No.

12        Q.    Okay.  And is this an inmate grievance

13   form?

14        A.    Yes.

15        Q.    I'm going to enlarge it a little bit.  Now

16   I don't think I really can.

17              Are you able to read the narrative

18   portion --

19        A.    Yes.

20        Q.    -- of this?

21        A.    Yes.

22        Q.    It appears to say.

23                        On Sunday, visiting day, I was

24        called from my unit.  I went out the door
```

Page 60

1      waiting.  Was Officer Bacon.  He see that I was

2      on a cane.  I told him I don't get cuffed up

3      because the cane.  He said that I would be

4      cuffed up today.  I had a hard time walking,

5      and the cuffs was digging down into my wrist

6      and I was sweating there and on the way back.

7      And I told him that the cuffs hurting and I'm

8      in a lot of pain.  And he stopped and looked

9      and turned around and said keep walking.  I was

10     sweating so bad, the mask was wet.  I asked can

11     I pull it down or get another one out.  He said

12     no.  I was short of breath.

13          You don't recall him saying anything like

14  that to you on the 19th of July --

15     A.   No.

16     Q.   -- 2020?

17     A.   No.

18     Q.   Okay.  Do you recognize -- the signatures

19  at the bottom, those would be by sheriff's

20  personnel; is that correct?

21     A.   That I don't remember.  I'm not sure.

22     Q.   You're not sure?

23     A.   No.

24     Q.   Do you --

Page 61

1      A.    -- civilian.

2      Q.    I'm sorry, I couldn't hear you.

3      A.    I thought it was a civilian because I

4    don't see no badge number.

5      Q.    So do you -- are you involved ever in

6    processing these grievance forms, or is that not

7    something you do?

8      A.    No, I do not.

9      Q.    And you don't recall ever being asked

10   about these allegations in the year 2020?

11     A.    No.

12     Q.    Have you ever been convicted of any

13   crimes?

14     A.    No.

15     Q.    Have you ever discussed this lawsuit with

16   any other sheriff's personnel?

17     A.    No.

18           MR. BLEIFUSS PRADOS:  All right.  I don't

19   think I have very many more questions, but I ask

20   that we take another ten-minute break and like

21   hopefully that will be it for me.  Thank you so much

22   for your patience.  Again, I think it's a miracle

23   that you can't hear the cacophony that's going on

24   around me because it's nightmarish.

```
1              If we can go off the record, please.

2                        (WHEREUPON, a short break was

3                        taken.)

4              MR. BLEIFUSS PRADOS:  Can we go back on

5    the record.

6    BY MR. BLEIFUSS PRADOS:

7         Q.   All right.  I showed you, Officer Bacon, a

8    couple of policies which were Bacon Exhibits 1 and

9    2.  How, in general, do you receive information

10   about sheriff's policies?  Is it through e-mail?

11        A.   Yeah, through e-mail.

12        Q.   Okay.  And when policies come out, are

13   there special trainings for those policies or is

14   that wrapped up into the yearly training?

15        A.   Basically just, no, the yearly training.

16   Policies come through the e-mail and basically just

17   going to read them, acknowledge.

18        Q.   I'm sorry.  Can we repeat that again.

19   It's my fault.  It's just the environment is very

20   loud here.

21        A.   Basically when the policies come through

22   e-mail, it's a policy or update on a policy,

23   basically we get e-mail.  And it's up to us, we read

24   the e-mail.  Then we have to acknowledge that we got
```

Page 63

1   it and read it.

2       Q.   Okay.  And how do you acknowledge you

3   received the e-mail?

4       A.   On the e-mail at the bottom of it, it has

5   a little button that says acknowledge.

6       Q.   Okay.  Acknowledge that you received it?

7       A.   Yes.

8       Q.   Okay.  And is there any way they verify

9   that you've read the e-mail?

10      A.   No.

11      Q.   During COVID, were you receiving your

12  annual trainings?

13      A.   Yes.

14      Q.   How were they done?  How were they

15  conducted?

16      A.   Basically a couple of time I believe some

17  of it was on computer, like a message of training

18  that you get.  And when you have to requalify with

19  your weapon, of course you have to go back to the

20  academy and stuff.

21      Q.   Do you recall in 2020 when your training

22  happened?

23      A.   I don't recall the exact month.

24      Q.   Is it generally the same month every year?

Page 64

1      A.   No, it can change up.

2      Q.   And again, when you verify that you've

3  received an e-mail, is that -- that alerts the

4  sheriff to the fact that you opened the e-mail?  If

5  you know, is that how it works?

6      A.   That I don't know.

7      Q.   Are policies, do they come to you as

8  attachments to the e-mail?

9      A.   No.  It just come to us with the e-mail,

10  it's all the employees.

11      Q.   And then you check to mark that you have

12  received the e-mail; correct?

13      A.   Right.  Once you get the policies, you

14  check -- there's a button that says acknowledge, and

15  you acknowledge that you read it because you have to

16  go through it first before you acknowledge.

17      Q.   Okay.  And is there any way they can prove

18  that you've read it when you mark that check mark?

19      A.   No.

20      Q.   Okay.  Is the policies, do they come as

21  just one big document or are they in different

22  chapters or segments?

23      A.   I guess it's different segments or

24  whatever.  Depends on, you know, what the policy is

Page 65

1    about obtained so.

2         Q.    And then the check mark box is at the

3    bottom of the screen and you check it to indicate

4    that you've received it?

5         A.    Yes.

6         Q.    And again, it's your testimony that you've

7    never seen an inmate transported between divisions

8    without handcuffs apart from pregnant women?

9         A.    Between divisions?

10        Q.    Yes.

11        A.    No.

12        Q.    And at these annual trainings, are you

13   shown written policies, or is it related to you

14   orally, the policies related to you orally?

15        A.    At the trainings?

16        Q.    Yes.

17        A.    No.  They might be related to us orally,

18   but mostly it's just through e-mails.

19        Q.    Okay.  So most of your education on

20   sheriff's policies comes through e-mail?

21        A.    Yes.

22             MR. BLEIFUSS PRADOS:  I have no further

23   questions.

24             MR. STILLMAN:  I got a couple.

1                    EXAMINATION

2    BY MR. STILLMAN:

3        Q.   Do you recall plaintiff ever falling while

4    you were taking him either to or from the yard for

5    the visit?

6        A.   Say that again.  Did you say "falling"?

7        Q.   Falling, falling down the stairs?

8        A.   No.

9        Q.   Do you recall him struggling in any

10   capacity such that it, like, gave you pause during

11   the journey back to or from?

12       A.   No.

13       Q.   Did Johnson ever ask you about any issues

14   with his mask or replacing his mask?

15       A.   No.

16       Q.   Did he ever request that you help him

17   remove his mask or that he could remove his mask?

18       A.   No.

19       Q.   Would anything have stopped him from being

20   able to move his mask down himself?

21       A.   No.

22       Q.   And he never indicated anything to you

23   that his mask was wet or soaked through?

24       A.   No.

Page 67

1     Q.    Did he ever indicate he was having trouble

2  breathing to you?

3     A.    No.

4     Q.    Would you consider yourself qualified

5  enough to recognize the signs of an asthma attack?

6     A.    No.

7     Q.    Did he ever mention anything about asthma

8  or suffering from asthma or having an asthma attack?

9     A.    No.

10     Q.    Was there ever -- did it occur that you

11  allowed him to do an emergency -- scratch that.

12          Did you ever emergency uncuff him to allow

13  him to medicate himself?

14     A.    No.

15     Q.    But you did take the elevator during the

16  journey back?

17     A.    Yes.

18          MR. STILLMAN:  All right.  No further

19  questions.

20          MR. O'CONNOR:  I have no additional

21  questions.

22          MR. BLEIFUSS PRADOS:  Just one question

23  based on the circumstances of the trek between the

24  divisions.

Page 68

```
 1                    FURTHER EXAMINATION
 2    BY MR. BLEIFUSS PRADOS:
 3        Q.    Did it occur to you that it might be
 4    difficult for a person to walk with a cane while
 5    being handcuffed when you were escorting
 6    Mr. Johnson?
 7        A.    No.
 8              MR. BLEIFUSS PRADOS:  Okay.  I have
 9    nothing else.
10              MR. STILLMAN:  That's it.
11              MR. BLEIFUSS PRADOS:  So I guess the
12    client, your client, Zachary, can decide whether to
13    waive signature.
14              MR. STILLMAN:  Yeah.  Antwaun, would you
15    like to review it, or are you okay just with what
16    you've said today.
17              THE WITNESS:  I'm okay.
18              MR. STILLMAN:  You'll waive?
19              THE WITNESS:  Yeah.
20              MR. STILLMAN:  So we'll waive.
21              THE COURT REPORTER:  Are you ordering at
22    this time?
23              MR. BLEIFUSS PRADOS:  I'm not ordering it
24    right now.  Can I have -- should I reach out to
```

```
                                          Page 69
 1   Veritext if and when I order?  We can off go off the
 2   record.
 3                        (Signature waived.)
 4                        (WHEREUPON, at 12:19 P.M. the
 5                        deposition was concluded.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 70

1                    CERTIFICATE

2                         OF

3          CERTIFIED SHORTHAND REPORTER

4

5          I, RHONDA K. WEILAND, a Certified

6    Shorthand Reporter of the State of Illinois, CSR

7    License No. 084-004438, do hereby certify:

8          That previous to the commencement of the

9    examination of the aforesaid witness, the witness

10   was duly sworn by me to testify the whole truth

11   concerning the matters herein;

12         That the foregoing deposition transcript

13   was stenographically reported by me and was

14   thereafter reduced to typewriting under my personal

15   direction and constitutes a true and accurate record

16   of the testimony given and the proceedings had at

17   the aforesaid deposition;

18         That the said deposition was taken before

19   me at the time and place specified;

20         That I am not a relative or employee or

21   attorney or counsel for any of the parties herein,

22   nor a relative or employee of such attorney or

23   counsel for any of the parties hereto, nor am I

24   interested directly or indirectly in the outcome of

Page 71

1   this action.

2           IN WITNESS WHEREOF, I do hereunto set my

3   hand at Chicago, Illinois, this 11th day of April,

4   2024.

5

6   _____

    RHONDA K. WEILAND, CSR

7   License No. 084-004438

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**[03718 - answer]**                                              Page 1

**0**

**03718**  1:5
**0545**  10:11
**084-004438**
  70:7 71:7

**1**

**1**  3:12 13:11,13
  13:17 14:2,11
  18:22 19:6
  22:12 24:12,13
  25:8,14 27:4
  28:11 30:12
  47:2 54:18,21
  55:15 62:8
**10**  21:8
**10:32**  1:16
**11**  7:20 8:2,24
  9:5
**111**  2:2
**11th**  71:3
**12:19**  69:4
**1400**  10:15
**14th**  1:16 3:2
**15**  30:5
**156**  56:11
**1611**  2:2
**16th**  37:10
**1711**  71:5
**17th**  37:8
**18th**  37:5
**1999**  6:21
**19th**  13:1,2
  14:10 15:5
  34:15 35:14
  37:13 43:6,21

54:4 60:14

**2**

**2**  3:13 56:10,13
  62:9
**20**  30:5 35:19
**2019**  9:7
**2020**  9:7,8 10:8
  13:1,2,9 14:10
  15:5 26:3
  34:15 35:15,21
  37:13 43:7,21
  45:17 54:4
  60:16 61:10
  63:21
**2024**  1:17 3:2
  10:7 71:4
**20th**  36:20 37:2
**22**  1:5
**230**  2:13,13
**25**  30:6
**2nd**  6:21

**3**

**3**  3:14 58:22,23
**300-4479**  2:15
**312**  2:9,15

**4**

**4**  3:6

**5**

**50**  2:7 35:22
**500**  2:7
**54**  3:12
**56**  3:13
**59**  3:14

**5:45**  10:12

**6**

**603-1880**  2:9
**60602**  2:3,8
**60606**  2:14
**641-4667**  2:4
**66**  3:7
**68**  3:8

**7**

**709**  56:10
**709.3.1**  56:23
  57:19 58:10
**773**  2:4

**8**

**8**  13:20,21,23
  15:6 19:6
  31:10,19 32:21
  47:2

**a**

**a.m.**  1:16
**able**  50:1,3
  59:17 66:20
**ableifuss**  2:4
**above**  19:10,11
**academy**  38:11
  38:12 63:20
**accurate**  70:15
**acknowledge**
  62:17,24 63:2
  63:5,6 64:14
  64:15,16
**action**  71:1
**actual**  24:14

**actually**  32:20
  33:11,19 44:17
  44:20 53:8
**additional**  18:1
  39:16 67:20
**adjust**  16:24
**adjusted**  16:22
**adjusting**  43:10
**administering**
  4:4
**adrian**  2:3
**affairs**  44:19
**aforesaid**  70:9
  70:17
**agency**  8:16
**ago**  8:19 51:21
**agree**  4:2,11
**agreement**  4:6
**agrees**  4:9,10
**ahead**  9:1
  14:22 27:13
**alert**  48:15,18
**alerted**  48:2
**alerts**  64:3
**allegations**
  53:4 61:10
**alleged**  52:4
**allow**  67:12
**allowed**  67:11
**annual**  63:12
  65:12
**answer**  5:19
  6:15 11:15
  33:20 36:2
  42:19 49:4

50:12 52:10
54:15 56:7,20
**antwaun** 1:7,11
2:16 3:3,10
4:13,19 68:14
**apart** 8:16
45:10 51:18
52:8 65:8
**apologize** 14:20
38:4
**appear** 23:20
**appeared** 2:5
2:10,16
**appears** 59:22
**applied** 17:23
20:3
**apply** 17:3
45:22 50:8,11
56:5
**applying** 38:15
39:17 45:15
57:1
**appointment**
41:5
**appropriate**
46:3,4 57:11
**april** 71:3
**area** 25:8,10,11
27:4,7
**armed** 8:12
**arms** 39:6
**asked** 15:20
19:22 43:20
60:10 61:9

**asking** 46:17
**assessment**
56:4
**assign** 14:18
29:3
**assigned** 7:23
12:8,21,22
13:1,7,15
14:10,14 28:21
28:23 31:12,19
32:24 33:15
34:6,8,11
36:12 40:23
41:1,1,5 57:12
**assignment**
11:22 12:2,4
12:23 13:5,16
14:13,24 22:23
36:4 37:19,20
40:23
**assume** 6:5
31:17 32:10
37:7 49:16
**asthma** 67:5,7
67:8,8
**attachments**
64:8
**attack** 40:3
67:5,8
**attained** 6:22
**attend** 8:8
**attorney** 3:5
4:7 70:21,22
**attorney's** 2:6

**audio** 14:4
56:19
**available** 11:18
**average** 40:22
**aware** 35:4
43:10 50:20,22
51:6 55:24

**b**

**b** 4:20
**back** 13:14,17
30:11,11,16,18
30:24 31:10,13
31:15,20,22
32:2,21,23,24
33:2,3,6,12,16
33:18,19,21,22
33:23 34:2,4,4
34:5,20 36:12
36:21 41:12
47:16 60:6
62:4 63:19
66:11 67:16
**backpacks** 11:9
11:13,16
**bacon** 1:7,11
2:16 3:3,10
4:10,13,19,19
54:18 56:10
58:22 60:1
62:7,8
**bad** 60:10
**badge** 61:4
**bar** 44:7
**baseball** 27:12
27:14,16,18

**based** 55:16
67:23
**basic** 5:12
**basically** 5:3
7:22,23 25:1
28:19 30:10,24
32:23 33:5
34:3 36:14
39:5,23 49:22
51:10 53:24
62:15,16,21,23
63:16
**bates** 56:11,11
**began** 38:4
**beginning** 4:7
51:24 52:1
**behalf** 2:5,10
2:16
**believe** 20:6,7
22:9 23:14
24:11 26:24
28:2 35:8 44:9
53:6 63:16
**belongs** 44:6
**big** 27:10,11,15
27:17 58:1
64:21
**bigger** 27:12,14
57:23
**binding** 4:4
**bit** 18:20 59:15
**bleifuss** 2:3 3:6
3:8 4:8,16 41:8
41:12,14 42:17
42:20,23 47:8

**[bleifuss - complaining]**

47:16,19 54:23
56:15 59:1
61:18 62:4,6
65:22 67:22
68:2,8,11,23
**block** 14:6,7
**blocks** 22:16
**blue** 38:22,24
39:2,2,4,4,6,7
42:8
**board** 51:13
**boot** 10:24
**bottom** 60:19
63:4 65:3
**boulevard** 2:2
2:7
**box** 38:22,24
39:2,3,4,6,7
42:8 65:2
**boxing** 39:4
**break** 6:9,10
47:10,14 61:20
62:2
**breath** 60:12
**breathing** 67:2
**briefly** 53:18
**bring** 28:19
39:7
**bringing** 53:14
**building** 28:11
**bulletin** 51:12
**business** 36:1
**button** 63:5
64:14

**c**

**c** 4:20 41:22,22
41:22
**cacophony**
61:23
**california**
10:18
**call** 12:1,1,3
46:2 49:19
58:21
**called** 19:1
39:19 53:10
59:24
**calumet** 8:9
**camp** 10:24
**cane** 15:14
21:12 43:19,22
44:4,4,6,15
47:5 60:2,3
68:4
**canes** 22:5
43:11,12,17
**capacity** 1:7
7:9 66:10
**car** 12:18
**career** 7:17
39:14 47:23
49:6 51:24
52:2
**carry** 16:10
**case** 9:18,19
**cause** 55:21
**ccdoc** 1:7
**cell** 53:17

**cement** 23:14
**center** 25:12
**certain** 17:20
43:15
**certificate** 70:1
**certified** 70:3,5
**certify** 70:7
**chain** 39:5,8
42:8
**chains** 55:18
**chainsaw** 38:5
**change** 64:1
**changed** 45:16
**changes** 11:8
**chapters** 64:22
**check** 49:14
64:11,14,18
65:2,3
**checking** 44:14
**checks** 33:5
**chest** 39:8
**chicago** 2:3,8
2:14 71:3
**choose** 17:2
**circle** 16:16
**circumstances**
57:14 67:23
**circus** 47:11
**city** 38:5
**civil** 1:14 51:18
52:9,12,20,21
52:23 53:2,5
**civilian** 61:1,3
**classification**
55:17

**clean** 5:23
**clear** 11:9
**clearing** 9:4
**clearly** 50:13
**click** 17:17,24
**clicks** 17:21
**client** 68:12,12
**clinical** 42:2
**close** 51:24
**code** 44:7
**college** 8:10
**color** 23:16
**come** 7:1 14:18
15:18 33:2
49:13 62:12,16
62:21 64:7,9
64:20
**comes** 39:3
65:20
**coming** 11:8
**commencem...**
70:8
**commencing**
1:15
**comment** 45:6
**communicated**
48:2
**complain** 24:1
25:21 36:13
**complained**
32:3,6,9,11,15
44:24 45:4
**complaining**
32:1

**[complaint - destination]** Page 4

**complaint** 9:24
10:4
**completed** 5:18
57:12
**complex** 10:17
**computer**
63:17
**concerning**
70:11
**concluded** 69:5
**concurrent**
8:20
**conducted**
63:15
**confusing** 6:4
**connected** 19:6
**consider** 67:4
**consist** 36:4
**constitutes**
70:15
**contraband**
53:14,16
**conversation**
5:17 15:17
**convicted**
61:12
**cook** 1:6,7 2:6
2:10,10 4:21
7:9 12:18
38:17 50:17
**cookcountys...**
2:9
**corporation**
1:8

**correct** 13:24
15:2 16:23
17:5,6 23:8
28:12,13 30:13
30:17 32:13
33:8,20 35:6
37:13 41:18
45:3,8 48:17
54:8 58:14,15
58:18,19 60:20
64:12
**correctional**
7:23 11:19
**correctly** 15:11
16:23 55:22
57:5
**coughing** 9:4
**counsel** 4:2
70:21,23
**county** 1:6,8
2:6,10,11 4:22
7:9 12:18
38:17 50:17
**couple** 21:7
25:16 62:8
63:16 65:24
**course** 39:22,24
44:19 63:19
**court** 1:1,14
4:1 5:22 6:17
53:8 68:21
**covid** 26:5
63:11
**coworkers** 31:1

**crew** 38:5
**crimes** 61:13
**csr** 1:12 70:6
71:6
**cuffed** 60:2,4
**cuffs** 16:15
32:1 60:5,7
**currently** 4:21
**custody** 19:1,4
41:23,24
**cut** 40:12
**cutting** 38:5
54:14
**cv** 1:5

**d**

**dark** 23:16
**dart** 1:6 2:10
**day** 1:16 11:23
12:8 14:15,18
31:7 33:14
35:14 36:3,11
36:14,15,20,23
37:5,17,21,24
45:12,17 59:23
71:3
**days** 12:10
34:15 40:12,14
53:19
**decide** 17:3
30:7 68:12
**defendant** 2:10
2:16 4:10
51:17 52:9,14
52:15

**defendants** 1:9
**defense** 40:1,2
53:11,12
**degree** 24:23
**department**
6:20
**dependent**
30:10,15
**depending**
16:22
**depends** 11:14
13:4 14:13
36:1 43:3
64:24
**deposed** 5:7
**deposition** 1:11
4:3 5:9 9:14,22
51:3 59:7 69:5
70:12,17,18
**depositions**
1:15
**describe** 16:12
17:14 23:12
27:24 38:23
**described** 10:4
**description**
3:11
**designate** 54:18
56:10
**designated**
21:15
**desk** 11:5
**destination**
12:3

**[detail - ex]**                                                    Page 5

| | | | |
|---|---|---|---|
| **detail** 16:13 | **discretion** | **document** | **elevator** 19:16 |
| **detained** 7:14 | 45:14,21,24 | 54:19,24 55:3 | 67:15 |
| 38:16 43:16 | **discuss** 20:11 | 55:12 57:13 | **elevators** 20:22 |
| **detainee** 24:6 | 34:10 58:16 | 59:2,4,6 64:21 | **emergency** |
| 50:16,18 52:6 | **discussed** 61:15 | **documents** | 67:11,12 |
| **detainees** 7:24 | **discussing** 31:6 | 9:21 | **employed** 4:21 |
| 12:16 19:2 | **discussion** | **doing** 5:13 6:14 | **employee** 7:10 |
| 26:8,18 30:22 | 41:11 | 11:23 14:16 | 52:13 70:20,22 |
| 35:8,9 36:5 | **distinctive** | 18:12 37:13 | **employees** |
| 38:9 43:11 | 37:17 45:11 | **door** 59:24 | 64:10 |
| 45:16 | **distortion** 14:4 | **douglas** 1:3 | **encountered** |
| **determine** 49:9 | 56:19 | 13:8 15:5 43:6 | 19:8 |
| **device** 16:17 | **district** 1:1,1 | **drive** 12:20,23 | **enforcement** |
| **devices** 55:21 | 1:14 | **drivers** 12:21 | 8:16 |
| **devore** 2:12 | **division** 7:20 | **duly** 4:14 70:10 | **enlarge** 59:15 |
| **devoreraduns...** | 8:2,24 9:5 | **duties** 7:21 | **enter** 6:23 |
| 2:15 | 13:11,13,15,17 | 10:6,8 13:12 | **entire** 7:17 |
| **different** 11:16 | 13:17,20,21,23 | 37:1,4,23 38:2 | 44:22,22 |
| 11:18 14:14,17 | 13:23 14:2,3 | **duty** 15:1 57:3 | **environment** |
| 16:3,5 38:16 | 14:11,12 15:6 | **dvorak** 2:1 | 62:19 |
| 64:21,23 | 18:22,22 19:6 | | **escort** 28:10 |
| **difficult** 68:4 | 19:6 22:12 | **e** | 30:14 |
| **difficulty** 23:20 | 24:12,13,14 | **e** 51:8,8,9,10 | **escort's** 30:11 |
| 26:1 | 25:8,14 27:4 | 55:9 56:17 | **escorted** 22:21 |
| **digging** 60:5 | 28:11 30:12 | 62:10,11,16,22 | **escorting** 30:16 |
| **direction** 22:10 | 31:10,13,19 | 62:23,24 63:3 | 32:14 68:5 |
| 22:14 70:15 | 32:21 33:15 | 63:4,9 64:3,4,8 | **estimate** 21:6 |
| **directly** 70:24 | 46:23 47:2,2 | 64:9,12 65:18 | 22:20 24:23 |
| **disabilities** | **divisions** 13:10 | 65:20 | 35:15 |
| 22:5 | 18:18 24:6 | **earlier** 33:10 | **event** 20:17 |
| **disability** 55:20 | 31:2 42:13 | **easier** 6:17 | 29:20 30:1 |
| **disabled** 56:24 | 43:2 46:18,22 | **easy** 5:14 | **everybody** |
| 57:2,11,20 | 65:7,9 67:24 | **education** 8:10 | 31:12 |
| **disciplined** | **doctor's** 41:5 | 65:19 | **ex** 8:3 13:5 |
| 50:15 53:13 | 42:2 | **either** 9:7 16:21 | |
| | | 66:4 | |

**[exact - grassy]** Page 6

| | | | |
|---|---|---|---|
| **exact** 51:22 | 34:23 42:14 | **finished** 58:4 | **g** |
| 63:23 | 48:16 56:16 | **first** 4:14 6:19 | |
| **exactly** 49:24 | **falling** 66:3,6,7 | 6:23 7:1,19,20 | **gauge** 17:7 |
| **examination** | 66:7 | 10:16 15:4,8 | **general** 62:9 |
| 3:4 4:15 66:1 | **familiar** 16:4 | 19:8 26:13 | **generally** 63:24 |
| 68:1 70:9 | 54:24 | 34:20 38:3,4,7 | **getting** 9:11 |
| **exception** | **family** 28:21,23 | 38:10 45:14 | **give** 14:15,17 |
| 55:19,24 56:4 | **far** 6:14 14:2 | 57:21 64:16 | 33:4 54:1,2 |
| **exchanged** | 21:3 22:13 | **five** 8:19 53:19 | **given** 11:22 |
| 15:16 | 24:4 32:23 | **floor** 23:13 | 35:21 70:16 |
| **exhibit** 3:12,13 | 48:14,23 | **following** 34:15 | **giving** 34:5 |
| 3:14 54:18,21 | **fastened** 17:4 | 34:18 36:20,23 | **gmail.com** 2:4 |
| 55:15 56:10,13 | **fault** 62:19 | **follows** 4:14 | **go** 9:1 12:3,10 |
| 56:23 58:22,23 | **feature** 57:8,16 | **forces** 8:13 | 12:13 14:22 |
| **exhibits** 3:9,16 | **february** 1:16 | **foregoing** | 16:15 20:23 |
| 62:8 | 3:2 | 70:12 | 22:23 24:10 |
| **expected** 26:7 | **federal** 1:13 | **form** 59:13 | 25:14 27:13 |
| 26:13,14,17,18 | **feet** 21:6,7,8 | **forms** 61:6 | 28:3,15,22 |
| **explain** 5:12 | 22:18 | **forth** 30:12,17 | 29:3 30:16 |
| 25:10 37:16 | **felt** 49:12 | 30:18 36:12 | 33:3,6 38:11 |
| 45:24 | **female** 48:23 | **four** 25:19 | 39:19,20 40:7 |
| **external** 5:2 | **fewer** 21:8 | **free** 28:15 | 40:11 41:8,12 |
| 7:16 8:3 9:6,9 | **field** 27:14,16 | **frequently** | 42:1 47:12 |
| 10:6 12:5 | 27:18,20 | 20:15 36:7 | 62:1,4 63:19 |
| 36:22 37:20,23 | **figure** 36:7 | 40:19 | 64:16 69:1 |
| 40:24 | 37:15 | **fro** 12:16 40:18 | **goes** 39:7 |
| **extra** 50:6 | **filed** 51:20 | **front** 11:3 | **going** 25:1,3,4 |
| **eye** 31:22 33:11 | **filing** 34:21 | **full** 4:18 7:3,6 | 30:24 54:17,17 |
| **f** | **finger** 49:14,14 | **function** 41:19 | 58:20 59:15 |
| | 49:15 50:1 | **further** 3:8 | 61:23 62:17 |
| **facilities** 7:8 | **fingers** 17:10 | 65:22 67:18 | **good** 4:17 5:13 |
| **facility** 11:2 | 17:15 18:8 | 68:1 | 6:14 23:2,8 |
| **fact** 33:17 64:4 | 49:17,23 50:3 | | **graduated** 8:5 |
| **fair** 23:1,7 24:4 | **finish** 54:15 | | **grass** 28:4 |
| 26:4 29:18,23 | | | **grassy** 27:23 |
| 31:24 32:11,22 | | | |

**grievance** 35:1
35:5 59:12
61:6
**ground** 5:12
25:8
**guard** 8:18
**guards** 8:17
**guess** 16:5
18:16 33:5
43:4 52:21
64:23 68:11
**gun** 11:4

**h**

**half** 54:6
**hallway** 11:4
15:6,10,18
23:2,18,21
24:8 26:10
**hallways** 26:19
**hand** 71:3
**handcuff** 15:19
15:20 16:8,17
16:18 17:11
19:22 42:8
45:8 48:4 50:2
50:4,6
**handcuffed**
15:22 17:8
19:23 20:1
46:6 47:6 49:1
68:5
**handcuffing**
20:11 34:14
40:5 51:14,15
58:14,16

**handcuffs**
15:24 16:1,4,5
16:10,12,14,21
17:3,9,16,17,24
18:9 20:3,8
24:2 25:22
32:7,16,19
34:11 36:14
38:21 39:5
44:24 45:7,23
46:2,11,19,20
47:2,3,21,24
48:1,3,11,16
49:7,12,20
50:9 55:18
65:8
**happen** 46:21
**happened**
18:15 31:18
40:15 63:22
**happens** 24:9
28:18
**harassment**
53:7
**hard** 60:4
**head** 6:16
22:11 30:19
**hear** 5:14 14:5
15:10 17:21
34:13,17 38:5
45:19 50:13
61:2,23
**held** 41:11
**help** 5:22 66:16

**hereto** 70:23
**hereunto** 71:2
**high** 8:5,8,9
39:10
**higher** 55:17
**highlighted**
57:21
**highlighting**
55:15
**hill** 24:13,15
**hired** 6:19 38:7
38:10
**history** 33:18
**hit** 16:18,24
**hopefully** 61:21
**hospital** 12:8,9
12:13,17 40:18
41:1,2,2,6,17
**hospitals** 5:4
7:12,14 12:7
**hour** 47:9
**housing** 30:12
**huh** 6:16 13:22
14:21 24:21
35:12
**human** 5:16
**hundred** 22:18
**hurting** 60:7

**i**

**identified**
54:22 56:14
58:24
**iic** 21:15 28:22
35:11 40:6
41:23 42:1

43:3 45:23
46:5 47:20
48:4,8 49:11
50:9
**iics** 7:24 13:14
13:16 18:21,23
19:3 35:10,13
38:9 41:4,20
43:1,11,15
45:16 48:24
49:2
**illinois** 1:1 2:3
2:8,14 70:6
71:3
**immediate** 57:3
**implementati...**
58:8
**important** 5:17
6:15
**incident** 35:2
57:11
**incidents** 10:4
**incredible**
47:11
**index** 3:1
**indicate** 65:3
67:1
**indicated** 66:22
**indicating** 39:6
**indirectly**
70:24
**individual** 17:8
19:1,3,3 55:17
**individuals**
41:23,24

**infield** 27:15,17
**influence** 47:5
**information**
62:9
**initially** 15:17
17:3
**injured** 50:9,10
**injury** 55:21
**inmate** 30:7,10
48:19 55:20
57:2,11 59:12
65:7
**inmates** 12:15
19:2 25:11
26:17 33:13
35:7,9 55:16
55:18
**insert** 17:11,15
**inside** 41:17
46:22,23
**instructed**
28:22
**interacted** 13:8
**interaction**
44:23 45:12
**interactions**
36:9
**interested**
70:24
**interrupted**
14:19
**investigation**
34:24
**involve** 7:13

**involved** 61:5
**irons** 55:19
**issues** 66:13

### j

**jail** 5:4 7:9,14
10:17 11:7,17
11:19 12:16
15:23 16:1,7
36:1 38:17
40:18 42:13
43:2 50:17
53:14
**james** 2:8
**james.oconnor**
2:9
**job** 5:13 6:14
8:22 14:10
32:14
**johnson** 1:3
13:8 15:5
17:24 19:9,18
20:11 21:11
23:18 24:1
25:21 29:6
31:6,10 34:14
35:1 36:9
43:21 44:23
45:12 58:14,17
66:13 68:6
**johnson's** 43:6
**journey** 66:11
67:16
**judgment** 46:2
49:19

**july** 9:8 10:8
13:1,2,9 14:10
15:5 34:15
35:14,21 36:20
37:2,5,13 43:6
43:21 54:4
60:14
**jump** 5:14,17

### k

**k** 1:12 70:5
71:6
**keep** 60:9
**kind** 33:5 41:19
42:5 46:1
48:19 55:8
**kinds** 38:16
**know** 5:15
10:23 11:14,16
11:22 12:6
13:6 14:6
17:11 22:15,17
22:23 24:24
27:17 31:5
32:15 36:2,19
37:3 39:23
40:13 43:5
44:5 48:1,14
49:12 50:5,7
51:8 53:10
58:4 64:5,6,24
**knowledge**
51:16

### l

**large** 57:21
**law** 2:1 8:15
**lawsuit** 10:1
13:9 34:21
51:18,20 52:5
61:15
**lawyer** 5:15
9:12,13,19
**learn** 39:23
**leave** 12:2
49:18
**leg** 38:21 42:7
55:18
**level** 19:9,10,13
20:14,23 25:8
43:3,6
**levels** 25:5
**license** 70:7
71:7
**lieu** 54:1
**line** 18:21
**lined** 18:17
29:2
**little** 16:16,18
17:1 18:19
24:13 39:2
49:12,16 59:15
63:5
**llc** 2:1,12
**lockers** 11:1,4
11:18
**long** 30:3,8
40:8

**longer** 19:2
**look** 23:4,12
  44:11,12
**looked** 29:12
  60:8
**looking** 17:21
  56:24
**looks** 23:3,13
**loose** 16:21
  18:8
**loosely** 17:4
**loosen** 49:17
**loosened** 49:6
**lot** 11:8 60:8
**loud** 62:20
**lower** 20:23
  42:24

**m**

**made** 23:14
  45:6
**mail** 51:8,8,9
  62:10,11,16,22
  62:23,24 63:3
  63:4,9 64:3,4,8
  64:9,12 65:20
**mailed** 55:9
  56:17
**mails** 51:10
  65:18
**make** 5:20 6:1
  6:7,12,17
  24:11 49:20
  56:4 57:22
**making** 46:2

**male** 49:2
**march** 6:21
**mark** 47:9
  64:11,18,18
  65:2
**mask** 26:11
  60:10 66:14,14
  66:17,17,20,23
**masking** 26:8
**masks** 26:8,14
  26:18 27:1
**matter** 22:16
**matters** 70:11
**mean** 9:17
  18:24 24:16,18
  25:9 45:24
  46:1 49:24
  53:23
**meaning** 58:10
**measure** 18:1
**medical** 13:23
  14:3,12
**medicate** 67:13
**meet** 25:11
**meeting** 25:7,7
  25:9,10 30:22
**member** 8:12
  57:2,12
**memorable**
  45:11
**memory** 9:15
  9:16 44:18
**mention** 67:7
**message** 63:17

**met** 9:18
**metal** 16:14
  39:3
**method** 39:10
  42:9,13 43:1
**mhtc** 10:19,21
  10:22 11:21,24
  12:11
**middle** 39:3,7
**milk** 52:7
**mind** 29:21
  30:1 34:21
**mind's** 31:22
  33:11
**minute** 47:9
  61:20
**minutes** 30:5,5
  47:13
**miracle** 61:22
**moment** 57:20
**monroe** 2:13
**month** 63:23,24
**morning** 4:17
  13:6
**move** 8:24 9:5
  16:19 17:13
  66:20
**moved** 17:1
  23:18,21 35:13
  35:22 46:5
**movement**
  32:18 55:16
**municipal** 1:8

**n**

**n** 4:19,19,20
**name** 4:18 44:5
  44:13
**names** 53:1
**narrative** 59:17
**narrow** 52:11
**natural** 5:16
**needs** 48:19
**never** 32:3
  44:23 45:4
  47:1,1,23 49:5
  59:9 65:7
  66:22
**nightmarish**
  61:24
**nodding** 6:16
  30:19
**nope** 23:22
**normal** 36:4
  37:19 44:19
**normally** 13:4
  17:9 36:15
  37:18 40:10
  48:4
**north** 22:11,11
**northern** 1:1
**notify** 48:5
  57:3
**number** 3:11
  17:21 44:13
  56:11 61:4

**[o - part]** Page 10

**o**

**o** 4:20
**o'clock** 1:16
**o'connor** 2:8
  4:11 42:15,19
  67:20
**oath** 4:4
**objection** 4:3
  42:15,18
**observe** 23:17
**observed** 46:7
  46:10,17
**observing** 29:5
**obtained** 65:1
**occasion** 53:14
**occur** 67:10
  68:3
**occurrence**
  36:10
**office** 2:6 5:1
  7:17 8:16,21
  20:4 38:8,13
  39:16,19 41:4
  41:7,15,16
  42:1,2
**officer** 1:7 4:3
  5:6 6:23 7:4,6
  7:22,23 11:5
  20:6,7 28:20
  33:1,4,5 34:6,8
  34:11 47:20
  60:1 62:7
**officers** 29:2
**offices** 2:1

**official** 1:6
**oh** 58:5
**okay** 6:17 7:3
  8:20,21 9:21
  10:3,14 11:7
  11:12 12:10,15
  12:20,24 13:12
  14:2,9 15:13
  15:24 16:3,9
  16:12 17:7,17
  17:20 18:3,7
  18:11,15,23
  19:5,8,12,15,17
  21:3,6,11,14,17
  21:20,24 22:4
  22:10,13,20
  23:10,11 24:1
  24:4,8,15,22
  25:1,7,18 26:3
  26:12,17 27:3
  27:15,19,22,22
  28:9,17,24
  29:5,18 30:3,7
  31:3,9,14,17,21
  31:24 32:4,8
  32:17 33:7,17
  34:1,7,13,17,23
  35:4,7,21 36:6
  36:17 37:1,7
  37:12,15 38:15
  38:19 39:13
  40:13,17 41:3
  41:24 42:5,9
  42:12,20 43:9
  43:15,20 44:7

  44:21 45:21
  46:7,24 47:4,8
  47:12 48:11
  49:9,19 50:15
  51:2,11,17,23
  52:8,11,22
  53:8,13 54:9
  55:7,11,14
  56:9,22 57:10
  57:24 58:5,6
  58:12,20 59:6
  59:12 60:18
  62:12 63:2,6,8
  64:17,20 65:19
  68:8,15,17
**old** 10:24
**once** 16:17,24
  16:24 17:9
  19:21 25:13
  28:19 31:11
  33:4 34:3 39:4
  39:5,18,20,21
  40:7,21,23
  44:23 49:13
  64:13
**ones** 14:15,17
**opened** 64:4
**operation** 5:2
  12:5
**operations** 7:16
  8:4 9:6,9 10:6
  36:22 37:20,23
**opposed** 6:16
**ops** 5:2 8:3 13:5
  40:24

**options** 53:20
  53:21,23
**orally** 65:14,14
  65:17
**order** 15:20
  19:22 37:24
  45:8 47:21,24
  48:1,3,4,12,16
  69:1
**ordering** 68:21
  68:23
**ordinarily**
  42:12
**ordinary** 24:5
  29:20 30:1
  36:10
**outcome** 70:24
**outside** 5:3
  7:11 25:16
  38:2
**overtime** 14:17
  37:22 54:4
**own** 29:4

**p**

**p.m.** 69:4
**page** 3:5,11
  55:14 56:12,22
**paid** 35:3
**pain** 60:8
**painted** 23:15
**paper** 48:8
**paragraphs**
  57:1
**part** 5:22 8:17
  11:10 36:8

**[part - protocol]**

40:6 56:1
**particular**
11:22 12:3,8
12:21,22 13:5
13:15 14:14
16:7,14 36:3
36:11,15 37:21
37:24 43:9,14
44:6
**parties** 53:1
70:21,23
**parts** 11:17
**passageway**
22:21
**patience** 47:17
61:22
**patrol** 5:3
**pause** 66:10
**paved** 27:23
28:2
**pay** 54:7
**pending** 6:11
**people** 11:4,8
11:12,17 14:11
21:18,21 22:4
22:21 28:6,12
30:22 32:14
35:22 40:17
46:18
**perimeter** 5:3
**period** 40:8,9
40:11
**permission**
43:16,19,22

**person** 16:10
16:18 29:14,15
39:4 46:11
47:6 48:9 68:4
**person's** 50:4
**personal** 70:14
**personnel**
11:19 20:4,12
30:16 31:7
45:22 46:11
48:15 58:17
60:20 61:16
**personnels**
46:12,16
**persons** 7:14
38:16 43:16
46:18
**pertaining** 1:15
48:23 51:14,15
**phone** 53:17
**physical** 55:20
**physically**
10:17 24:9
**piece** 39:3 48:8
**place** 26:5
70:19
**plaintiff** 1:4 2:5
4:8 13:9 53:11
53:12 66:3
**plastic** 11:9
**played** 34:24
**please** 4:6,17
6:4 56:7,20
62:1

**plural** 21:17
**point** 25:20,24
28:9 31:10
**policies** 45:15
45:16 50:20,22
50:23 51:3,5,6
51:7,12 62:8
62:10,12,13,16
62:21 64:7,13
64:20 65:13,14
65:20
**policy** 33:8
43:9,14 55:1
56:1,10,17
57:8,16 58:8
62:22,22 64:24
**portion** 57:21
59:18
**position** 4:24
**possible** 56:19
**posted** 51:11
51:12
**prados** 2:3 3:6
3:8 4:8,16 41:8
41:12,14 42:17
42:20,23 47:8
47:16,19 54:23
56:15 59:1
61:18 62:4,6
65:22 67:22
68:2,8,11,23
**pregnant** 48:24
65:8
**preparation**
9:22 51:3 59:7

**prepared** 9:14
9:20
**present** 2:1
45:17
**pretty** 27:20
29:20,24
**previous** 70:8
**prior** 14:9 59:9
**prison** 35:14
**probably** 21:1
25:16,19 30:24
33:14
**probation** 7:1
**probationary**
6:23
**procedure** 1:14
51:10 55:1,19
**procedures**
15:23 19:24
51:7
**proceed** 4:1
**proceedings**
70:16
**process** 11:10
38:11
**processing** 61:6
**produce** 15:20
15:21 19:22,23
48:7
**progressively**
17:18
**promptly** 57:3
**properly** 40:6
**protocol** 43:10

**prove** 64:17
**pull** 60:11
**pursuant** 1:13
**put** 17:9 18:7
  20:8
**putting** 38:8

**q**

**qualified** 67:4
**question** 5:15
  5:18 6:3,6,11
  16:6 18:16
  42:22 54:15
  67:22
**questions** 61:19
  65:23 67:19,21
**quick** 41:9

**r**

**radunsky** 2:12
**ramp** 24:16,19
  24:20,22
**rank** 5:5 6:22
**reach** 68:24
**read** 9:24 51:8
  51:9 55:22
  57:5,20,22
  58:3 59:17
  62:17,23 63:1
  63:9 64:15,18
**really** 10:23
  32:10 59:16
**recall** 12:24
  13:7 15:4,13
  15:16 18:3,11
  19:20 21:5,9

21:23 26:8,23
28:6 29:5,10
29:12,14,19,24
31:3,6,9 35:16
35:20 36:19
37:1,4,12
40:14,16 43:5
43:5,20 44:14
44:17 51:20,21
52:4,22 53:1,4
56:18 57:7,15
58:6 60:13
61:9 63:21,23
66:3,9
**receive** 33:2
38:8 39:16
62:9
**received** 53:19
56:3 63:3,6
64:3,12 65:4
**receiving** 57:7
58:7 63:11
**recently** 40:11
**recognize**
60:18 67:5
**recollection**
10:3 18:5 23:2
23:8,10 29:8
31:15 37:17
45:7,18 55:2
55:11
**recollections**
45:20
**record** 4:2,6,18
5:23 41:9,10

41:13 47:12,17
62:1,5 69:2
70:15
**reduced** 70:14
**refer** 19:2,3
**refresher** 39:22
39:23
**regarding**
50:21
**regular** 14:16
15:1 21:10
22:22 36:15,22
37:19,23 38:2
**regulations**
26:5
**related** 26:5
52:12 65:13,14
65:17
**relating** 35:1
**relative** 70:20
70:22
**relatively** 24:5
36:7 40:19
**relocate** 47:10
**relocated** 47:18
**remember** 15:7
20:16,18,20
30:21 31:21
32:1,4,5,10,20
33:11,19,22
34:1,7 36:8
44:20 52:24
55:6 60:21
**remembered**
32:9,16 36:13

**remotely** 4:5
**remove** 66:17
  66:17
**repeat** 42:22
  50:12 56:7,20
  62:18
**replacing** 66:14
**report** 10:16,18
  11:3 12:9
  57:11,13 58:13
**reported** 70:13
**reporter** 4:1
  5:23 6:17
  68:21 70:3,6
**requalify** 63:18
**requalifying**
  39:24
**request** 66:16
**required** 27:1
**requirement**
  46:8
**respect** 48:20
**responsibility**
  50:8
**responsible**
  57:2
**restate** 6:5
**restrained**
  55:16
**restraint** 39:11
  55:20
**restraints** 38:9
  38:16,19 39:17
  42:3,5 45:15
  50:21,24 56:23

57:1,10,19
**retraining**  40:9
**review**  9:21
68:15
**reviewed**  51:2
**reviewing**
55:12 56:18
58:4
**rhonda**  1:12
70:5 71:6
**right**  6:19 7:11
17:23 19:5
21:2,4,15 22:7
23:17 28:2
38:3 41:17
54:3 58:12
61:18 62:7
64:13 67:18
68:24
**risk**  55:18
**role**  34:24 35:3
**roll**  12:1,1,3
**room**  17:13
41:20 46:1
50:5
**round**  57:18
**rtu**  13:15,18,19
15:6 33:15
34:4
**rules**  1:13 5:13
**run**  38:12

**s**

**saw**  15:4,8 55:5
59:6

**saying**  5:24
6:16 17:2
18:13 19:18
33:18 46:17
60:13
**says**  63:5 64:14
**scan**  44:10
**schedule**  30:11
30:14
**school**  8:6,8,9
**scratch**  67:11
**screen**  65:3
**second**  41:9
55:14
**secondary**
16:16
**section**  55:15
58:10
**secure**  11:5
40:5 42:9,12
**security**  8:17
8:18,22 16:17
18:1 39:10
43:1,3,6 55:17
**see**  15:21 49:14
54:18 59:2
60:1 61:4
**seeing**  55:3
**seems**  33:19
36:6
**seen**  46:21
48:11 49:5
55:4,7 59:4,9
65:7

**segment**  40:4
**segments**  64:22
64:23
**sense**  5:20 6:1,7
6:12
**series**  24:11
**served**  8:15
**service**  39:20
39:21
**set**  71:2
**setting**  42:3
**several**  33:13
**sexual**  53:6
**shackled**  49:1
**shackles**  38:21
42:7
**sharing**  58:20
58:21
**sheriff**  1:6 2:10
4:22 7:10
12:18 41:16
64:4
**sheriff's**  4:24
6:20 7:17 8:16
8:21 20:4,12
30:15 31:7
33:8 38:7,12
39:15,18 45:21
46:10 48:15
52:12 58:17
60:19 61:16
62:10 65:20
**shift**  10:10 11:8
13:4 54:12

**short**  47:14
60:12 62:2
**shorthand**  70:3
70:6
**show**  11:21,24
54:17
**showed**  62:7
**showing**  56:9
**shown**  51:5
65:13
**side**  8:22
**signature**  68:13
69:3 71:5
**signatures**
60:18
**signs**  67:5
**similar**  10:7
**sir**  4:17
**sit**  10:7 29:16
30:24
**sits**  11:6 28:20
**sitting**  15:8
31:4
**smoothly**  36:16
**soaked**  66:23
**somebody**  32:5
42:16
**sorry**  9:1 10:20
14:5,19 18:20
27:12 43:10
45:19 46:14
54:13 61:2
62:18
**sort**  12:17 36:6

| | | | |
|---|---|---|---|
| **space** 50:5 | **stated** 15:19 | **submitted** 35:1 | **take** 6:9,10 |
| **spacey** 27:21 | 19:21 44:3 | **subsection** | 17:10 28:17,24 |
| **speak** 18:19 | 49:11 | 57:18,19 58:8 | 30:18 31:20 |
| 46:14 | **states** 1:1,14 | **substance** 9:11 | 32:23,24 47:9 |
| **special** 43:16 | **steep** 24:22 | **suffering** 67:8 | 57:20 61:20 |
| 43:18 48:19 | **stenographic...** | **suing** 52:6 | 67:15 |
| 62:13 | 70:13 | **suit** 52:21,23 | **taken** 1:11 |
| **specific** 18:5 | **steps** 25:18 | 53:2,5 | 47:15 62:3 |
| 26:4 31:14 | **stick** 29:21 30:1 | **suite** 2:2,7,13 | 70:18 |
| 50:20 55:2,11 | 49:14 | **suits** 52:9,12,20 | **takes** 39:4,22 |
| 56:6,8 57:8 | **sticker** 44:5,8 | **summer** 26:3 | **tell** 19:24 29:3 |
| **specifically** | **sticking** 49:23 | **sunday** 59:23 | **ten** 35:17 47:9 |
| 18:11 31:3,21 | **stillman** 2:14 | **supervisor** | 47:13 61:20 |
| 56:18 57:15 | 3:7 4:10 65:24 | 28:20 57:4 | **tendered** 3:16 |
| 58:7 | 66:2 67:18 | **supposed** 30:4 | **tent** 27:20 28:1 |
| **specifics** 32:21 | 68:10,14,18,20 | **sure** 60:21,22 | 28:3,19 |
| **specified** 70:19 | **stint** 8:1 | **suspended** | **terminology** |
| **spell** 4:18 | **stop** 58:20 | 53:18,24 | 21:15 35:8 |
| **spoiled** 52:6 | **stopped** 60:8 | **suspension** | **terms** 15:24 |
| **squad** 12:18 | 66:19 | 54:2 | 16:13 24:9 |
| **square** 39:2 | **store** 11:12,16 | **sweating** 60:6 | 25:4 26:8 |
| **squeeze** 50:1,3 | **story** 25:2,3,4 | 60:10 | 45:15 54:6 |
| **staff** 26:9,13 | **straight** 12:13 | **switch** 16:18 | **tested** 18:8 |
| **stairs** 19:15 | 20:24 | 17:1 | **testified** 4:14 |
| 24:18 25:16,18 | **street** 2:13 | **sworn** 4:12,14 | 5:9 33:10 |
| 28:10 66:7 | **strike** 39:14 | 57:2,12 70:10 | 52:18,23 54:3 |
| **stand** 10:22 | **stroger** 12:8,9 | **system** 48:14 | 58:12 |
| 13:19 | 40:18 41:1,2,6 | 48:18,22 | **testify** 46:12,15 |
| **standing** 15:7,9 | 41:17 42:10 | | 53:8 70:10 |
| **started** 39:15 | **struggling** 66:9 | **t** | **testifying** 41:16 |
| **starting** 56:11 | **stuff** 63:20 | | **testimony** 18:7 |
| **state** 4:6,17 | **subject's** 17:5 | **t** 4:19 | 23:23 25:20,24 |
| 48:5 70:6 | **subjects** 56:24 | **table** 28:21,23 | 26:21 27:5,8 |
| **state's** 2:6 | 57:20 | 29:3,3,16 | 28:5 29:20,23 |
| | | **tables** 29:1 | 32:8 35:5 |
| | | **tactics** 40:1,2 | |

| | | | |
|---|---|---|---|
| 44:21 45:2,4 | **time** 8:17 15:14 | **transcript** | **tunnels** 15:23 |
| 46:24 47:4 | 21:22 26:7,24 | 70:12 | 20:2 |
| 65:6 70:16 | 32:18 34:20 | **transition** | **turn** 20:23 21:1 |
| **thank** 61:21 | 51:22 54:1,2,6 | 40:14 | 22:8,10 24:10 |
| **thanks** 47:17 | 54:10 60:4 | **transport** | **turned** 60:9 |
| 58:6 | 63:16 68:22 | 12:15 13:14,16 | **turning** 55:14 |
| **thing** 22:24 | 70:19 | 24:6 29:17 | 56:22 |
| 39:19 55:8 | **times** 22:20 | 40:17 41:4 | **turns** 24:12 |
| 58:2 | 26:15 | 46:11,18 | **two** 14:6,7 |
| **think** 5:13 | **today** 10:7 60:4 | **transported** | 16:14 17:10 |
| 21:14,17 33:10 | 68:16 | 16:20 39:13 | 49:14,23 50:3 |
| 35:13 36:14 | **today's** 51:3 | 46:5 47:1,20 | **type** 22:24 40:2 |
| 55:5,7 59:16 | **told** 9:18,19 | 48:20 65:7 | **types** 16:3,5 |
| 61:19,22 | 10:2 15:21 | **transporting** | 38:19 |
| **third** 56:22 | 60:2,7 | 7:13 14:11 | **typewriting** |
| **thomas** 1:6 | **took** 19:16 | 21:18,21 28:7 | 70:14 |
| 2:10 | 31:12 33:15,18 | 36:5,12 37:21 | **typically** 42:24 |
| **thought** 9:3 | 33:21,22 | 38:1 43:1,11 | |
| 61:3 | **totality** 57:13 | **treatment** | **u** |
| **three** 22:2,3 | **towards** 21:4 | 50:16,18 | |
| 25:19 40:12,14 | 22:12 | **trees** 38:6 | **u** 4:19 |
| **throat** 9:4 | **train** 40:5 | **trek** 67:23 | **uh** 6:16 13:22 |
| **tier** 20:6,7 | **trained** 38:15 | **trials** 52:18 | 14:21 24:21 |
| 32:24 33:2,6 | 57:16 | **trip** 28:7 | 35:12 |
| 34:6,8,11 | **training** 38:8 | **trouble** 67:1 | **ultimately** |
| **tiers** 7:24 | 39:16,20,21 | **true** 37:8,10 | 49:19 |
| **tight** 17:12 | 40:1,6,8,11 | 70:15 | **uncuff** 67:12 |
| 49:7,10,13,16 | 56:3,6,8 57:7 | **truth** 70:10 | **under** 50:1 |
| 49:21,21 50:6 | 58:7,11 62:14 | **try** 54:14 | 70:14 |
| **tighten** 16:19 | 62:15 63:17,21 | **trying** 36:7 | **understand** |
| **tighter** 16:22 | **trainings** 51:6 | 37:15 40:2 | 33:17 |
| 17:18 | 62:13 63:12 | **tunnel** 19:6,9 | **understanding** |
| **tightly** 17:4,7 | 65:12,15 | 19:10,13 20:14 | 33:7 |
| **tightness** 24:2 | **trajectory** | 23:4 34:4 | **understood** 6:6 |
| 44:24 | 20:15 24:9 | | **uneventful** |
| | | | 24:5 |

**unhandcuff**
33:1
**unhandcuffing**
34:5
**unit** 14:14,16
59:24
**united** 1:1,14
**unusual** 20:17
**update** 51:9
62:22
**upstairs** 24:10
**use** 12:17,18
16:7 35:8
43:22 47:4,5
50:21,23 56:23
57:19
**used** 21:17
42:10,13 43:1
57:10

**v**

**van** 12:19
**vehicle** 12:17
**verbally** 6:15
**verify** 63:8 64:2
**veritext** 69:1
**versus** 46:3
**videoconfere...**
1:13
**visible** 22:5
**visit** 25:15,15
28:12 31:11
34:3 66:5
**visiting** 18:22
25:12 27:4,7
29:10 59:23

**visitors** 25:11
26:9,23 38:1
**visits** 13:17
30:3,8 37:19
37:21,22
**volunteer**
14:24 22:24
**volunteered**
37:22 54:9
**vs** 1:5

**w**

**w** 4:19
**waist** 39:9
55:18
**wait** 5:18 54:14
**waiting** 41:20
60:1
**waive** 68:13,18
68:20
**waived** 46:8
69:3
**walk** 20:1 21:3
22:13 23:15
24:13,15 25:17
25:21 26:1
28:1,15 29:4,6
68:4
**walked** 16:20
18:17,21 19:14
26:19 34:4
**walking** 15:22
21:11 22:7
26:1,10 60:4,9
**walkway** 28:2

**walkways**
27:23
**walls** 23:12
**want** 28:15
58:2
**washington** 2:2
2:7
**way** 6:3 20:18
32:1 50:9,10
60:6 63:8
64:17
**weapon** 11:5
39:24 63:19
**wear** 16:17
26:11,14,14,18
27:1
**week** 35:21,23
40:10,14,22
**weeks** 34:18
**weiland** 1:12
70:5 71:6
**went** 15:18
36:15 59:24
**west** 2:2,7,13
**wet** 60:10
66:23
**whereof** 71:2
**witness** 4:4,12
42:16,21 52:14
52:15 53:6
68:17,19 70:9
70:9 71:2
**witnessed** 20:8
20:10 38:1

**women** 65:8
**words** 15:16
**work** 5:3 7:11
7:13,19 8:1,17
8:18,21,21
10:16,18 11:23
12:7 13:1,8
16:13 21:9
29:1 36:2,3,7
37:18 52:12
54:2,12
**worked** 7:8,16
7:20,20 14:23
36:20,21
**working** 7:24
9:8 11:15 12:5
12:6 13:5,10
16:1 31:1 33:1
37:22 38:4
39:15 54:4
**works** 5:2
11:17 64:5
**wrap** 39:8
**wrapped** 62:14
**wrist** 16:15
50:4 60:5
**wrists** 17:5
**write** 58:13
**written** 50:20
50:23 51:12
56:1,17 65:13

**y**

**yard** 25:15,16
27:4,7,10
28:12,14 29:6

30:23 66:4
**yeah**  13:10
14:8 34:22
35:24 62:11
68:14,19
**year**  7:2 39:20
39:21 40:7
61:10 63:24
**yearly**  40:9
62:14,15
**years**  8:19
51:21
**yellow**  23:15
**yesterday**  59:5
59:9

**z**

**zachary**  2:14
68:12
**zoom**  1:12
**zstillman**  2:15

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.