Page 1

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS

2

3

4  DOUGLAS JOHNSON,          )
                             )

5         Plaintiff,        )
                             )

6      vs.                ) No. 22-cv-03718
                             )

7  COOK COUNTY SHERIFF THOMAS DART, )
  in his official capacity,     )

8  ANTWAUN BACON, a CCDOC officer,  )
  and COOK COUNTY, a municipal    )

9  corporation,              )
                             )

10        Defendants.       )

11

12

13

14        30(b)(6) deposition of COOK COUNTY SHERIFF

15  THOMAS DART, by and through his representative LARRY

16  GAVIN, taken remotely before NADINE J. WATTS, CSR, RPR,

17  and Notary Public, pursuant to the Federal Rules of

18  Civil Procedure for the United States District Courts

19  pertaining to the taking of depositions, commencing at

20  9:08 a.m. Central Daylight Time on the 24th day of

21  April, A.D., 2024.

22

23

24

Page 2

```
 1              There were present at the taking of this
 2   deposition the following counsel:
 3              (Appeared via videoconference)
                DVORAK LAW OFFICES, LLC by
 4              MR. ADRIAN BLEIFUSS PRADOS
                111 West Washington Street
 5              Suite 1611
                Chicago, Illinois  60602
 6              (773) 641-4667
                ableifuss@gmail.com
 7
                    on behalf of the Plaintiff;
 8
                (Appeared via videoconference)
 9              COOK COUNTY STATE'S ATTORNEY by
                MR. JAMES O'CONNOR
10              500 Richard J. Daley Center
                5th Floor
11              Chicago, Illinois  60602
                (312) 603-1880
12
                    on behalf of Defendant Cook County
13                  Sheriff Thomas Dart;
14              (Appeared via videoconference)
                DEVORE RADUNSKY, LLC by
15              MR. ZACHARY STILLMAN
                230 West Monroe Street
16              Suite 230
                Chicago, Illinois  60606
17              (312) 300-4479
                zstillman@devoreradunsky.com
18
                    on behalf of Defendant Antwaun Bacon.
19
20
21
22
23
24
```

Page 3

1              30(b)(6) DEPOSITION OF LARRY GAVIN

2                    TAKEN APRIL 24, 2024

3

4    EXAMINATION BY                              PAGE

5    Mr. Adrian Bleifuss Prados                   4, 66

6    Mr. James O'Connor                          64

7                      EXHIBITS

8                 (Retained by counsel)

9                                              PAGE

10   GAVIN DEPOSITION EXHIBIT 1                   9

         Policy 708, Control of Inmate

11       Movements

12   GAVIN DEPOSITION EXHIBIT 2                  24

         Policy 709, Use of Restraints

13

14   GAVIN DEPOSITION GROUP EXHIBIT 3            32

        Set of policies

15   GAVIN DEPOSITION EXHIBIT 4                  61

         Spreadsheet

16

17

18

19

20

21

22

23

24

```
                                              Page 4
 1                       LARRY GAVIN,
 2    called as a witness herein, having been first duly
 3    sworn, was examined upon oral interrogatories and
 4    testified as follows:
 5                        EXAMINATION
 6                   by Mr. Bleifuss Prados:
 7       MR. BLEIFUSS PRADOS:  Q   Good morning, sir.  Could
 8    you please state your full name and spell it for the
 9    record.
10       A   Sure.  My name is Larry Gavin.  That's
11    L-A-R-R-Y, G-A-V, as in Victor, I-N, as in Nancy.
12       Q   And are you currently employed with the Cook
13    County Sheriff?
14       A   I am.
15       Q   And what is your rank within the Sheriff's
16    Department?
17       A   My current rank is First Assistant Executive
18    Director.
19       Q   And is that -- Are you a sworn officer?
20       A   I am sworn.
21       Q   Okay.  And when did you first join the Sheriff's
22    Department?
23       A   May 1st, 1995.
24       Q   And what was your rank at the time?
```

Page 5

1     A    Officer.

2     Q    And were you subsequently promoted?

3     A    I was.  I was promoted to Sergeant in April of

4  2004.

5     Q    And were you subsequently promoted after that?

6     A    I was.  I was promoted to Lieutenant in May of

7  2008.

8     Q    And were you subsequently promoted after that?

9     A    I was.  I was promoted to Assistant Executive

10  Director in July of 2017.

11    Q    July of 2017 you said?

12    A    Yes, sir.

13    Q    And did you have a subsequent promotion or is

14  that your current rank?

15    A    No, I had a subsequent promotion in January of

16  2022.  I was promoted to First Assistant Executive

17  Director.

18    Q    Thank you, sir.  And how are you addressed by

19  your subordinates?  First Assistant?

20    A    No, just Director.

21    Q    Director, okay.

22    A    They call me a lot of stuff, but Director is the

23  formal title.

24    Q    Okay.  And, Director, have you ever been deposed

```
                                                Page 6
 1   before?
 2        A    Yes.
 3        Q    Okay.  So just to kind of refresh you on the
 4   rules of a deposition, we're going to ask you a series
 5   of questions.  Unless counsel instructs you otherwise,
 6   you are required to answer.  Does that make sense?
 7        A    Yep.
 8        Q    And it's very natural in human conversation to
 9   anticipate the question being posed to you and to jump
10   in, but I'd ask that you please wait for me to finish my
11   question before you answer.  Does that make sense?
12        A    Yes.
13        Q    And I will very possibly phrase a question or
14   frame a question in a way that will be confusing to you.
15   And if that happens, please let me know and I will
16   attempt to rephrase the question.  Otherwise, I will
17   assume that you understood the question.  Does that make
18   sense?
19        A    Yes.
20        Q    Approximately how many times have you been
21   deposed?
22        A    More than 10 times.
23        Q    And throughout your career in the Sheriff's
24   Department, have you been in the Cook County Sheriff's
```

Page 7

1    Department of Corrections or where have you been working

2    within the Sheriff's operations?

3        A    All but two years I've been in the Department of

4    Corrections.  I spent a couple of years in our

5    Information Technology Unit.  But other than that, I've

6    been in the jail the entire time.

7        Q    Okay.  In terms of preparing for this

8    deposition, have you read the complaint in this matter?

9        A    No, I have not formally read the complaint, but

10   I did speak with Mr. O'Connor, who gave me an overview

11   of the issue.

12       Q    Okay.  And do you personally know defendant

13   Antwaun Bacon?

14       A    No.

15       Q    Would you be able to recognize him if you saw

16   him?

17       A    No.

18       Q    Do you know whether you've ever spoken to him?

19       A    I do not know.

20       Q    Have you spoken -- Apart from counsel, have you

21   spoken to anybody else within the Sheriff's Department

22   about this lawsuit?

23       A    Only our assistant general counsel.

24       Q    And what documents, if any, did you review in

Page 8

1    preparation for your deposition today?

2        A    Just the Lexipol Orders 709, 148, and 708.

3        Q    I'm going to attempt to share my screen.  Well,

4    actually, strike that.

5             Is it your understanding that you've been

6    designated today to testify on behalf of the Sheriff

7    regarding Sheriff's Policy 709 and 708, specifically as

8    to how those policies applied to persons with

9    disabilities and persons with walking aids in Cook

10   County Jail in July of 2020?

11       A    Yes.

12       Q    Okay.  And is it also your understanding that

13   you've been designated by the Sheriff to testify today

14   about Sheriff's personnel -- about how Sheriff's

15   personnel in July of 2020 were trained to implement

16   those policies?  Is that fair to say?

17       A    Yes.

18       Q    Okay.  And do you understand that a set of --

19   Other policies, including Policy 148, Communicating With

20   Interaction -- and Interactions With Individuals With

21   Disabilities, 705, Prohibition on Discrimination, 801,

22   Inmates With Disabilities, 807, Inmate

23   Non-Discrimination, 1103, Visitation Procedures, and

24   1219, Inmate Visitation, were recently tendered to us.

1    Is that something you're aware of?

2        A    No, I'm not sure exactly which policies you all

3    received.

4        Q    Okay.  Are you familiar with those policies?

5        A    Yes.

6        Q    Okay.  And are you also prepared to discuss how

7    those policies applied in July of 2020?

8        A    Yes.

9        Q    Okay.  And you're also prepared to testify about

10   how personnel were trained in the implementation of

11   those policies in July of 2020?

12       A    Yes.

13       Q    Okay.  Thank you.

14            I don't believe this will be a very long

15   deposition, but we just have to get through a few

16   things.  I'm going to try to share my screen.

17            Do you see this screen that I'm sharing now?

18   It says Policy 708.

19       A    Yes, sir.

20       Q    Okay.  And we would designate -- This is Bates

21   stamped -- The document starts on Bates No. 62 for

22   identification.  If we could deem this Gavin Exhibit 1.

23            (Document marked as Gavin Deposition

24            Exhibit 1 for identification.)

```
                                                    Page 10
1       Q    This is called Control of Inmate Movements; is

2    that correct?

3       A    Yes, sir.

4       Q    And do you know -- Can you testify as to how

5    this policy would have applied to a person with a cane

6    in -- in terms of the Sheriff's policy, how it would

7    have applied to a person with a cane in July of 2020?

8    And by person, I mean a detainee.

9       A    I don't understand what you mean relative to

10   apply.

11      Q    This policy would have controlled and applied to

12   individuals with canes in the Cook County Jail in July

13   of 2020, correct?

14      A    This policy would have applied to all

15   individuals in custody at that time, correct.

16      Q    Okay.  And I'm looking at Subsection 708.4.  It

17   says, the movement of one or more detainees in the

18   department should be done in an orderly manner, with

19   inmates walking in pairs.  Sworn members should have

20   situational awareness during the movement of inmates and

21   should consider the layout of the department, areas of

22   poor visibility, and the presence of other inmates being

23   moved.  Sworn members should avoid areas where inmates

24   may have access to contraband items.
```

Page 11

1      And then it says, inmates should be retained

2   during movement based upon individual security

3   classification, with higher risk inmates in handcuffs,

4   waist chains and leg irons.  An exception to this

5   procedure is when an inmate has a physical disability

6   where restraint devices may cause injury.

7      I've highlighted that last sentence.  Can you

8   explain what that highlighted sentence means?

9      A    That if we're notified by our medical partners

10  that an individual in custody could be at risk of

11  injury, serious injury, that the recommendation by them

12  would be to not utilize physical restraints.

13     Q    Okay.  And would this have any bearing on how an

14  individual with -- who walks with a cane is restrained

15  while moving within the jail?

16     A    Provided that security had knowledge of the use

17  of restraints relative to his medical need.  If the

18  medical need to not have the restraints superseded our

19  security need, then we would certainly acquiesce and not

20  utilize a physical restraint.

21     Q    And how would that be determined?

22     A    It's determined by our medical staff, Cermak.

23     Q    Okay.

24     A    They establish the medical and mental health

1    need for the jail, and they communicate that to us

2    through the use of the medical alerts that are populated

3    inside of our Jail Management System, in addition to

4    meetings and roundings and interactions that our

5    administrative staff have with their administrative

6    staff and our line staff have with their nursing staff.

7            So if Larry Gavin's ability to be ambulatory is

8    extremely inhibited by the use of a mechanical

9    restraint, it would be notated in Cermak's Cerner system

10   and also communicated to security.

11       Q   And how would an individual -- So is it fair to

12   say that this policy does not specifically spell any

13   particular -- spell out any particular guidance for if

14   and when a person with a cane should be handcuffed?

15       A   That is correct.  Our policies establish

16   high-level governance over the way in which we are to

17   carry out our operations, with the understanding that

18   there are always caveats to that.  So like no policy can

19   speak to every single conceivable situation that we

20   would be confronted with.

21       Q   And would it be possible that, for example --

22   or, in fact, in this case that an inmate with a cane,

23   the circumstances under which they should be handcuffed

24   are not spelled out in any written policy that you're

Page 13

1    aware of that was in effect in July of 2020?

2        A    That's correct.

3        Q    Okay.  And how would an individual's medical

4    needs be communicated to personnel, for example, in this

5    case, defendant Antwaun Bacon, as they're escorting, in

6    this case, the plaintiff, Mr. Johnson, throughout the

7    prison?

8        A    So the medical need is assessed during the time

9    of intake with intermittent doctors' appointments and

10   what have you.  So if an individual in custody's medical

11   need began to deteriorate to a point where medical needs

12   to intercede and make recommendations to security that a

13   mechanical restraint not be used, that happens all the

14   time.

15           So there is a constant communicative process

16   that takes place between our medical partner and

17   security to discuss particulars with the population.

18       Q    And if --

19       A    And their --

20       Q    I'm sorry to interrupt.  Please finish your

21   answer.

22       A    Oh, I'm sorry.  I was saying and their medical

23   needs.

24           So we speak about the specifics of individuals

1    who have a higher level of medical need.  And, you know,

2    the majority of the population -- I shouldn't say

3    majority, but the population who has medical needs that

4    are being adhered to or they're being administered -- if

5    a guy's on medication and he's receiving his medication,

6    then certainly we're not communicating about that.

7           But if his need becomes greater, if we need to

8    change his housing, if we need to rethink, you know, the

9    parameters of security because of the increased medical

10   need, then certainly we will address that.

11       Q   Okay.  And specifically in this case, would that

12   be -- would that communication have been formalized or

13   is it an informal process by which medical staff speak

14   with security personnel?

15       A   It could be a little bit of both.  And what I

16   mean by that is if the individual in custody related to

17   the staff member that I should not be handcuffed because

18   of my medical condition, then the staff member would

19   have -- or should have spoken to medical, which my

20   understanding is that this individual was in our medical

21   building.  So there's a 24-hour dispensary.  There's

22   nursing 24 hours.  And security staff are charged to

23   have that conversation with nursing.

24           I'll give you an example.  Hey, Larry Gavin is

```
 1    saying he shouldn't be handcuffed because of his medical

 2    condition, can you tell me if there's anything in his

 3    chart -- Because we're not privy to the specifics in the

 4    medical chart, but we do have a responsibility to seek

 5    out information that may be pertinent relative to

 6    someone's medical condition as we attempt to sidle that

 7    with the security need of the institution.

 8              So I would expect the officer or the supervisor

 9    to engage the medical staff to ascertain the level of

10    medical need.  Hey, can this guy be handcuffed while he

11    walks for a distance to wherever?  And if there's

12    something in the chart that suggests that we need to be

13    sensitive to that medical need, then of course we would

14    acquiesce.

15              If there isn't anything in there in particular

16    that suggests that he is further hampered by the use of

17    a mechanical restraint, then we would always side with

18    the use of the mechanical restraint for the safety of

19    the institution.

20       Q    Okay.  And do you know in this instance, if you

21    know, did Officer Bacon consult with medical personnel

22    before escorting Mr. Johnson?

23       A    I don't know.

24       Q    Okay.  And you're saying -- And when you say
```

Page 16

1    that, if he didn't, he ought to have?

2        A    I'm saying that if he was notified by the

3    individual in custody that he felt hampered by the use

4    of a mechanical restraint, that it would have been

5    prudent for the officer to take the next step and ask

6    the medical team if there was anything in the

7    individual's chart that inhibits him from being

8    mechanically restrained.

9        Q    Okay.  And is it fair to say that there is no

10   policy at the Sheriff's Department that prohibits a

11   person who is dependent on a cane from walking -- from

12   being handcuffed?

13       A    You're saying is -- there's no policy that

14   prohibits someone from being handcuffed?

15       Q    Who has to walk with a cane.

16       A    No.

17       Q    Okay.  And in the event that a -- And there's

18   no -- there's no system by which a Sheriff's employee or

19   a security personnel can review or familiarize

20   themselves with a detainee's medical needs absent

21   conferring with medical personnel; is that correct?

22       A    That's correct.

23       Q    Okay.  There's no chart that they can access

24   remotely or on any device that they control, correct?

1      A    There's no chart, but there are medical alerts

2   that are populated inside our Jail Management System

3   that gives us a cursory understanding of the medical

4   and/or mental health need.

5      Q    And are those -- I'm sorry, finish your thought.

6      A    I'm sorry.  As well as the security need.

7      Q    Okay.  And are those medical alerts visible to

8   personnel as they're escorting detainees around the

9   jail?

10     A    No, but it would be visible before they started

11  the escort if they went into the Jail Management System.

12     Q    Okay.  And they would have to do that at a

13  terminal or an office, or where would they do that?

14     A    We have computers on all living units, all

15  posts.  I mean, so there are a plethora of places for an

16  individual to access the Jail Management System via

17  computer.

18     Q    Okay.  And how would jail employees in the

19  summer of 2020 have been trained or informed about the

20  contents of this written policy?

21     A    So I'm not sure if they update it, because we

22  make updates to policy all the time, and they get

23  notified via e-mail to go into our policy and procedure

24  manual, which is Lexipol, and to refamiliarize

Page 18

1   themselves with the updated information.

2          So every employee of the Sheriff would receive

3   an e-mail that is specific to them as it relates to the

4   policies and procedure that they are governed by.  So

5   they would have received an e-mail.

6      Q   Okay.  And then is it true that they have to

7   check a box related to that e-mail or attach that e-mail

8   that indicates that they've read the updated policy?

9      A   My understanding is that they go into the policy

10  and then you check it there saying that you acknowledge

11  receipt of the policy, yes.

12     Q   Okay.  And apart from that checkmark, there's no

13  technology or system that guarantees that personnel are

14  reading the policy; is that correct?

15     A   I have no way of knowing.  That's a technology

16  question.

17     Q   Okay.  So you don't know one way or another

18  whether there's a way to verify that employees are

19  reading the policies, correct?

20     A   I know that there is a way of verifying, but I

21  don't know the operation by which they do it because I'm

22  not in the technology unit.  But I do know that there is

23  a way of verifying because we receive e-mails

24  intermittently reminding staff to acknowledge the new --

1  like a new order, a changed Lexipol order.

2      Q   But that would be for staff that didn't check

3  the box, correct, indicating that they had received the

4  policy update?

5      A   Yes.

6      Q   Okay.  So, again, the question is whether --

7  what you're able to verify is whether they've checked

8  the box, not whether they've actually sat there and read

9  the policy, correct?

10     A   Again, I'm -- That you accept -- that you accept

11 that the new policy has been sent out and you're

12 acknowledging receipt of it.  To the extent of whether

13 or not they read it or opened it, I don't know if

14 there's anything that would tell us that.  I don't know.

15     Q   Okay.  And would you agree that there's no

16 language in 708 that specifies how tightly or loosely

17 restraints should be placed on an inmate when they're

18 being moved around the facility, correct?

19     A   Yes, not in -- not in the policy, but in the

20 training there is.

21     Q   Okay.  And what is the rule in the training or

22 what's taught to staff in training?

23     A   I could only speak for when I was training.  So

24 I don't -- You know, so we were always taught that you

```
                                                    Page 20
```

1    should leave at least a couple of fingers' worth of

2    space within the mechanical restraint to allow for the

3    individual to have blood flow and, you know, not have

4    them on too tight where they make a mark or become

5    restrictive or could possibly restrict blood flow.

6        Q    And is that training done sort of on the job?

7    Is that kind of an informal process or is that taught at

8    the Academy?

9        A    It's taught at the Academy.

10       Q    And that would have been true also for anyone

11   working in July of 2020?

12       A    Yes.

13       Q    Okay.  And is there any way where that lesson or

14   that principle is reinforced while people are on the

15   job?

16       A    It's really in-service training when we go

17   through our use of force modules I'm sure, yes.

18       Q    Okay.  And what's the purpose of that -- of that

19   practice of leaving some space between the wrist and the

20   metal band?

21       A    Just to ensure that the individual being

22   restrained has proper blood flow and we're not

23   restricting their -- the ability of the blood to flow

24   and, you know, risk of clot or, you know, have them --

```
                                                            Page 21
 1    have the individual leave marks on their wrist or

 2    whatever.  Swelling --

 3        Q   Okay.  So would you -- I'm sorry if I

 4    interrupted.

 5        A   No, I was saying swelling or anything of that

 6    magnitude.

 7        Q   All right.  So the purpose is to avoid swelling,

 8    the leaving of marks or injuries in general; is that

 9    correct?

10        A   That's correct.

11        Q   And would it be fair to say that if the

12    handcuffs are placed so tightly that they do leave red

13    marks and swelling or cause injuries, those handcuffs

14    were placed too tightly?

15        MR. O'CONNOR:  I'm going to object to the form of

16    the question.  You may answer.

17        MR. BLEIFUSS PRADOS:  Q   You can still answer.

18        A   Yeah, I mean, I can't speak to every

19    individual's wrist.  Some people swell -- I mean,

20    everybody is made up differently.

21            So I can't speak to, you know, any one

22    individual having handcuffs on, whether they were too

23    tight or not, whether the swelling was due to the

24    handcuffs being placed too tight or not.  I mean, I
```

```
1   don't think it would be prudent for me to speak to that.
2       Q   Would you agree that if and when handcuffs are
3   applied without leaving the two-finger gap that you
4   described, that would not be consistent with the
5   policies and practice -- normal practices of the
6   Sheriff's Department?
7       MR. O'CONNOR:  Object to the form of the question.
8   You may answer.
9       THE WITNESS:  Yeah, I wouldn't speak -- I wouldn't
10  say that because I don't -- there's no written policy
11  that says that you have to leave two fingers.  This is
12  just what we were taught in the Academy.  And behind
13  it -- the concept behind it was to find a way to
14  establish how tight or loose you have them on the
15  individual in custody.
16          So it's -- I don't think it's a stated practice
17  more so than it is an understood one from going through
18  the Academy when you're learning about the use of
19  mechanical restraints and such, so.
20      MR. BLEIFUSS PRADOS:  Q  Okay.  Well, I understand
21  it's not a written policy.  Would you say it's an
22  unwritten policy or practice?
23      MR. O'CONNOR:  Objection.
24      THE WITNESS:  Yeah, I didn't say that.  I said it's
```

Page 23

1    understood -- From my experience of being in the

2    Academy, that was the example that was given to me to

3    establish whether or not you were utilizing mechanical

4    restraints too tightly.

5            I have seen other law enforcement officers use

6    three fingers instead of two.  I mean, so like the

7    concept is to be as least intrusive with the use of

8    mechanical restraints as possible.  And that's the goal.

9        MR. BLEIFUSS PRADOS:  Q   Okay.  So it's neither an

10   unwritten policy, nor a practice, it is an

11   understanding -- a general understanding that you hope

12   people develop at the Academy?

13       A   I never said it wasn't a practice.  You said

14   that.

15       Q   Okay.  So how would you characterize it?

16       A   I would characterize it as everyone that goes

17   through the Sheriff's Academy understands that when

18   you're placing mechanical restraints on an individual,

19   you have to do them in a way that does not become too

20   restrictive and affect their blood flow, cause swelling,

21   bleeding.  In other words, don't put handcuffs on too

22   tight.  That's what I remember.

23       Q   Could you call that an unwritten rule?

24       MR. O'CONNOR:  Objection to the form.

1      THE WITNESS:  Yeah.  Sorry.

2      MR. O'CONNOR:  You may answer.

3      THE WITNESS:  Yes.

4      MR. BLEIFUSS PRADOS:  Q  Okay.  And is it an

5  unwritten rule that personnel are expected to follow?

6      MR. O'CONNOR:  Objection to form.  You may answer.

7      THE WITNESS:  Yes.

8      MR. BLEIFUSS PRADOS:  Q  Okay.  I'm going to switch

9  over to what we're going to call Gavin Exhibit 2.  This

10  is Policy 708, Use of Restraints.  It starts on Bates

11  No. 156.

12          (Document marked as Gavin Deposition

13          Exhibit 2 for identification.)

14      MR. O'CONNOR:  709?

15      MR. BLEIFUSS PRADOS:  I'm sorry, yeah, 709.  I

16  apologize.

17          There is a subsection of this called 709.3.1,

18  Use of Restraints On Disabled Subjects.  Are you

19  familiar with this subsection of this policy?

20      A   Yes.

21      Q   Okay.  And this policy says that a physical

22  disability, e.g., visually impaired, hearing impaired,

23  or paraplegic, does not preclude the use of restraints

24  on an inmate.  Sworn members should take the factors

Page 25

1   outlined in this policy into consideration when

2   determining the types of restraints used on an inmate.

3          Would this encompass -- Would this apply to --

4   this subsection apply to detainees who are issued canes?

5      A    This policy, as with all, establishes governance

6   on the way we interact with the population.  So, yes.

7      Q    Okay.  And would you agree that a detainee who

8   has been issued a cane is a disabled inmate for the

9   purposes of this policy?

10     A    No.

11     Q    Okay.  What is a disabled inmate?  Who would

12  qualify as a disabled inmate?

13     A    Medical establishes whether someone's disabled.

14  I mean, I'm not a lawyer, so I don't know the legal

15  definition of disabled.  But in my 29 years I have

16  watched the population walk around with a cane and then

17  go out to the recreation yard and play basketball.  So I

18  don't quantify it that way.

19          I follow the recommendation of Medical as it

20  relates to what the individual can and cannot do from an

21  ambulatory perspective.  And we are responsible for

22  adhering to whatever constraints we're given by Medical.

23  So it's not my job to say someone is disabled because I

24  don't know the legal definition of being disabled.

1      Q   Okay.  Is anyone -- Anyone who wants a cane, are

2   they allowed to have a cane in the Cook County Jail?

3      MR. O'CONNOR:  Objection to the form.  You can

4   answer if you know.

5      THE WITNESS:  Not to my knowledge, no.

6      MR. BLEIFUSS PRADOS:  Q   So an inmate has to

7   demonstrate some need for a cane for ambulation before

8   they're given a cane?

9      MR. O'CONNOR:  Objection to the form and basis of

10   knowledge.

11      THE WITNESS:  Yeah, I don't know what they have to

12   demonstrate.

13      MR. BLEIFUSS PRADOS:  Q   Okay.  But it's not

14   something that anyone can get, correct?

15      MR. O'CONNOR:  Objection to form.  You can answer.

16      THE WITNESS:  I don't -- Honestly, I don't know

17   because, like I said, I've seen too many people with

18   canes do activities that I just discussed.  So I don't

19   know what the threshold is for an individual in custody

20   to be -- to receive a cane.

21      MR. BLEIFUSS PRADOS:  Q   I'm looking at the second

22   section I've highlighted there, the second -- not

23   section, but piece of language I've highlighted there,

24   saying when applying restraints to a disabled inmate,

Page 27

1    the responsible sworn member shall promptly notify

2    his/her immediate on-duty supervisor.

3              Would that requirement apply to correctional

4    personnel who are applying handcuffs to a person with a

5    cane?

6        A    Again, this policy, as with all, just

7    establishes universal governance on the way we are

8    charged to deal with the population.

9              The RTU is a medical and mental health

10   facility.  So the governance that's established within

11   this policy, it's in force, as with all, but the

12   supervisors who are privy to the movement for the day,

13   they understand who will be receiving visits and who's

14   going to the dispensary and all of those things that

15   require movement.  There's already an understanding that

16   they know who's being moved and a mechanical restraint

17   will be utilized for that movement.

18       MR. BLEIFUSS PRADOS:  Thank you.  Madame Court

19   Reporter, could you please read my last question back.

20              (Whereupon, the reporter read the following:

21              "Q  I'm looking at the second section I've

22                 highlighted there, the second -- not section,

23                 but piece of language I've highlighted there,

24                 saying when applying restraints to a disabled

Page 28

```
 1              inmate, the responsible sworn member shall

 2              promptly notify his/her immediate on-duty

 3              supervisor.

 4                   Would that requirement apply to

 5              correctional personnel who are applying

 6              handcuffs to a person with a cane?")

 7        MR. BLEIFUSS PRADOS:  Q   Thank you very much.  And

 8   is your answer to that, no, that that does not control

 9   over a person who's applying handcuffs to a person with

10   a cane?

11        A   My answer to that is that I globalized my answer

12   by saying it's not specific to someone with a cane.

13        Q   Okay.  But does it include people with a cane?

14        A   It includes anyone incarcerated in the

15   Department of Corrections.

16        Q   Okay.  So would you agree that Defendant Bacon

17   should have conferred with a supervisor before applying

18   the handcuffs to Mr. Johnson in July of 2020?

19        A   I would not agree to that.

20        Q   Okay.  Because this policy doesn't require that

21   he do so, correct?

22        A   No, I didn't say that.

23        Q   Okay.  So could you clarify?

24        A   Again, this policy establishes universal
```

Page 29

1    governance on the way in which we are to interact with

2    the population.

3            The individual that we are discussing was

4    already assigned to a medical and mental health housing

5    unit, which there's an understanding that there's an

6    elevated level of medical or mental healthcare that does

7    not necessitate the sworn staff member making

8    notification to the on-duty supervisor because of those

9    things, in addition to the fact that the supervisors in

10   that medical and mental health housing facility have

11   firsthand knowledge of their movement for the day.

12           So it's already understood that I have visits

13   today or I have medical movement or I have mental health

14   movement.  So the supervisor has already been made aware

15   of all of the movement for the day.

16       Q    Okay.  So there's no -- Specifically when

17   someone is being moved out of Division 8, there's no

18   requirement that the escort has to confer with a

19   supervisor because it's presumed that these are kind of

20   special cases that are already on the supervisor's

21   radar; is that the answer?  Is that your answer?

22       A    It's not presumed.  The population in the RTU

23   has an elevated medical and/or mental health need.

24       Q    Okay.  And would any escort who's taking -- And

Page 30

1    escort is perhaps -- What's the terminology you would

2    use to describe someone who has been tasked with moving

3    personnel between divisions?

4        A    A movement officer.

5        Q    Okay.  Would the movement officer be aware that

6    anyone being moved out of Division 8 has some special

7    medical situation?

8        A    Yes, because everybody who's housed in the RTU

9    has an elevated medical and/or mental health need.

10       Q    Okay.  And, so in short, because they are

11   presumed to have an elevated medical or mental health

12   need and because supervisors are already aware of their

13   movements for the day, there's no reason why a movement

14   officer needs to confer with any supervisor before

15   moving an inmate; is that correct?

16       A    I didn't say that.  And there is no presumption.

17   It's a fact that if you are housed in the RTU, you're

18   going to have an elevated medical or mental health alert

19   in our Jail Management System.

20            It's not a presumption.  We're not working on

21   presumptions.  You're going to be an M3, which is an

22   elevated medical need, and you're going to be a P3,

23   which is an elevated psychological need.  So that's not

24   a presumption.  That's a fact.

1      Q   Okay.  Any movement officer would know about

2   that fact?

3      A   That is correct.

4      Q   Okay.  And would you agree that -- Is it not

5   your testimony that that movement officer would not need

6   to notify an immediate supervisor before restraining a

7   Division 8 inmate?

8      A   As I've said two other times, and I'll say it

9   again, our policies establish governance for the way we

10  are to interact with the population.  This statement

11  here works as a construct to help the individual staff

12  member understand their responsibilities to the

13  organization.

14         There's a working understanding that if you are

15  housed in the RTU, you have an elevated medical and/or

16  mental health need.

17     Q   Okay.  So this written policy establishes

18  general principles, but it doesn't necessarily govern

19  specific instances; is that fair to say?

20     A   There's no policy that could govern every single

21  conceivable instance that we would encounter in the

22  institution.  That is correct.

23     Q   Okay.  And, for example, this policy does not

24  specifically govern the handcuffing of a person who's

Page 32

1    dependent on a cane; is that correct?

2        A    I did not see anything specifically to anyone

3    being handcuffed with a cane in this policy.

4        Q    Okay.  In your general experience while working

5    at the Sheriff's Department, have you ever encountered

6    the issue of handcuffing people with canes in terms of

7    setting policy or establishes norms or practices?

8        A    I'm sorry, could you say that again?

9        Q    Yeah.  In your years of experience with the

10   Sheriff's Department, have you ever encountered the

11   issue or the policy-making task of establishing rules or

12   policies or norms about how and when inmates with canes

13   should be handcuffed?

14       A    I have not, no.

15       Q    Okay.  Have you ever -- Has this ever been a

16   problem that you've had to deal with in your

17   administrative capacity at the jail?

18       A    No.

19       Q    Okay.  I'm going to move over to what we're

20   going to call Gavin Group Exhibit 3.  This is a set of

21   policies that were tendered last week to us.

22              (Document marked as Gavin Deposition

23              Group Exhibit 3 for identification.)

24       Q    We're going to start with Policy 148.  Are you

Page 33

1    familiar with this policy?

2        A    Yes.

3        Q    And this starts on Bates No. 164 of this group

4    exhibit.

5             And this policy includes some highlighted

6    language that I'm going to read here.  It says, mobility

7    impairment refers to the inability of an individual to

8    use one or more of his/her extremities or a lack of

9    strength to walk, grasp, or lift objects.  The use of a

10   wheelchair, crutches, or a walker may be utilized to aid

11   in mobility.

12            Would you agree that this policy spells out

13   that persons who have difficulty walking have mobility

14   impairments?  That means they have disabilities, they

15   have a disability?

16       A    No.

17       Q    Okay.  What does a mobility impairment mean?

18       A    What do I think a mobility impairment means?  I

19   don't know what the technical definition of mobility

20   impairment means.  It's all subjective in my mind.  But

21   I would say that if someone is impaired mobilly, it's

22   that they're not very ambulatory.

23       Q    Okay.  And would requiring a cane to walk around

24   be a sign of impaired mobility?

Page 34

1      A    Yes.

2      Q    Okay.  I'm scrolling around here.  Thank you for

3  your patience.  And I'm now looking at Procedure 705,

4  which starts on Bates No. 173.  This is the Prohibition

5  Against Discrimination on the Basis of Disability.

6          Can you describe the purpose of this

7  prohibition?

8      A    It says the procedure provides guidelines for

9  Cook County Department of Corrections' members with

10  regard to the proper identification of inmates with

11  disabilities and assures -- I mean, yeah, assures their

12  access to programs, services, and activities.

13      Q    And there's a Subsection 705.7 about mobility

14  impairments, persons with mobility impairments, correct?

15      A    Yes.

16      Q    And is it true that canes are specifically and

17  expressly described in here as an auxiliary aid for

18  inmates with mobility impairments?

19      A    Yes.

20      Q    And then Subsection 3 of -- This is Subsection

21  705.7.  And this is -- I guess it would be 705.7.3.  It

22  says that inmates with mobility disabilities shall be

23  permitted to maintain the use of their auxiliary aids as

24  prescribed, e.g., long distance only, full time.  Can

Page 35

1    you explain what that Subsection 3 means?

2       A    There are two separate medical alerts.  One, a

3    cane, and then there's another one that says cane long

4    distance only.

5            So if an individual in custody had the cane

6    long distance only, they would not keep the cane on

7    their person full time, only when they were in transit,

8    being moved -- being moved outside of the housing unit

9    for a long distance.

10           The individual with the medical alert that just

11   says cane means that they're allowed to have their cane

12   all the time.

13      Q    Okay.  And so there's no way that somebody would

14   be allowed to have a cane as they're being escorted

15   between different units unless they have the long

16   distance medical alert for a cane; is that correct?

17      A    No, that's not what I said.

18      Q    Okay.  Please clarify, or please explain.

19      A    I said if you have -- There are two separate

20   medical alerts in our Jail Management System that get

21   fed from the medical system.  One says cane.  If you

22   just have a regular cane alert, you keep your cane on

23   you full time.  If you have the cane long distance only,

24   you do not keep that cane on your person unless you're

Page 36

1    in transit for a long distance.

2         Q    Okay.  And if -- I'm sorry, finish your thought.

3         A    If you have cane long distance, you wouldn't

4    have the cane on your person while you're moving about

5    the living unit.

6         Q    Okay.  And so if you're allowed to have a cane

7    while being escorted between units, you have at least a

8    long distance medical alert and possibly a full-time

9    cane medical alert, correct?

10        A    Yes.

11        Q    Okay.  And so you would be one of the detainees

12   that are described here within this policy, correct?

13        A    Yes.

14        Q    Okay.  And, again, how would a movement officer

15   know whether a detainee has a long distance or full-time

16   cane medical alert?

17        A    It's in the Jail Management System.  They have

18   an order from a doctor that they have on their person

19   that says what their medical orders are for the medical

20   device that they've been given.

21        Q    Okay.  And they would need to go to a terminal

22   or office to review that information, correct?

23        A    Not an office.  They could go to one of the

24   posts in any living unit.

Page 37

1    Q   Yes.

2    A   Or they could --

3    Q   And just -- I'm sorry.

4    A   Or they could ask the individual in custody to

5    see their order.

6    Q   Okay.  And if the individual in custody already

7    has a cane, is that a good sign to the movement officer

8    that this individual has a medical alert for that cane?

9    MR. O'CONNOR:  Objection to the form.  You may

10   answer.

11   THE WITNESS:  Not always, because members of the

12   population loan their medical devices to other people.

13   So I would say no.

14   MR. BLEIFUSS PRADOS:  Q   Okay.  So should a

15   movement officer review a detainee with a cane's medical

16   alerts moving them between units?

17   A   No.

18   Q   Okay.  Why not?

19   A   If the individual has a cane -- I don't know

20   what the -- If you wanted to affirm -- If you wanted to

21   affirm that the individual needs the cane, then, yes.

22   But if you're just moving the individual in custody from

23   one area to another for the purpose of an operation,

24   then you would just move the individual.

1          If there was a security concern, then

2     certainly you would look up the individual to ascertain

3     whether or not, you know, the cane is needed, if the

4     cane's needed for long distance.

5          A lot of times the living unit officer already

6     has done that cursory work.  So if I am the movement

7     officer, when I come on -- when I land on the living

8     unit to pick up Larry Gavin, the living unit officer's

9     already said, hey, I already checked Larry Gavin out, he

10    has a cane, he has a cane alert that's active, so he's

11    going to use his cane.

12    Q    Okay.  So would there be some kind of mechanism,

13    even if it's an informal verbal exchange between jail

14    personnel, that would alert the movement officer to the

15    fact that it's okay for this person to have a cane?

16    MR. O'CONNOR:  Objection to the form.  You may

17    answer if you understand.

18    THE WITNESS:  I mean, yeah, but I don't -- I mean,

19    no one is attempting to remove the medical device from

20    the individual unless there's a belief that the person's

21    not entitled to it.  So I'm not really sure what I'm

22    answering.

23          I mean, if you have a cane, if you've been

24    issued a medical device, you will be allowed to utilize

Page 39

1    your medical device.

2        MR. BLEIFUSS PRADOS:  Q   Okay.  Is there any policy

3    that you're aware of, either a written policy or an

4    unwritten rule or practice, in force in the Sheriff's

5    Department that relates to the difficulty with which

6    persons with canes will -- Strike that.

7            Is there any policy, either written policy or

8    practice, that you're aware of that addresses the issue

9    of when persons with canes can be handcuffed or

10   contemplates the difficulty with which persons with

11   canes will walk around when they're handcuffed?

12       MR. O'CONNOR:  Objection to the form, compound.  You

13   can answer if you understand.

14       THE WITNESS:  Having a cane does not preclude you

15   from being handcuffed.  Just because you have a cane

16   does not mean that you will not be placed in mechanical

17   restraints.

18       MR. BLEIFUSS PRADOS:  Q   And under some

19   circumstances could it mean that you would not be placed

20   in mechanical restraints?

21       A   That's a hypothetical.  I mean, you know,

22   everything is individualized, and with -- like I said

23   earlier, with the consult from Medical.

24            If there is a medical reason that has been

Page 40

1   communicated to security that an individual can be

2   further impaired by the use of a mechanical restraint,

3   and the recommendation from our medical partner is that

4   they not be secured in a mechanical restraint because of

5   their medical condition, then they will not be secured

6   in a mechanical restraint.

7       Q    Okay.  So there's no written policy that

8   addresses that specifically; it's determined through

9   consultation between security personnel and medical

10  personnel?

11      A    We spoke on that earlier.  Yes.

12      Q    And is there any process in place that ensures

13  that that consultation happen that you're aware of?

14      A    Is there any -- I'm sorry, can you reask the

15  question?

16      Q    Sure.  Is there any policy in place that ensures

17  that that consultation happen?

18      A    As previously stated, everyone who comes into

19  the institution receives a medical evaluation.  And if

20  the medical evaluation determines that someone is in

21  need of the use of a cane, they're issued the use of a

22  cane with the appropriate corresponding medical alert.

23          If at any point their medical need is increased

24  or there is a change in their medical condition to which

Page 41

1    the use of a mechanical restraint is not recommended by

2    Medical, they will communicate that to Security and we

3    will acquiesce based on their recommendation and not use

4    a medical -- I mean a mechanical restraint.

5        Q    So is it fair to say that you don't know of any

6    specific policy that ensures that that consultation

7    happens?

8        A    I don't know of -- We have an interagency

9    agreement with our medical partners, and I'm not privy

10   to every single word that's contained therein.  But we

11   do have communications with our medical partners I'm

12   involved in three times a week at least.  So there is a

13   static communication at an administrative level between

14   us and our medical partners.

15           The superintendents of the housing units have

16   interagency meetings where they meet with our medical

17   and mental health partners.  So there's a hierarchal

18   structure of meetings and deliberations that take -- and

19   communications that take place daily, weekly, biweekly,

20   triweekly, monthly.  So there is static systems in place

21   to discuss the medical and mental health needs of the

22   population.

23       Q    Okay.  And are those discussions that you're

24   privy to, are they about specific inmates or are they

Page 42

1    about general policy?

2        A    Both.

3        Q    Okay.  And do you know either way whether there

4    was any specific communication between administration

5    and medical personnel regarding the plaintiff in this

6    case, Douglas Johnson's medical needs?

7        A    I do not know.

8        Q    Okay.  I'm scrolling down to Policy 801.  This

9    is, again, within Gavin Group Exhibit 3.  This document

10   starts on Bates No. 181.

11           And this is Inmates With Disabilities.  Are you

12   familiar with this written policy?

13       A    Yes.

14       Q    And what is the purpose of this written policy?

15       A    The policy provides guidelines for addressing

16   the needs and rights of inmates detained by the Cook

17   County Department of Corrections in accordance with the

18   Americans With Disabilities Act.

19       Q    Okay.  Then there's a subsection called 801.4,

20   Sworn Member Responsibilities.  And part of this

21   subsection says that a sworn member should accommodate

22   requests for assistance from inmates with disabilities

23   if the accommodation would not raise a safety concern or

24   affect the orderly function of the department.

Page 43

1              Is there any policy on point or any rule at the

2    Sheriff's Department about whether inmates with canes

3    have to be handcuffed as they're moved between units or

4    not?

5         A    Respectfully, I think we asked and answered

6    that.  But can you ask it again?

7         Q    Sure.  Is there any policy on point -- any

8    policy at the Sheriff's Department that states one way

9    or another whether a detainee with a cane medical alert

10   or who depends upon a cane to walk should be handcuffed

11   as they're moved between units?

12        MR. O'CONNOR:  Objection.  But you may answer it.

13        THE WITNESS:  So as I previously stated, every

14   individual in custody with a cane is subject to the use

15   of medical -- I mean, I'm sorry, mechanical restraints

16   unless otherwise notified by our medical partner or if

17   the Sheriff's ADA coordinator makes a recommendation to

18   Security that based on the elevated medical need that

19   the individual should not be restrained.

20        MR. BLEIFUSS PRADOS:  Q   Okay.  So the presumption

21   is that they should be restrained?

22        A    It's not a presumption.  Everyone that's

23   incarcerated in the Cook County Department of

24   Corrections, unless otherwise stated because of their

Page 44

1    enhanced medical need, will be restrained.  That's not a

2    presumption.

3        Q    Okay.  And you agree that there are exceptions

4    to that general policy, correct?

5        A    I agree that there are exceptions to every

6    general policy, yes.

7        Q    Okay.  And is there a particular system in place

8    to communicate to movement officers when and where those

9    exceptions should be made?

10       A    We've discussed that as well, respectfully.

11   We've talked about the communicative process between our

12   medical and mental health partners and Security.  And we

13   talked about the ability for our line staff to engage

14   medical nursing staff.  We talked about the fact that

15   the RTU has a 24-hour dispensary that is manned by

16   medical personnel constantly.

17            So, yes, those systems are in place for the

18   very reason that every policy cannot encompass every

19   single conceivable situation that a sworn staff member

20   would be confronted with within the institution.

21       Q    Okay.  Would you agree that there's no system in

22   place that requires a sworn staff member from conferring

23   with supervisors or medical personnel to determine

24   whether an exception would be made to the mechanical

Page 45

1   restraint rule?

2       A    I would not agree with that.

3       Q    Okay.  Can you elaborate?

4       A    Because we have a responsibility to the medical,

5   mental health, and safety needs of the people in our

6   custody and we are charged to do what we can to make

7   sure that we are not in violation of any of their

8   Constitutional rights, nor are we in violation or

9   attempting to treat them inhumanely as it relates to a

10  medical condition.

11           So if an individual with a cane tells us that

12  he cannot walk, the expectation is that the sworn staff

13  member would communicate that up the chain of command,

14  and the chain of command would make notification to

15  medical saying that the individual was saying that he

16  cannot walk, would you guys -- and we would get him a

17  medical evaluation and then we would take the

18  recommendation of our medical partners.

19           So, no, we have systems in place that the -- I

20  mean that staff are responsible for to make sure that

21  we're not treating people inhumanely.

22      Q    Okay.  So the staff member should, upon being

23  told by an inmate that they cannot walk, should engage

24  in this investigation or consultative process, correct?

Page 46

1     A    That's correct.

2     MR. O'CONNOR:  Object to form.

3     MR. BLEIFUSS PRADOS:  Q   And if they don't, are

4  they breaking the Sheriff's Department's rules?

5     MR. O'CONNOR:  Objection to the form.  You may

6  answer.

7     THE WITNESS:  Yes.

8     MR. BLEIFUSS PRADOS:  Q   Okay.  And is there any

9  mechanism in place that you're aware of that enforces

10  this responsibility that sworn officers have, sworn

11  members have, to inquire with their supervisors or

12  medical personnel about an inmate's needs?

13     A    The population can file a grievance.  And in the

14  grievance they can say that on this date and time I was

15  being escorted and I said to the officer that I couldn't

16  walk and the officer made me walk anyway.  And then that

17  will be investigated and reviewed.

18     Q    Okay.  So the grievance process is an important

19  part of the kind of accountability system for enforcing

20  these rules; would you agree?

21     A    I would agree that the grievance process serves

22  as kind of an oversight as it relates to ensuring that

23  the population is treated fairly and equitably and have

24  a voice in addressing what they believe to be

Page 47

1    violations, yes.

2        Q    Okay.  When inmates are visiting -- Well, strike

3    that.

4             Where would an inmate in July of 2020 -- And,

5    again, when I'm saying inmate, I'm saying inmate and

6    detainee as sort of interchangeable terms for the

7    purposes of this deposition.

8             In July of 2020 where would an inmate housed in

9    the medical unit meet with visitors?  Where physically

10   in the jail complex would they meet with visitors, if

11   you know?

12       A    So this was during the time of the pandemic.  I

13   know that the visitation area in the RTU is on the

14   second floor.  But I can't speak specifically to where

15   this individual was going to visit on the given day.

16       Q    Okay.  And is that because during the

17   pandemic -- during the height of the pandemic the jail

18   probably didn't want visitors coming to the medical

19   building?

20       MR. O'CONNOR:  Objection to the form.  You may

21   answer.

22       THE WITNESS:  Yeah, I don't know what the thought

23   was at the highest levels of the office.  I just know

24   that the visitation room in the RTU was on the second

1    floor.  But I can't remember if that room was being

2    utilized in July of 2020.

3           MR. BLEIFUSS PRADOS:  Q   And what were the rules

4    about the use of mechanical restraints for inmates while

5    they're meeting with visitors in July of 2020?

6       A   I don't know if there were any rules in

7    particular because it was July of 2020.

8       Q   And is that because the conditions were so

9    abnormal at that time, or what do you mean?

10      A   Because I don't know if we made a variance to

11   our practice because of the pandemic.  So I'm not sure.

12      Q   Okay.  How -- You've described a number of

13   processes that sworn members are supposed to participate

14   in when evaluating an inmate's medical needs, and

15   specifically whether they need to be restrained with a

16   handcuff -- with handcuffs while being moved.  How would

17   those practices or procedures be taught to sworn

18   personnel?

19      A   Well, you mischaracterized my statement.  I

20   didn't -- That's not what I said.

21      Q   Please clarify -- Please correct what you said.

22      A   I said that if the staff member had concerns

23   about whether or not an individual's use for a cane --

24   Because we were talking about an individual's use for a

1  cane and you were asking me, well, how would they know

2  if they need to use the cane or not.  And I said that

3  there are processes in place by which they could find

4  out if they wanted to know for sure that the individual

5  rightly was entitled to use the cane by way of alert

6  through the jail mass, speaking with medical staff, so

7  on and so forth.

8          And then we talked about whether or not an

9  individual -- if an individual said to a staff member

10  that he or she could not physically walk.  Then we said

11  that they would make notification up the chain of

12  command and that they would consult with Medical and get

13  the individual a medical consult to determine his or her

14  level of medical care or need.

15      Q   Okay.  And how are sworn members instructed in

16  following those procedures?

17      A   To, first of all, make notification to their

18  immediate supervisor, who would engage and become a part

19  of whatever the scenario that's presenting itself is.

20  And between that first line or command-level supervisor,

21  someone would consult with Medical and have the

22  individual in custody receive a medical evaluation based

23  on the, for lack of a better word, complaint that the

24  individual in custody is making relative to his or her

Page 50

1    ability to walk or use the cane or not be able -- you

2    know, or whatever.

3            Whatever the medical need is, we have a

4    responsibility to get the individual in front of Medical

5    so that his medical -- his or her medical need can be

6    addressed.

7    Q   Okay.  And how is that responsibility

8    communicated to sworn members or inculcated in the

9    staff?  Is it through on-the-job training?  Is it at the

10   Academy?  Is it through e-mails?  How is this taught to

11   people?

12   A   It starts at the Academy with understanding our

13   responsibility to avail individuals in custody to our

14   medical and mental health partners.

15           In emergent circumstances we would call 911.

16   We don't -- You know, so like it's just our operation.

17   There's a hierarchal level of integration with respect

18   to working with the medical and mental health partners

19   to assess the medical and mental health need of the

20   individuals in custody.  And Security has the

21   responsibility to avail those individuals to our medical

22   and mental health partners as they need to be.

23   Q   Okay.  Is it fair to say that there's no written

24   policy that specifically addresses when and where

Page 51

1    individuals with a cane should be handcuffed as they're

2    being moved or when exceptions should be made to that

3    general practice?

4        MR. O'CONNOR:  Objection, form, asked and answered.

5    You can answer.

6        THE WITNESS:  Yeah, we keep going around,

7    respectfully.  This is the fourth time.

8             Again, everyone in custody that has a medical

9    device of a cane primarily will be placed in mechanical

10   restraints unless otherwise recommended by our medical

11   partner.  We default to the medical -- We default to the

12   mechanical restraint.  I guess that's the best way to

13   put it.

14            Everyone with a cane will be handcuffed to the

15   front unless otherwise recommended by our medical

16   partner or the Sheriff's ADA coordinator who believes

17   that the individual's medical need supersedes the

18   security need, and then we would acquiesce to that

19   recommendation.

20       MR. BLEIFUSS PRADOS:  Q   Okay.  Is there a written

21   policy that says when an inmate has a cane, the default

22   is to handcuff them?

23       A    No.

24       Q    Okay.  Is there any written policy that

Page 52

1    addresses exceptions to when an individual with a cane

2    should need not be handcuffed I guess?

3        A    No, but there's no policy -- I mean, everyone

4    that's incarcerated in the jail, there's a high

5    probability that you will be in hand restraints.

6        Q    Okay.

7        A    Unless your medical need is such that a

8    recommendation has been made that you not be in a hand

9    restraint.

10       Q    Okay.  And is there any written policy that

11   guarantees that when a person need not be in hand

12   restraints, the movement officer will be informed of

13   that fact?

14       A    As previously stated, we have medical alerts

15   that are fed from the medical system to our Jail

16   Management System.  In addition, the individual in

17   custody has a written order from a doctor for his or her

18   cane.  In addition, we have communication with our

19   medical partners on multiple levels.

20            We have an interagency agreement.  We have a

21   ton of systems in place that allows for communication to

22   go forth that unless restrictive recommendation can be

23   made for an individual, and we will acquiesce.

24       Q    So is the answer to my question, yes, there is a

Page 53

1    system that guarantees that that happens?

2        A    There are no guarantees.

3            Hey, like this is becoming redundant,

4    respectfully.  It's like you're trying to trip me up.

5    And I'm going to continue to say exactly what I'm

6    saying, respectfully, because you're trying to find

7    different ways for me to say something different.  And

8    I'm going to keep telling you the same thing.  So just

9    so you know.

10           So, again, we are --

11       Q    I thank you for your respect.  I appreciate

12   that.

13       A    Yeah, because it's extremely redundant and like

14   I'm not going to say anything different, sir,

15   respectfully.

16       Q    And are there any written policies that address

17   specifically how tightly handcuffs should be applied to

18   detainees in general?

19       A    We also discussed that, and I talked about how

20   in the training academy --

21       Q    It's a yes or no question.  Sir, it's a yes or

22   no question.

23       A    Yeah, but you've asked that already and I

24   answered it.  So why would it be yes or no now when it

Page 54

1    wasn't before?  You asked me that.

2        Q    Sir, it's a yes or no question.  You still have

3    to answer my questions even if you're aggravated.  I

4    apologize.

5        A    I'm not aggravated at all.  I'm fine.  You keep

6    asking the question again and I'll answer it yes or no,

7    sir.

8        Q    Okay.  Is there any written policies that

9    address how tightly an inmate's handcuff should be

10   fastened in general?

11       A    Not to my knowledge.

12       Q    Okay.  Is there any written policies that

13   address how tightly an inmate's handcuffs should be

14   fastened when they have to walk with a cane?

15       A    Not to my knowledge.

16       Q    Are there any unwritten policies that address

17   that second question?

18       A    There's a universal technique that is implied,

19   that we attempt to secure the hand restraint tight

20   enough to make them secure for ourselves, but not to

21   restrict the blood flow, not to injure the individual in

22   custody.

23            The hand restraints are used just for

24   restrictive movement of the individual for the safety

Page 55

1    and security of the institution, but they should not be

2    used in a manner that causes any undue harm, stress,

3    pain, et cetera, to the individual being restrained.

4        Q    Okay.  And how are -- how are staff trained in

5    applying that universal principle?

6        A    They're trained in the Academy.

7        Q    Okay.  And you're not sure whether -- what

8    they're teaching is the two-finger rule or the

9    three-finger rule or what have you; is that correct?

10       A    I'm not sure what they're teaching today, other

11   than to say that no matter what, two finger, three

12   finger, the idea -- the thesis is to be as least

13   restrictive as possible when placing mechanical

14   restraints around someone's wrists so that you do not

15   prevent them from having proper blood flow or injury or

16   swelling or making marks.

17       Q    Is it safe to say that you don't know

18   specifically what Antwaun Bacon was taught at the

19   Academy with respect to that policy?

20       A    I do not know specifically what he was taught in

21   the Academy.  But there is a universal understanding of

22   a law enforcement professional what the threshold is.

23       Q    Okay.  And that threshold could be one finger,

24   two fingers, or three fingers depending on how it's

Page 56

1   done?

2       A   The threshold is to make the hand restraint as

3   tight as you need to without restricting blood flow,

4   without causing swelling or injury to the individual

5   that is being restrained.

6       Q   Okay.  And when injury is caused to the

7   individual, is it fair to say that that is a failure to

8   follow the policy?

9       A   No.

10      MR. O'CONNOR:  Objection.

11      THE WITNESS:  Yeah, I don't know why injury -- There

12  could be a million reasons why someone gets injured.  If

13  they're trying to work themselves out of the handcuffs,

14  they could get injured.  So the handcuff could be placed

15  properly, but if you're trying to rub back and forth and

16  trying to get out of them, you could injure yourself.

17      MR. BLEIFUSS PRADOS:  Q   All right.  And you would

18  agree that if the handcuffs are placed so tightly that

19  they cause an injury, that they've been placed

20  improperly?

21      MR. O'CONNOR:  Objection to form.

22      THE WITNESS:  I would agree that if handcuffs are

23  placed too tightly, they can cause injury, yes.

24      MR. BLEIFUSS PRADOS:  Q   And that would be a

Page 57

1  violation of policy, correct?

2      A   Yes.  If they're placed too tightly, yes.

3      Q   And, again, that's not a written policy, that is

4  a universal understanding that's communicated at the

5  Academy?

6      A   If handcuffs are placed too tightly, that would

7  be a violation of policy.

8      Q   Okay.  Are you aware of any ongoing education

9  that jail personnel receive regarding the tightness of

10 handcuffs?

11     A   You also asked this earlier, and we talked about

12 in-service training that takes place once a year for

13 every sworn member.  And that's where we would be

14 reintroduced to the placement of mechanical restraints.

15     Q   Okay.  And do you know as a matter of fact that

16 the tightness of mechanical restraints is addressed in

17 those yearly trainings?

18     A   Yes, because I have to participate in them.  So

19 I know firsthand that they are.

20     Q   Okay.  And what is the rule that's being -- that

21 was taught in 2020?  Was it the two-finger rule or the

22 three-finger rule or was that specified?

23     A   You already asked that, and I'll answer it

24 again, that mechanical restraints are to be placed on

Page 58

1    the person to secure them, but not to restrict their
2    blood flow or to cause injury.  You asked that already.
3       Q   Okay.  So is it fair to say that when you were
4    in the Academy, you were taught about the two-finger
5    rule?  Was that your testimony?
6       A   It was -- Yes, I said when I was in the Academy,
7    that we were taught to use two fingers in between the
8    person's wrist and the hand restraint as a way of -- a
9    guide to understand whether or not the mechanical
10   restraint was being too restrictive.  Yes.
11      Q   All right.  And is it safe to say that you're
12   not sure whether that's still being taught in the
13   Academy?
14      A   I said, again, that I have firsthand knowledge
15   that we are still training staff to be as least
16   restrictive with the usage of hand restraints as
17   possible.
18      Q   Okay.  So this is a yes or no question.  You're
19   not sure whether that two-finger test is still being
20   taught in the Academy?  Yes or no.
21      A   I gave you an example of the two finger as a
22   means that we would use as a guide.  It was not a
23   formalized written directive.  It was an example of how
24   an individual could discern whether or not handcuffs

Page 59

1    were being placed on too tight.

2        Q    Okay.  And you're not sure whether that

3    two-finger guideline is still being taught in the

4    Academy, correct?

5        A    No, I'm not.

6        Q    Okay.  And you're not sure whether Antwaun Bacon

7    had been taught that two-finger guideline, correct?

8        A    I'm sure Antwaun Bacon has been taught how to

9    put on mechanical restraints and how to not make them

10   too tight.

11       Q    Director, that was not my question.  You're not

12   sure whether Antwaun Bacon was taught the two-finger

13   guideline, correct?

14       A    I am sure that Antwaun Bacon has been taught how

15   to place mechanical restraints on individuals in custody

16   without making them too tight.  You --

17       Q    That's not my question.

18       A    Yeah, but I'm telling you what was taught to me.

19   So like you're saying -- you're globalizing the

20   two-finger rule.  The two-finger rule was just a guide

21   to suggest to a law enforcement member about how not to

22   make the hand restraints too tight.

23            I don't know if Antwaun Bacon was taught the

24   two-finger rule, but I know he was taught to not make

Page 60

1    hand restraints too tight.

2        Q   Is it possible he was taught the two-finger

3    guideline?

4        A   Yes, it's possible.

5        Q   Is it possible he was taught a three-finger

6    guideline?

7        A   It's possible.

8        Q   You're not sure either way, correct?

9        A   I'm not sure which -- what he was taught

10   specifically as it relates to using a guide.  But I'm

11   sure he was taught -- I'm positive he was taught not to

12   place hand restraints on an individual too tight.

13       Q   Okay.  And how are you positive of that fact?

14       A   Because we're all taught that in law enforcement

15   as a part of our use of force training, how to place

16   hand restraints on individuals and to make sure that

17   they're not too tight and to make sure that the

18   restraints allow for the blood flow to continue.  All

19   law enforcement officers in our department are taught

20   that.

21       MR. BLEIFUSS PRADOS:  Thank you, Director.  I

22   promise you I don't have many more questions, but if we

23   could just take a 10-minute break.

24       MR. O'CONNOR:  Can we make it five?  I know that

Page 61

1   Mr. Gavin does have a plane to catch this afternoon.

2       MR. BLEIFUSS PRADOS:  I won't go much longer.

3       THE WITNESS:  Okay.  Yeah, I've got a hard stop at

4   11:00.

5       MR. BLEIFUSS PRADOS:  At 11:00 o'clock?  Okay.  Did

6   you say five minutes?  Is that what you said?

7       MR. O'CONNOR:  Can we do a five-minute break?

8       MR. BLEIFUSS PRADOS:  Yeah, we can take a

9   five-minute break instead.

10          (Recess was taken.)

11      MR. BLEIFUSS PRADOS:  Q  Director, I'd just like to

12  show you -- I guess we're on Exhibit 4; is that right?

13      MR. O'CONNOR:  Yes.

14          (Document marked as Gavin Deposition

15           Exhibit 4 for identification.)

16      MR. BLEIFUSS PRADOS:  Q  Okay.  Do you see this

17  document I'm showing to you?  It's a spreadsheet.

18      A   Not yet.  Now I do, yes.

19      Q   Do you see I've highlighted a row in the middle

20  for cane?

21      A   Yes.

22      Q   With a start time -- an effective date, I'm

23  sorry, of December 8th, 2019 and an expiration date of

24  December 9th, 2021?

Page 62

1      A    I don't see the expiration date.

2      Q    Oh, I'm sorry.  Do you see it now?

3      MR. O'CONNOR:  It's covered by the panels, Adrian.

4      MR. BLEIFUSS PRADOS:  Q   Let's see if I can move

5   this here.  Do you see it now?

6      A    No.

7      Q    Okay.

8      A    Yes, I see it now.

9      Q    Okay.

10      A    Yes.

11      Q    And do you know from this alert whether

12   Mr. Johnson had a long distance alert for a cane or a

13   permanent cane medical alert?

14      A    I wouldn't categorize it as permanent, but I

15   would say that the fact that he had a regular cane alert

16   means that he could keep the cane on his person at all

17   time for use.

18      Q    Okay.  And what does the 10.5 alert mean, if you

19   know?

20      A    It's just a hierarchal technological way of

21   making sure the alerts are -- how they are viewed in the

22   Jail Management System.  It really has no other value

23   than that that I understand.

24      Q    And so is this the -- Does it give you -- Does

Page 63

1    it prioritize alerts?  If you know.  I don't want you to

2    speculate.

3        A   I don't remember exactly what that was meant

4    for.  I don't remember.

5        Q   And is this the information that a movement

6    officer would see if they looked up an inmate in one of

7    the terminals?

8        A   Yeah, they're not terminals, they're individual

9    computers.  The Jail Management System is a web address.

10   So those are not like terminals the way it used to be.

11          But if they looked up in the computer, they

12   would -- and went into the Jail Management System under

13   his booking, they would see all of his active medical

14   and -- I mean medical, psyche, and security alerts.

15   And, yes, this would be one of the alerts they would

16   see.

17       Q   They would see also, for example, the lower bunk

18   alert?

19       A   Yes.

20       Q   Do you see it here?

21       A   Yes.

22       MR. BLEIFUSS PRADOS:  All right.  I actually have no

23   further questions.

24       THE WITNESS:  Thank you.

```
1                    EXAMINATION

2                 by Mr. O'Connor:

3      MR. O'CONNOR:  Q  I have a couple questions very,

4  very briefly, Director.

5      A   Oh, that's fine.

6      Q   I apologize if the first couple sound familiar.

7            You have talked at great length that the

8  standard operating procedure is that any inmates that

9  are being transported while in the jail are to be placed

10  in hand restraints, correct?

11      A   Yes.

12      Q   And that's minimally?

13      A   Yes.

14      MR. BLEIFUSS PRADOS:  Objection to form.

15      MR. O'CONNOR:  Q   And that is unless it has been

16  determined by medical personnel that the medical need

17  necessitates that they not be placed in hand restraints;

18  is that correct?

19      A   That's correct.

20      Q   Is it the standard -- Like baseline is what I

21  mean.  I apologize.  Is it the baseline that an inmate

22  without any sort of special security needs or disability

23  needs, that they would be transported in hand restraints

24  behind their back?
```

Page 65

1      A    Yes.

2      Q    If they are placed in hand restraints in front

3   of their body due to a disability, such as using a cane,

4   is that an accommodation that's being made for that

5   restriction?

6      A    Yes.

7      Q    And would that accommodation be in accordance

8   with the policies and procedures of the Cook County

9   Sheriff's Office?

10     A    Yes.

11     Q    Also, and this is a separate issue, but the hand

12  restraints that are used on inmates when they're being

13  transported, when they are placed, are they static or

14  could they still be adjusted further?

15     A    Well, we have two different types of handcuffs,

16  but there are some that double lock.  So you can place

17  hand restraints on someone and then double lock them

18  where they can't move -- where you can't make them any

19  tighter.  And then there are some that don't have the

20  double-locking function where they can be made tighter

21  if the person attempts to manipulate them or even if

22  staff wanted to make them tighter.

23         So I'm not sure which particular hand restraint

24  was being used that day.

1      Q    Okay.  But there are -- You said the single

2  lock, even once they're put on, they can be made tighter

3  by either officers or even inadvertently by the inmate

4  wearing them; is that correct?

5      A    That's correct.

6      Q    And if that were to happen, it could create a

7  situation where it's tighter than it should be; is that

8  correct?

9      A    That's correct.

10     MR. O'CONNOR:  I have no further questions.

11                        RE-EXAMINATION

12                   by Mr. Bleifuss Prados:

13     MR. BLEIFUSS PRADOS:  Q  Director, you can always

14  remove handcuffs and re-apply them if they are too

15  tight, correct?

16     A    Absolutely.

17     Q    And you can remove handcuffs entirely if they're

18  too tight or causing the inmate an injury, correct?

19     A    That's correct.

20     Q    And removing the handcuffs or not using the

21  handcuffs could also be an accommodation for a person

22  who needs to walk with a cane, correct?

23     A    If Medical has recommended that the use of

24  mechanical restraints should not be because of his

Page 67

1   condition, yes.

2       Q    If a movement officer suspects or has reason to

3   believe that the handcuffs are causing the inmate an

4   injury, isn't it their responsibility to remove the

5   handcuffs?

6       A    Once they get the individual to a medical

7   dispensary for them to be evaluated, yes.

8       Q    And so it's their responsibility then to have an

9   evaluation done as to whether the handcuffs are causing

10  the inmate an injury?

11      A    Yes.  If I have you handcuffed and you're

12  telling me that they are too tight and they're

13  restrictive and I don't think that they are, I'm going

14  to escort you to a medical facility to have you

15  evaluated by medical professionals.

16      Q    Okay.  Is there a written policy that instructs

17  movement officers to do that?

18      A    There's a written policy -- Or there's an

19  understanding that we have a responsibility to avail

20  medical services to the population when they have a

21  complaint of a medical condition.

22      Q    Okay.  And that's an understanding as opposed to

23  a written policy, correct?

24      A    No, that's what we're responsible for.  I mean,

Page 68

1    I don't know the actual policy verbatim, but we're

2    responsible for ensuring that we provide them the

3    opportunity to see medical and mental health staff if

4    they believe they have an issue.

5        Q    And if a movement officer believes or has reason

6    to believe that handcuffs are causing or have caused a

7    detainee an injury, it is their responsibility to have

8    them seen by medical professionals, correct?

9        A    Yes.

10       MR. BLEIFUSS PRADOS:  Okay.  I have nothing else.

11            Director, thank you for your time and for your

12   good cheer throughout this deposition.

13       THE WITNESS:  No problem at all.

14       MR. O'CONNOR:  Zach, you didn't have any questions,

15   did you?

16       MR. STILLMAN:  No, I'm good.

17       MR. BLEIFUSS PRADOS:  I guess the waiver issue.

18       MR. O'CONNOR:  Director Gavin, just so you know,

19   there is only more thing left to discuss, and that's

20   whether or not you wish to review the transcript for any

21   spelling errors or anything like that or if you wish to

22   waive signature.

23       THE WITNESS:  I'm going to waive signature.

24       MR. O'CONNOR:  Thank you, sir.

Page 69

1          (Whereupon, the deposition concluded

2          at 10:49 a.m. Central Daylight Time.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 70

1    STATE OF ILLINOIS   )
                         ) ss:
2    COUNTY OF C O O K   )

3

4         The within and foregoing deposition of the

5    aforementioned witness was taken before NADINE J. WATTS,

6    CSR, RPR, and Notary Public, at the place, date and time

7    aforementioned.

8         There were present during the taking of the

9    deposition the previously named counsel.

10        The said witness was first duly sworn and was

11   then examined upon oral interrogatories; the questions

12   and answers were taken down in shorthand by the

13   undersigned, acting as stenographer and Notary Public;

14   and the within and foregoing is a true, accurate and

15   complete record of all of the questions asked of and

16   answers made by the aforementioned witness, at the time

17   and place hereinabove referred to.

18        The signature of the witness was waived by

19   agreement of counsel.

20        The undersigned is not interested in the

21   within case, nor of kin or counsel to any of the

22   parties.

23

24

Page 71

1          Witness my official signature and seal as

2     Notary Public in and for Cook County, Illinois, on this

3     8th day of May, A. D. 2024.

4

5

6                              *Nadine J. Watts*

                               NADINE J. WATTS, CSR, RPR

7                              Notary Public

                               License No. 084-002736

8                              One North Franklin Street

                               Suite 3000

9                              Chicago, Illinois  60606

                               (312) 442-9087

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**[03718 - acknowledging]**                                    Page 1

| **0** |
|---|
| **03718** 1:6 |
| **084-002736** |
| 71:7 |

| **1** |
|---|
| **1** 3:10 9:22,24 |
| **10** 6:22 60:23 |
| **10.5** 62:18 |
| **10:49** 69:2 |
| **1103** 8:23 |
| **111** 2:4 |
| **11:00** 61:4,5 |
| **1219** 8:24 |
| **148** 8:2,19 |
| 32:24 |
| **156** 24:11 |
| **1611** 2:5 |
| **164** 33:3 |
| **173** 34:4 |
| **181** 42:10 |
| **1995** 4:23 |
| **1st** 4:23 |

| **2** |
|---|
| **2** 3:12 24:9,13 |
| **2004** 5:4 |
| **2008** 5:7 |
| **2017** 5:10,11 |
| **2019** 61:23 |
| **2020** 8:10,15 |
| 9:7,11 10:7,13 |
| 13:1 17:19 |
| 20:11 28:18 |
| 47:4,8 48:2,5,7 |
| 57:21 |

| **2021** 61:24 |
|---|
| **2022** 5:16 |
| **2024** 1:21 3:2 |
| 71:3 |
| **20805** 71:6 |
| **22** 1:6 |
| **230** 2:15,16 |
| **24** 3:2,12 14:21 |
| 14:22 44:15 |
| **24th** 1:20 |
| **29** 25:15 |

| **3** |
|---|
| **3** 3:13 32:20,23 |
| 34:20 35:1 |
| 42:9 |
| **30** 1:14 3:1 |
| **300-4479** 2:17 |
| **3000** 71:8 |
| **312** 2:11,17 |
| 71:9 |
| **32** 3:13 |

| **4** |
|---|
| **4** 3:5,15 61:12 |
| 61:15 |
| **442-9087** 71:9 |

| **5** |
|---|
| **500** 2:10 |
| **5th** 2:10 |

| **6** |
|---|
| **6** 1:14 3:1 |
| **603-1880** 2:11 |
| **60602** 2:5,11 |
| **60606** 2:16 |
| 71:9 |

| **61** 3:15 |
|---|
| **62** 9:21 |
| **64** 3:6 |
| **641-4667** 2:6 |
| **66** 3:5 |

| **7** |
|---|
| **705** 8:21 34:3 |
| **705.7** 34:13 |
| **705.7.** 34:21 |
| **705.7.3.** 34:21 |
| **708** 3:10 8:2,7 |
| 9:18 19:16 |
| 24:10 |
| **708.4.** 10:16 |
| **709** 3:12 8:2,7 |
| 24:14,15 |
| **709.3.1** 24:17 |
| **773** 2:6 |

| **8** |
|---|
| **8** 29:17 30:6 |
| 31:7 |
| **801** 8:21 42:8 |
| **801.4** 42:19 |
| **807** 8:22 |
| **8th** 61:23 71:3 |

| **9** |
|---|
| **9** 3:10 |
| **911** 50:15 |
| **9:08** 1:20 |
| **9th** 61:24 |

| **a** |
|---|
| **a.d.** 1:21 |
| **a.m.** 1:20 69:2 |

| **ability** 12:7 |
|---|
| 20:23 44:13 |
| 50:1 |
| **able** 7:15 19:7 |
| 50:1 |
| **ableifuss** 2:6 |
| **abnormal** 48:9 |
| **absent** 16:20 |
| **absolutely** |
| 66:16 |
| **academy** 20:8,9 |
| 22:12,18 23:2 |
| 23:12,17 50:10 |
| 50:12 53:20 |
| 55:6,19,21 |
| 57:5 58:4,6,13 |
| 58:20 59:4 |
| **accept** 19:10,10 |
| **access** 10:24 |
| 16:23 17:16 |
| 34:12 |
| **accommodate** |
| 42:21 |
| **accommodati...** |
| 42:23 65:4,7 |
| 66:21 |
| **accordance** |
| 42:17 65:7 |
| **accountability** |
| 46:19 |
| **accurate** 70:14 |
| **acknowledge** |
| 18:10,24 |
| **acknowledging** |
| 19:12 |

**acquiesce**
11:19 15:14
41:3 51:18
52:23
**act** 42:18
**acting** 70:13
**active** 38:10
63:13
**activities** 26:18
34:12
**actual** 68:1
**actually** 8:4
19:8 63:22
**ada** 43:17
51:16
**addition** 12:3
29:9 52:16,18
**address** 14:10
53:16 54:9,13
54:16 63:9
**addressed** 5:18
50:6 57:16
**addresses** 39:8
40:8 50:24
52:1
**addressing**
42:15 46:24
**adhered** 14:4
**adhering** 25:22
**adjusted** 65:14
**administered**
14:4
**administration**
42:4

**administrative**
12:5,5 32:17
41:13
**adrian** 2:4 3:5
62:3
**affect** 23:20
42:24
**affirm** 37:20,21
**aforemention...**
70:5,7,16
**afternoon** 61:1
**aggravated**
54:3,5
**agree** 19:15
22:2 25:7
28:16,19 31:4
33:12 44:3,5
44:21 45:2
46:20,21 56:18
56:22
**agreement** 41:9
52:20 70:19
**aid** 33:10 34:17
**aids** 8:9 34:23
**alert** 30:18
35:10,16,22
36:8,9,16 37:8
38:10,14 40:22
43:9 49:5
62:11,12,13,15
62:18 63:18
**alerts** 12:2 17:1
17:7 35:2,20
37:16 52:14
62:21 63:1,14

63:15
**allow** 20:2
60:18
**allowed** 26:2
35:11,14 36:6
38:24
**allows** 52:21
**ambulation**
26:7
**ambulatory**
12:7 25:21
33:22
**americans**
42:18
**answer** 6:6,11
13:21 21:16,17
22:8 24:2,6
26:4,15 28:8
28:11,11 29:21
29:21 37:10
38:17 39:13
43:12 46:6
47:21 51:5
52:24 54:3,6
57:23
**answered** 43:5
51:4 53:24
**answering**
38:22
**answers** 70:12
70:16
**anticipate** 6:9
**antwaun** 1:8
2:18 7:13 13:5
55:18 59:6,8

59:12,14,23
**anybody** 7:21
**anyway** 46:16
**apart** 7:20
18:12
**apologize** 24:16
54:4 64:6,21
**appeared** 2:3,8
2:14
**applied** 8:8 9:7
10:5,7,11,14
22:3 53:17
**apply** 10:10
25:3,4 27:3
28:4 66:14
**applying** 26:24
27:4,24 28:5,9
28:17 55:5
**appointments**
13:9
**appreciate**
53:11
**appropriate**
40:22
**approximately**
6:20
**april** 1:21 3:2
5:3
**area** 37:23
47:13
**areas** 10:21,23
**ascertain** 15:9
38:2
**asked** 43:5 51:4
53:23 54:1

**[asked - capacity]**

57:11,23 58:2
70:15
**asking** 49:1
54:6
**assess** 50:19
**assessed** 13:8
**assigned** 29:4
**assistance**
42:22
**assistant** 4:17
5:9,16,19 7:23
**assume** 6:17
**assures** 34:11
34:11
**attach** 18:7
**attempt** 6:16
8:3 15:6 54:19
**attempting**
38:19 45:9
**attempts** 65:21
**attorney** 2:9
**auxiliary** 34:17
34:23
**avail** 50:13,21
67:19
**avoid** 10:23
21:7
**aware** 9:1 13:1
29:14 30:5,12
39:3,8 40:13
46:9 57:8
**awareness**
10:20

**b**

**b** 1:14 3:1
**back** 27:19
56:15 64:24
**bacon** 1:8 2:18
7:13 13:5
15:21 28:16
55:18 59:6,8
59:12,14,23
**band** 20:20
**based** 11:2 41:3
43:18 49:22
**baseline** 64:20
64:21
**basis** 26:9 34:5
**basketball**
25:17
**bates** 9:20,21
24:10 33:3
34:4 42:10
**bearing** 11:13
**becoming** 53:3
**began** 13:11
**behalf** 2:7,12
2:18 8:6
**belief** 38:20
**believe** 9:14
46:24 67:3
68:4,6
**believes** 51:16
68:5
**best** 51:12
**better** 49:23
**bit** 14:15

**biweekly** 41:19
**bleeding** 23:21
**bleifuss** 2:4 3:5
4:6,7 21:17
22:20 23:9
24:4,8,15 26:6
26:13,21 27:18
28:7 37:14
39:2,18 43:20
46:3,8 48:3
51:20 56:17,24
60:21 61:2,5,8
61:11,16 62:4
63:22 64:14
66:12,13 68:10
68:17
**blood** 20:3,5,22
20:23 23:20
54:21 55:15
56:3 58:2
60:18
**body** 65:3
**booking** 63:13
**box** 18:7 19:3,8
**break** 60:23
61:7,9
**breaking** 46:4
**briefly** 64:4
**building** 14:21
47:19
**bunk** 63:17

**c**

**c** 70:2
**call** 5:22 23:23
24:9 32:20

50:15
**called** 4:2 10:1
24:17 42:19
**cane** 10:5,7
11:14 12:14,22
16:11,15 25:8
25:16 26:1,2,7
26:8,20 27:5
28:6,10,12,13
32:1,3 33:23
35:3,3,5,6,11
35:11,14,16,21
35:22,22,23,24
36:3,4,6,9,16
37:7,8,19,21
38:3,10,10,11
38:15,23 39:14
39:15 40:21,22
43:9,10,14
45:11 48:23
49:1,2,5 50:1
51:1,9,14,21
52:1,18 54:14
61:20 62:12,13
62:15,16 65:3
66:22
**cane's** 37:15
38:4
**canes** 10:12
25:4 26:18
32:6,12 34:16
39:6,9,11 43:2
**capacity** 1:7
32:17

care   49:14
career   6:23
carry   12:17
case   12:22 13:5
    13:6 14:11
    42:6 70:21
cases   29:20
catch   61:1
categorize
    62:14
cause   11:6
    21:13 23:20
    56:19,23 58:2
caused   56:6
    68:6
causes   55:2
causing   56:4
    66:18 67:3,9
    68:6
caveats   12:18
ccdoc   1:8
center   2:10
central   1:20
    69:2
cermak   11:22
cermak's   12:9
cerner   12:9
certainly   11:19
    14:6,10 38:2
cetera   55:3
chain   45:13,14
    49:11
chains   11:4
change   14:8
    40:24

changed   19:1
characterize
    23:15,16
charged   14:22
    27:8 45:6
chart   15:3,4,12
    16:7,23 17:1
check   18:7,10
    19:2
checked   19:7
    38:9
checkmark
    18:12
cheer   68:12
chicago   2:5,11
    2:16 71:9
circumstances
    12:23 39:19
    50:15
civil   1:18
clarify   28:23
    35:18 48:21
classification
    11:3
clot   20:24
come   38:7
comes   40:18
coming   47:18
command
    45:13,14 49:12
    49:20
commencing
    1:19
communicate
    12:1 41:2 44:8

45:13
communicated
    12:10 13:4
    40:1 50:8 57:4
communicating
    8:19 14:6
communication
    14:12 41:13
    42:4 52:18,21
communicati...
    41:11,19
communicative
    13:15 44:11
complaint   7:8,9
    49:23 67:21
complete   70:15
complex   47:10
compound
    39:12
computer
    17:17 63:11
computers
    17:14 63:9
conceivable
    12:19 31:21
    44:19
concept   22:13
    23:7
concern   38:1
    42:23
concerns   48:22
concluded   69:1
condition   14:18
    15:2,6 40:5,24
    45:10 67:1,21

conditions   48:8
confer   29:18
    30:14
conferred
    28:17
conferring
    16:21 44:22
confronted
    12:20 44:20
confusing   6:14
consider   10:21
consideration
    25:1
consistent   22:4
constant   13:15
constantly
    44:16
constitutional
    45:8
constraints
    25:22
construct   31:11
consult   15:21
    39:23 49:12,13
    49:21
consultation
    40:9,13,17
    41:6
consultative
    45:24
contained
    41:10
contemplates
    39:10

**[contents - deposition]**                                        Page 5

**contents** 17:20
**continue** 53:5
  60:18
**contraband**
  10:24
**control** 3:10
  10:1 16:24
  28:8
**controlled**
  10:11
**conversation**
  6:8 14:23
**cook** 1:7,8,14
  2:9,12 4:12
  6:24 8:9 10:12
  26:2 34:9
  42:16 43:23
  65:8 71:2
**coordinator**
  43:17 51:16
**corporation**
  1:9
**correct** 10:2,13
  10:15 12:15
  13:2 16:21,22
  16:24 18:14,19
  19:3,9,18 21:9
  21:10 26:14
  28:21 30:15
  31:3,22 32:1
  34:14 35:16
  36:9,12,22
  44:4 45:24
  46:1 48:21
  55:9 57:1 59:4

59:7,13 60:8
64:10,18,19
66:4,5,8,9,15
66:18,19,22
67:23 68:8
**correctional**
27:3 28:5
**corrections** 7:1
7:4 28:15 34:9
42:17 43:24
**corresponding**
40:22
**counsel** 2:2 3:8
6:5 7:20,23
70:9,19,21
**county** 1:7,8,14
2:9,12 4:13
6:24 8:10
10:12 26:2
34:9 42:17
43:23 65:8
70:2 71:2
**couple** 7:4 20:1
64:3,6
**course** 15:13
**court** 1:1 27:18
**courts** 1:18
**covered** 62:3
**create** 66:6
**crutches** 33:10
**csr** 1:16 70:6
71:6
**current** 4:17
5:14

**currently** 4:12
**cursory** 17:3
  38:6
**custody** 10:15
  11:10 14:16
  16:3 22:15
  26:19 35:5
  37:4,6,22
  43:14 45:6
  49:22,24 50:13
  50:20 51:8
  52:17 54:22
  59:15
**custody's** 13:10
**cv** 1:6

**d**

**d** 71:3
**daily** 41:19
**daley** 2:10
**dart** 1:7,15
  2:13
**date** 46:14
  61:22,23 62:1
  70:6
**day** 1:20 27:12
  29:11,15 30:13
  47:15 65:24
  71:3
**daylight** 1:20
  69:2
**deal** 27:8 32:16
**december**
  61:23,24
**deem** 9:22

**default** 51:11
  51:11,21
**defendant** 2:12
  2:18 7:12 13:5
  28:16
**defendants**
  1:10
**definition**
  25:15,24 33:19
**deliberations**
  41:18
**demonstrate**
  26:7,12
**department**
  4:16,22 6:24
  7:1,3,21 10:18
  10:21 16:10
  22:6 28:15
  32:5,10 34:9
  39:5 42:17,24
  43:2,8,23
  60:19
**department's**
  46:4
**dependent**
  16:11 32:1
**depending**
  55:24
**depends** 43:10
**deposed** 5:24
  6:21
**deposition** 1:14
  2:2 3:1,10,12
  3:13,15 6:4 7:8
  8:1 9:15,23

**[deposition - encountered]** Page 6

24:12 32:22
47:7 61:14
68:12 69:1
70:4,9
**depositions**
1:19
**describe** 30:2
34:6
**described** 22:4
34:17 36:12
48:12
**designate** 9:20
**designated** 8:6
8:13
**detained** 42:16
**detainee** 10:8
25:7 36:15
37:15 43:9
47:6 68:7
**detainee's**
16:20
**detainees** 10:17
17:8 25:4
36:11 53:18
**deteriorate**
13:11
**determine**
44:23 49:13
**determined**
11:21,22 40:8
64:16
**determines**
40:20
**determining**
25:2

**develop** 23:12
**device** 16:24
36:20 38:19,24
39:1 51:9
**devices** 11:6
37:12
**devore** 2:14
**devoreraduns...**
2:17
**different** 35:15
53:7,7,14
65:15
**differently**
21:20
**difficulty** 33:13
39:5,10
**directive** 58:23
**director** 4:18
5:10,17,20,21
5:22,24 59:11
60:21 61:11
64:4 66:13
68:11,18
**disabilities** 8:9
8:21,22 33:14
34:11,22 42:11
42:18,22
**disability** 11:5
24:22 33:15
34:5 64:22
65:3
**disabled** 24:18
25:8,11,12,13
25:15,23,24
26:24 27:24

**discern** 58:24
**discrimination**
8:21,23 34:5
**discuss** 9:6
13:17 41:21
68:19
**discussed** 26:18
44:10 53:19
**discussing** 29:3
**discussions**
41:23
**dispensary**
14:21 27:14
44:15 67:7
**distance** 15:11
34:24 35:4,6,9
35:16,23 36:1
36:3,8,15 38:4
62:12
**district** 1:1,1
1:18
**division** 29:17
30:6 31:7
**divisions** 30:3
**doctor** 36:18
52:17
**doctors** 13:9
**document** 9:21
9:23 24:12
32:22 42:9
61:14,17
**documents**
7:24
**double** 65:16
65:17,20

**douglas** 1:4
42:6
**due** 21:23 65:3
**duly** 4:2 70:10
**duty** 27:2 28:2
29:8
**dvorak** 2:3

**e**

**e** 17:23 18:3,5,7
18:7,23 50:10
**e.g.** 24:22 34:24
**earlier** 39:23
40:11 57:11
**education** 57:8
**effect** 13:1
**effective** 61:22
**either** 39:3,7
42:3 60:8 66:3
**elaborate** 45:3
**elevated** 29:6
29:23 30:9,11
30:18,22,23
31:15 43:18
**emergent** 50:15
**employed** 4:12
**employee** 16:18
18:2
**employees**
17:18 18:18
**encompass**
25:3 44:18
**encounter**
31:21
**encountered**
32:5,10

**[enforcement - first]** Page 7

enforcement
  23:5 55:22
  59:21 60:14,19
enforces  46:9
enforcing
  46:19
engage  15:9
  44:13 45:23
  49:18
enhanced  44:1
ensure  20:21
ensures  40:12
  40:16 41:6
ensuring  46:22
  68:2
entire  7:6
entirely  66:17
entitled  38:21
  49:5
equitably  46:23
errors  68:21
escort  17:11
  29:18,24 30:1
  67:14
escorted  35:14
  36:7 46:15
escorting  13:5
  15:22 17:8
establish  11:24
  12:15 22:14
  23:3 31:9
established
  27:10
establishes
  25:5,13 27:7

28:24 31:17
  32:7
establishing
  32:11
et  55:3
evaluated  67:7
  67:15
evaluating
  48:14
evaluation
  40:19,20 45:17
  49:22 67:9
event  16:17
everybody
  21:20 30:8
exactly  9:2 53:5
  63:3
examination
  3:4 4:5 64:1
  66:11
examined  4:3
  70:11
example  12:21
  13:4 14:24
  23:2 31:23
  58:21,23 63:17
exception  11:4
  44:24
exceptions  44:3
  44:5,9 51:2
  52:1
exchange  38:13
executive  4:17
  5:9,16

exhibit  3:10,12
  3:13,15 9:22
  9:24 24:9,13
  32:20,23 33:4
  42:9 61:12,15
exhibits  3:7
expect  15:8
expectation
  45:12
expected  24:5
experience  23:1
  32:4,9
expiration
  61:23 62:1
explain  11:8
  35:1,18
expressly  34:17
extent  19:12
extremely  12:8
  53:13
extremities
  33:8

**f**

facility  19:18
  27:10 29:10
  67:14
fact  12:22 29:9
  30:17,24 31:2
  38:15 44:14
  52:13 57:15
  60:13 62:15
factors  24:24
failure  56:7
fair  8:16 12:11
  16:9 21:11

31:19 41:5
  50:23 56:7
  58:3
fairly  46:23
familiar  9:4
  24:19 33:1
  42:12 64:6
familiarize
  16:19
fastened  54:10
  54:14
fed  35:21 52:15
federal  1:17
felt  16:3
file  46:13
find  22:13 49:3
  53:6
fine  54:5 64:5
finger  22:3
  55:8,9,11,12,23
  57:21,22 58:4
  58:19,21 59:3
  59:7,12,20,20
  59:24 60:2,5
fingers  20:1
  22:11 23:6
  55:24,24 58:7
finish  6:10
  13:20 17:5
  36:2
first  4:2,17,21
  5:16,19 49:17
  49:20 64:6
  70:10

**[firsthand - handcuffed]** Page 8

**firsthand** 29:11
57:19 58:14
**five** 60:24 61:6
61:7,9
**floor** 2:10
47:14 48:1
**flow** 20:3,5,22
20:23 23:20
54:21 55:15
56:3 58:2
60:18
**follow** 24:5
25:19 56:8
**following** 2:2
27:20 49:16
**follows** 4:4
**force** 20:17
27:11 39:4
60:15
**foregoing** 70:4
70:14
**form** 21:15
22:7 23:24
24:6 26:3,9,15
37:9 38:16
39:12 46:2,5
47:20 51:4
56:21 64:14
**formal** 5:23
**formalized**
14:12 58:23
**formally** 7:9
**forth** 49:7
52:22 56:15

**fourth** 51:7
**frame** 6:14
**franklin** 71:8
**front** 50:4
51:15 65:2
**full** 4:8 34:24
35:7,23 36:8
36:15
**function** 42:24
65:20
**further** 15:16
40:2 63:23
65:14 66:10

**g**

**g** 4:11
**gap** 22:3
**gavin** 1:16 3:1
3:10,12,13,15
4:1,10 9:22,23
14:24 24:9,12
32:20,22 38:8
38:9 42:9 61:1
61:14 68:18
**gavin's** 12:7
**general** 7:23
21:8 23:11
31:18 32:4
42:1 44:4,6
51:3 53:18
54:10
**give** 14:24
62:24
**given** 23:2
25:22 26:8
36:20 47:15

**gives** 17:3
**globalized**
28:11
**globalizing**
59:19
**gmail.com** 2:6
**go** 17:23 18:9
20:16 25:17
36:21,23 52:22
61:2
**goal** 23:8
**goes** 23:16
**going** 6:4 8:3
9:16 21:15
22:17 24:8,9
27:14 30:18,21
30:22 32:19,20
32:24 33:6
38:11 47:15
51:6 53:5,8,14
67:13 68:23
**good** 4:7 37:7
68:12,16
**govern** 31:18
31:20,24
**governance**
12:16 25:5
27:7,10 29:1
31:9
**governed** 18:4
**grasp** 33:9
**great** 64:7
**greater** 14:7
**grievance**
46:13,14,18,21

**group** 3:13
32:20,23 33:3
42:9
**guarantees**
18:13 52:11
53:1,2
**guess** 34:21
51:12 52:2
61:12 68:17
**guidance** 12:13
**guide** 58:9,22
59:20 60:10
**guideline** 59:3
59:7,13 60:3,6
**guidelines** 34:8
42:15
**guy** 15:10
**guy's** 14:5
**guys** 45:16

**h**

**hampered**
15:16 16:3
**hand** 52:5,8,11
54:19,23 56:2
58:8,16 59:22
60:1,12,16
64:10,17,23
65:2,11,17,23
**handcuff** 48:16
51:22 54:9
56:14
**handcuffed**
12:14,23 14:17
15:1,10 16:12
16:14 32:3,13

39:9,11,15
43:3,10 51:1
51:14 52:2
67:11
**handcuffing**
31:24 32:6
**handcuffs** 11:3
21:12,13,22,24
22:2 23:21
27:4 28:6,9,18
48:16 53:17
54:13 56:13,18
56:22 57:6,10
58:24 65:15
66:14,17,20,21
67:3,5,9 68:6
**happen** 40:13
40:17 66:6
**happens** 6:15
13:13 41:7
53:1
**hard** 61:3
**harm** 55:2
**health** 11:24
17:4 27:9 29:4
29:10,13,23
30:9,11,18
31:16 41:17,21
44:12 45:5
50:14,18,19,22
68:3
**healthcare** 29:6
**hearing** 24:22
**height** 47:17

**help** 31:11
**hereinabove**
70:17
**hey** 14:24
15:10 38:9
53:3
**hierarchal**
41:17 50:17
62:20
**high** 12:16 52:4
**higher** 11:3
14:1
**highest** 47:23
**highlighted**
11:7,8 26:22
26:23 27:22,23
33:5 61:19
**honestly** 26:16
**hope** 23:11
**hour** 14:21
44:15
**hours** 14:22
**housed** 30:8,17
31:15 47:8
**housing** 14:8
29:4,10 35:8
41:15
**human** 6:8
**hypothetical**
39:21

**i**

**idea** 55:12
**identification**
9:22,24 24:13
32:23 34:10

61:15
**illinois** 1:1 2:5
2:11,16 70:1
71:2,9
**immediate** 27:2
28:2 31:6
49:18
**impaired** 24:22
24:22 33:21,24
40:2
**impairment**
33:7,17,18,20
**impairments**
33:14 34:14,14
34:18
**implement** 8:15
**implementati...**
9:10
**implied** 54:18
**important**
46:18
**improperly**
56:20
**inability** 33:7
**inadvertently**
66:3
**incarcerated**
28:14 43:23
52:4
**include** 28:13
**includes** 28:14
33:5
**including** 8:19
**increased** 14:9
40:23

**inculcated** 50:8
**indicates** 18:8
**indicating** 19:3
**individual** 11:2
11:10,14 12:11
13:10 14:16,20
16:3 17:16
20:3,21 21:1
21:22 22:15
23:18 25:20
26:19 29:3
31:11 33:7
35:5,10 37:4,6
37:8,19,21,22
37:24 38:2,20
40:1 43:14,19
45:11,15 47:15
49:4,9,9,13,22
49:24 50:4
52:1,16,23
54:21,24 55:3
56:4,7 58:24
60:12 63:8
67:6
**individual's**
13:3 16:7
21:19 48:23,24
51:17
**individualized**
39:22
**individuals**
8:20 10:12,15
13:24 50:13,20
50:21 51:1
59:15 60:16

**[informal - know]** Page 10

informal   14:13
  20:7 38:13
information
  7:5 15:5 18:1
  36:22 63:5
informed   17:19
  52:12
inhibited   12:8
inhibits   16:7
inhumanely
  45:9,21
injure   54:21
  56:16
injured   56:12
  56:14
injuries   21:8,13
injury   11:6,11
  11:11 55:15
  56:4,6,11,19,23
  58:2 66:18
  67:4,10 68:7
inmate   3:10
  8:22,24 10:1
  11:5 12:22
  19:17 24:24
  25:2,8,11,12
  26:6,24 28:1
  30:15 31:7
  45:23 47:4,5,5
  47:8 51:21
  63:6 64:21
  66:3,18 67:3
  67:10
inmate's   46:12
  48:14 54:9,13

inmates   8:22
  10:19,20,22,23
  11:1,3 32:12
  34:10,18,22
  41:24 42:11,16
  42:22 43:2
  47:2 48:4 64:8
  65:12
inquire   46:11
inside   12:3
  17:2
instance   15:20
  31:21
instances   31:19
institution   15:7
  15:19 31:22
  40:19 44:20
  55:1
instructed
  49:15
instructs   6:5
  67:16
intake   13:9
integration
  50:17
interact   25:6
  29:1 31:10
interaction
  8:20
interactions
  8:20 12:4
interagency
  41:8,16 52:20
intercede   13:12

interchangea...
  47:6
interested
  70:20
intermittent
  13:9
intermittently
  18:24
interrogatories
  4:3 70:11
interrupt   13:20
interrupted
  21:4
intrusive   23:7
investigated
  46:17
investigation
  45:24
involved   41:12
irons   11:4
issue   7:11 32:6
  32:11 39:8
  65:11 68:4,17
issued   25:4,8
  38:24 40:21
items   10:24

**j**

j   1:16 2:10 70:5
  71:6
jail   7:6 8:10
  10:12 11:15
  12:1,3 17:2,9
  17:11,16,18
  26:2 30:19
  32:17 35:20

  36:17 38:13
  47:10,17 49:6
  52:4,15 57:9
  62:22 63:9,12
  64:9
james   2:9 3:6
january   5:15
job   20:6,15
  25:23 50:9
johnson   1:4
  13:6 15:22
  28:18 62:12
johnson's   42:6
join   4:21
july   5:10,11
  8:10,15 9:7,11
  10:7,12 13:1
  20:11 28:18
  47:4,8 48:2,5,7
jump   6:9

**k**

k   70:2
keep   35:6,22,24
  51:6 53:8 54:5
  62:16
kin   70:21
kind   6:3 20:7
  29:19 38:12
  46:19,22
know   6:15 7:12
  7:18,19 10:4
  14:1,8 15:20
  15:21,23 18:17
  18:20,21,22
  19:13,14,24

**[know - mean]**                                    Page 11

20:3,24,24
21:21 25:14,24
26:4,11,16,19
27:16 31:1
33:19 36:15
37:19 38:3
39:21 41:5,8
42:3,7 47:11
47:13,22,23
48:6,10 49:1,4
50:2,16 53:9
55:17,20 56:11
57:15,19 59:23
59:24 60:24
62:11,19 63:1
68:1,18
**knowing** 18:15
**knowledge**
11:16 26:5,10
29:11 54:11,15
58:14

**l**

**l** 4:11
**lack** 33:8 49:23
**land** 38:7
**language** 19:16
26:23 27:23
33:6
**larry** 1:15 3:1
4:1,10 12:7
14:24 38:8,9
**law** 2:3 23:5
55:22 59:21
60:14,19

**lawsuit** 7:22
**lawyer** 25:14
**layout** 10:21
**learning** 22:18
**leave** 20:1 21:1
21:12 22:11
**leaving** 20:19
21:8 22:3
**left** 68:19
**leg** 11:4
**legal** 25:14,24
**length** 64:7
**lesson** 20:13
**level** 12:16 14:1
15:9 29:6
41:13 49:14,20
50:17
**levels** 47:23
52:19
**lexipol** 8:2
17:24 19:1
**license** 71:7
**lieutenant** 5:6
**lift** 33:9
**line** 12:6 44:13
49:20
**little** 14:15
**living** 17:14
36:5,24 38:5,7
38:8
**llc** 2:3,14
**loan** 37:12
**lock** 65:16,17
66:2

**locking** 65:20
**long** 9:14 34:24
35:3,6,9,15,23
36:1,3,8,15
38:4 62:12
**longer** 61:2
**look** 38:2
**looked** 63:6,11
**looking** 10:16
26:21 27:21
34:3
**loose** 22:14
**loosely** 19:16
**lot** 5:22 38:5
**lower** 63:17

**m**

**m3** 30:21
**madame** 27:18
**made** 21:20
29:14 44:9,24
46:16 48:10
51:2 52:8,23
65:4,20 66:2
70:16
**magnitude**
21:6
**mail** 17:23 18:3
18:5,7,7
**mails** 18:23
50:10
**maintain** 34:23
**majority** 14:2,3
**make** 6:6,11,17
13:12 17:22
20:4 45:6,14

45:20 49:11,17
54:20 56:2
59:9,22,24
60:16,17,24
65:18,22
**makes** 43:17
**making** 29:7
32:11 49:24
55:16 59:16
62:21
**management**
12:3 17:2,11
17:16 30:19
35:20 36:17
52:16 62:22
63:9,12
**manipulate**
65:21
**manned** 44:15
**manner** 10:18
55:2
**manual** 17:24
**mark** 20:4
**marked** 9:23
24:12 32:22
61:14
**marks** 21:1,8
21:13 55:16
**mass** 49:6
**matter** 7:8
55:11 57:15
**mean** 10:8,9
14:16 17:15
21:18,19,24
23:6 25:14

33:17 34:11
38:18,18,23
39:16,19,21
41:4 43:15
45:20 48:9
52:3 62:18
63:14 64:21
67:24
**means** 11:8
33:14,18,20
35:1,11 58:22
62:16
**meant** 63:3
**mechanical**
12:8 13:13
15:17,18 16:4
20:2 22:19
23:3,8,18
27:16 39:16,20
40:2,4,6 41:1,4
43:15 44:24
48:4 51:9,12
55:13 57:14,16
57:24 58:9
59:9,15 66:24
**mechanically**
16:8
**mechanism**
38:12 46:9
**medical** 11:9
11:17,18,22,24
12:2 13:3,8,10
13:11,16,22
14:1,3,9,13,18
14:19,20 15:1

15:4,6,9,10,13
15:21 16:6,20
16:21 17:1,3,7
25:13,19,22
27:9 29:4,6,10
29:13,23 30:7
30:9,11,18,22
31:15 35:2,10
35:16,20,21
36:8,9,16,19,19
37:8,12,15
38:19,24 39:1
39:23,24 40:3
40:5,9,19,20,22
40:23,24 41:2
41:4,9,11,14,16
41:21 42:5,6
43:9,15,16,18
44:1,12,14,16
44:23 45:4,10
45:15,17,18
46:12 47:9,18
48:14 49:6,12
49:13,14,21,22
50:3,4,5,5,14
50:18,19,21
51:8,10,11,15
51:17 52:7,14
52:15,19 62:13
63:13,14 64:16
64:16 66:23
67:6,14,15,20
67:21 68:3,8
**medication**
14:5,5

**meet** 41:16
47:9,10
**meeting** 48:5
**meetings** 12:4
41:16,18
**member** 14:17
14:18 27:1
28:1 29:7
31:12 42:20,21
44:19,22 45:13
45:22 48:22
49:9 57:13
59:21
**members** 10:19
10:23 24:24
34:9 37:11
46:11 48:13
49:15 50:8
**mental** 11:24
17:4 27:9 29:4
29:6,10,13,23
30:9,11,18
31:16 41:17,21
44:12 45:5
50:14,18,19,22
68:3
**metal** 20:20
**middle** 61:19
**million** 56:12
**mind** 33:20
**minimally**
64:12
**minute** 60:23
61:7,9

**minutes** 61:6
**mischaracteri...**
48:19
**mobility** 33:6
33:11,13,17,18
33:19,24 34:13
34:14,18,22
**mobilly** 33:21
**modules** 20:17
**monroe** 2:15
**monthly** 41:20
**morning** 4:7
**move** 32:19
37:24 62:4
65:18
**moved** 10:23
19:18 27:16
29:17 30:6
35:8,8 43:3,11
48:16 51:2
**movement**
10:17,20 11:2
27:12,15,17
29:11,13,14,15
30:4,5,13 31:1
31:5 36:14
37:7,15 38:6
38:14 44:8
52:12 54:24
63:5 67:2,17
68:5
**movements**
3:11 10:1
30:13

**moving** 11:15
30:2,15 36:4
37:16,22
**multiple** 52:19
**municipal** 1:8

**n**

**n** 4:11
**nadine** 1:16
70:5 71:6
**name** 4:8,10
**named** 70:9
**nancy** 4:11
**natural** 6:8
**necessarily**
31:18
**necessitate**
29:7
**necessitates**
64:17
**need** 11:17,18
11:19 12:1
13:8,11 14:1,7
14:7,8,10 15:7
15:10,12,13
17:4,6 26:7
29:23 30:9,12
30:22,23 31:5
31:16 36:21
40:21,23 43:18
44:1 48:15
49:2,14 50:3,5
50:19,22 51:17
51:18 52:2,7
52:11 56:3
64:16

**needed** 38:3,4
**needs** 13:4,11
13:23 14:3
16:20 30:14
37:21 41:21
42:6,16 45:5
46:12 48:14
64:22,23 66:22
**neither** 23:9
**never** 23:13
**new** 18:24 19:1
19:11
**non** 8:23
**normal** 22:5
**norms** 32:7,12
**north** 71:8
**northern** 1:1
**notary** 1:17
70:6,13 71:2,7
**notated** 12:9
**notification**
29:8 45:14
49:11,17
**notified** 11:9
16:2 17:23
43:16
**notify** 27:1
28:2 31:6
**number** 48:12
**nursing** 12:6
14:22,23 44:14

**o**

**o** 70:2,2
**o'clock** 61:5

**o'connor** 2:9
3:6 7:10 21:15
22:7,23 23:24
24:2,6,14 26:3
26:9,15 37:9
38:16 39:12
43:12 46:2,5
47:20 51:4
56:10,21 60:24
61:7,13 62:3
64:2,3,15
66:10 68:14,18
68:24
**object** 21:15
22:7 46:2
**objection** 22:23
23:24 24:6
26:3,9,15 37:9
38:16 39:12
43:12 46:5
47:20 51:4
56:10,21 64:14
**objects** 33:9
**office** 17:13
36:22,23 47:23
65:9
**officer** 1:8 4:19
5:1 15:8,21
16:5 30:4,5,14
31:1,5 36:14
37:7,15 38:5,7
38:14 46:15,16
52:12 63:6
67:2 68:5

**officer's** 38:8
**officers** 23:5
44:8 46:10
60:19 66:3
67:17
**offices** 2:3
**official** 1:7 71:1
**oh** 13:22 62:2
64:5
**okay** 4:21 5:21
5:24 6:3 7:7,12
8:12,18 9:4,6,9
9:13,20 10:16
11:13,23 13:3
14:11 15:20,24
16:9,17,23
17:7,12,18
18:6,12,17
19:6,15,21
20:13,18 21:3
22:20 23:9,15
24:4,8,21 25:7
25:11 26:1,13
28:13,16,20,23
29:16,24 30:5
30:10 31:1,4
31:17,23 32:4
32:15,19 33:17
33:23 34:2
35:13,18 36:2
36:6,11,14,21
37:6,14,18
38:12,15 39:2
40:7 41:23
42:3,8,19

**[okay - places]**

Page 14

43:20 44:3,7
44:21 45:3,22
46:8,18 47:2
47:16 48:12
49:15 50:7,23
51:20,24 52:6
52:10 54:8,12
55:4,7,23 56:6
57:8,15,20
58:3,18 59:2,6
60:13 61:3,5
61:16 62:7,9
62:18 66:1
67:16,22 68:10
**once** 57:12 66:2
67:6
**ongoing** 57:8
**opened** 19:13
**operating** 64:8
**operation**
18:21 37:23
50:16
**operations** 7:2
12:17
**opportunity**
68:3
**opposed** 67:22
**oral** 4:3 70:11
**order** 19:1,1
36:18 37:5
52:17
**orderly** 10:18
42:24
**orders** 8:2
36:19

**organization**
31:13
**ought** 16:1
**outlined** 25:1
**outside** 35:8
**oversight** 46:22
**overview** 7:10

**p**

**p3** 30:22
**page** 3:4,9
**pain** 55:3
**pairs** 10:19
**pandemic**
47:12,17,17
48:11
**panels** 62:3
**parameters**
14:9
**paraplegic**
24:23
**part** 42:20
46:19 49:18
60:15
**participate**
48:13 57:18
**particular**
12:13,13 15:15
44:7 48:7
65:23
**particulars**
13:17
**parties** 70:22
**partner** 13:16
40:3 43:16
51:11,16

**partners** 11:9
41:9,11,14,17
44:12 45:18
50:14,18,22
52:19
**patience** 34:3
**people** 20:14
21:19 23:12
26:17 28:13
32:6 37:12
45:5,21 50:11
**permanent**
62:13,14
**permitted**
34:23
**person** 10:5,7,8
12:14 16:11
27:4 28:6,9,9
31:24 35:7,24
36:4,18 38:15
52:11 58:1
62:16 65:21
66:21
**person's** 38:20
58:8
**personally** 7:12
**personnel** 8:14
8:15 9:10 13:4
14:14 15:21
16:19,21 17:8
18:13 24:5
27:4 28:5 30:3
38:14 40:9,10
42:5 44:16,23
46:12 48:18

57:9 64:16
**persons** 8:8,9
33:13 34:14
39:6,9,10
**perspective**
25:21
**pertaining** 1:19
**pertinent** 15:5
**phrase** 6:13
**physical** 11:5
11:12,20 24:21
**physically** 47:9
49:10
**pick** 38:8
**piece** 26:23
27:23
**place** 13:16
40:12,16 41:19
41:20 44:7,17
44:22 45:19
46:9 49:3
52:21 57:12
59:15 60:12,15
65:16 70:6,17
**placed** 19:17
21:12,14,24
39:16,19 51:9
56:14,18,19,23
57:2,6,24 59:1
64:9,17 65:2
65:13
**placement**
57:14
**places** 17:15

placing 23:18 55:13
plaintiff 1:5 2:7 13:6 42:5
plane 61:1
play 25:17
please 4:8 6:10 6:15 13:20 27:19 35:18,18 48:21,21
plethora 17:15
point 13:11 40:23 43:1,7
policies 3:14 8:8,16,19 9:2,4 9:7,11 12:15 18:4,19 22:5 31:9 32:12,21 53:16 54:8,12 54:16 65:8
policy 3:10,12 8:7,19 9:18 10:5,6,11,14 12:12,18,24 16:10,13 17:20 17:22,23 18:8 18:9,11,14 19:4,9,11,19 22:10,21,22 23:10 24:10,19 24:21 25:1,5,9 27:6,11 28:20 28:24 31:17,20 31:23 32:3,7 32:11,24 33:1

33:5,12 36:12 39:2,3,7,7 40:7 40:16 41:6 42:1,8,12,14,15 43:1,7,8 44:4,6 44:18 50:24 51:21,24 52:3 52:10 55:19 56:8 57:1,3,7 67:16,18,23 68:1
poor 10:22
populated 12:2 17:2
population 13:17 14:2,3 25:6,16 27:8 29:2,22 31:10 37:12 41:22 46:13,23 67:20
posed 6:9
positive 60:11 60:13
possible 12:21 23:8 55:13 58:17 60:2,4,5 60:7
possibly 6:13 20:5 36:8
posts 17:15 36:24
practice 20:19 22:5,16,22 23:10,13 39:4 39:8 48:11

51:3
practices 22:5 32:7 48:17
prados 2:4 3:5 4:6,7 21:17 22:20 23:9 24:4,8,15 26:6 26:13,21 27:18 28:7 37:14 39:2,18 43:20 46:3,8 48:3 51:20 56:17,24 60:21 61:2,5,8 61:11,16 62:4 63:22 64:14 66:12,13 68:10 68:17
preclude 24:23 39:14
preparation 8:1
prepared 9:6,9
preparing 7:7
prescribed 34:24
presence 10:22
present 2:1 70:8
presenting 49:19
presumed 29:19,22 30:11
presumption 30:16,20,24 43:20,22 44:2

presumptions 30:21
prevent 55:15
previously 40:18 43:13 52:14 70:9
primarily 51:9
principle 20:14 55:5
principles 31:18
prioritize 63:1
prison 13:7
privy 15:3 27:12 41:9,24
probability 52:5
probably 47:18
problem 32:16 68:13
procedure 1:18 11:5 17:23 18:4 34:3,8 64:8
procedures 8:23 48:17 49:16 65:8
process 13:15 14:13 20:7 40:12 44:11 45:24 46:18,21
processes 48:13 49:3
professional 55:22

**professionals** 67:15 68:8
**programs** 34:12
**prohibition** 8:21 34:4,7
**prohibits** 16:10 16:14
**promise** 60:22
**promoted** 5:2,3 5:5,6,8,9,16
**promotion** 5:13 5:15
**promptly** 27:1 28:2
**proper** 20:22 34:10 55:15
**properly** 56:15
**provide** 68:2
**provided** 11:16
**provides** 34:8 42:15
**prudent** 16:5 22:1
**psyche** 63:14
**psychological** 30:23
**public** 1:17 70:6,13 71:2,7
**purpose** 20:18 21:7 34:6 37:23 42:14
**purposes** 25:9 47:7

**pursuant** 1:17
**put** 23:21 51:13 59:9 66:2

**q**

**qualify** 25:12
**quantify** 25:18
**question** 6:9,11 6:13,14,16,17 18:16 19:6 21:16 22:7 27:19 40:15 52:24 53:21,22 54:2,6,17 58:18 59:11,17
**questions** 6:5 54:3 60:22 63:23 64:3 66:10 68:14 70:11,15

**r**

**r** 4:11,11
**radar** 29:21
**radunsky** 2:14
**raise** 42:23
**rank** 4:15,17 4:24 5:14
**read** 7:8,9 18:8 19:8,13 27:19 27:20 33:6
**reading** 18:14 18:19
**really** 20:16 38:21 62:22

**reask** 40:14
**reason** 30:13 39:24 44:18 67:2 68:5
**reasons** 56:12
**receipt** 18:11 19:12
**receive** 18:2,23 26:20 49:22 57:9
**received** 9:3 18:5 19:3
**receives** 40:19
**receiving** 14:5 27:13
**recently** 8:24
**recess** 61:10
**recognize** 7:15
**recommendat...** 11:11 25:19 40:3 41:3 43:17 45:18 51:19 52:8,22
**recommendat...** 13:12
**recommended** 41:1 51:10,15 66:23
**record** 4:9 70:15
**recreation** 25:17
**red** 21:12
**redundant** 53:3 53:13

**refamiliarize** 17:24
**referred** 70:17
**refers** 33:7
**refresh** 6:3
**regard** 34:10
**regarding** 8:7 42:5 57:9
**regular** 35:22 62:15
**reinforced** 20:14
**reintroduced** 57:14
**related** 14:16 18:7
**relates** 18:3 25:20 39:5 45:9 46:22 60:10
**relative** 10:9 11:17 15:5 49:24
**remember** 23:22 48:1 63:3,4
**reminding** 18:24
**remotely** 1:16 16:24
**remove** 38:19 66:14,17 67:4
**removing** 66:20

| | | | |
|---|---|---|---|
| **rephrase** 6:16 | 55:3 56:5 | 54:24 55:13 | **rules** 1:17 6:4 |
| **reporter** 27:19 | **restraining** | 58:10,16 67:13 | 32:11 46:4,20 |
| 27:20 | 31:6 | **retained** 3:8 | 48:3,6 |
| **representative** | **restraint** 11:6 | 11:1 | **s** |
| 1:15 | 11:20 12:9 | **rethink** 14:8 | **safe** 55:17 |
| **requests** 42:22 | 13:13 15:17,18 | **review** 7:24 | 58:11 |
| **require** 27:15 | 16:4 20:2 | 16:19 36:22 | **safety** 15:18 |
| 28:20 | 27:16 40:2,4,6 | 37:15 68:20 | 42:23 45:5 |
| **required** 6:6 | 41:1,4 45:1 | **reviewed** 46:17 | 54:24 |
| **requirement** | 51:12 52:9 | **richard** 2:10 | **sat** 19:8 |
| 27:3 28:4 | 54:19 56:2 | **right** 21:7 | **saw** 7:15 |
| 29:18 | 58:8,10 65:23 | 56:17 58:11 | **saying** 13:22 |
| **requires** 44:22 | **restraints** 3:12 | 61:12 63:22 | 15:1,24 16:2 |
| **requiring** | 11:12,17,18 | **rightly** 49:5 | 16:13 18:10 |
| 33:23 | 19:17 22:19 | **rights** 42:16 | 21:5 26:24 |
| **respect** 50:17 | 23:4,8,18 | 45:8 | 27:24 28:12 |
| 53:11 55:19 | 24:10,18,23 | **risk** 11:3,10 | 45:15,15 47:5 |
| **respectfully** | 25:2 26:24 | 20:24 | 47:5 53:6 |
| 43:5 44:10 | 27:24 39:17,20 | **room** 47:24 | 59:19 |
| 51:7 53:4,6,15 | 43:15 48:4 | 48:1 | **says** 9:18 10:17 |
| **responsibilities** | 51:10 52:5,12 | **roundings** 12:4 | 11:1 22:11 |
| 31:12 42:20 | 54:23 55:14 | **row** 61:19 | 24:21 33:6 |
| **responsibility** | 57:14,16,24 | **rpr** 1:16 70:6 | 34:8,22 35:3 |
| 15:4 45:4 | 58:16 59:9,15 | 71:6 | 35:11,21 36:19 |
| 46:10 50:4,7 | 59:22 60:1,12 | **rtu** 27:9 29:22 | 42:21 51:21 |
| 50:13,21 67:4 | 60:16,18 64:10 | 30:8,17 31:15 | **scenario** 49:19 |
| 67:8,19 68:7 | 64:17,23 65:2 | 44:15 47:13,24 | **screen** 8:3 9:16 |
| **responsible** | 65:12,17 66:24 | **rub** 56:15 | 9:17 |
| 25:21 27:1 | **restrict** 20:5 | **rule** 19:21 | **scrolling** 34:2 |
| 28:1 45:20 | 54:21 58:1 | 23:23 24:5 | 42:8 |
| 67:24 68:2 | **restricting** | 39:4 43:1 45:1 | **seal** 71:1 |
| **restrained** | 20:23 56:3 | 55:8,9 57:20 | **second** 26:21 |
| 11:14 16:8 | **restriction** 65:5 | 57:21,22 58:5 | 26:22 27:21,22 |
| 20:22 43:19,21 | **restrictive** 20:5 | 59:20,20,24 | 47:14,24 54:17 |
| 44:1 48:15 | 23:20 52:22 | | |

**[section - stamped]**                                                    Page 18

**section**   26:22
   26:23 27:21,22
**secure**   54:19,20
   58:1
**secured**   40:4,5
**security**   11:2
   11:16,19 12:10
   13:12,17 14:9
   14:14,22 15:7
   16:19 17:6
   38:1 40:1,9
   41:2 43:18
   44:12 50:20
   51:18 55:1
   63:14 64:22
**see**   9:17 32:2
   37:5 61:16,19
   62:1,2,4,5,8
   63:6,13,16,17
   63:20 68:3
**seek**   15:4
**seen**   23:5 26:17
   68:8
**sense**   6:6,11,18
**sensitive**   15:13
**sent**   19:11
**sentence**   11:7,8
**separate**   35:2
   35:19 65:11
**sergeant**   5:3
**series**   6:4
**serious**   11:11
**serves**   46:21
**service**   20:16
   57:12

**services**   34:12
   67:20
**set**   3:14 8:18
   32:20
**setting**   32:7
**share**   8:3 9:16
**sharing**   9:17
**sheriff**   1:7,14
   2:13 4:13 8:6
   8:13 18:2
**sheriff's**   4:15
   4:21 6:23,24
   7:2,21 8:7,14
   8:14 10:6
   16:10,18 22:6
   23:17 32:5,10
   39:4 43:2,8,17
   46:4 51:16
   65:9
**short**   30:10
**shorthand**
   70:12
**show**   61:12
**showing**   61:17
**side**   15:17
**sidle**   15:6
**sign**   33:24 37:7
**signature**   68:22
   68:23 70:18
   71:1,6
**single**   12:19
   31:20 41:10
   44:19 66:1
**sir**   4:7 5:12,18
   9:19 10:3

53:14,21 54:2
   54:7 68:24
**situation**   12:19
   30:7 44:19
   66:7
**situational**
   10:20
**somebody**
   35:13
**someone's**   15:6
   25:13 55:14
**sorry**   13:20,22
   17:5,6 21:3
   24:1,15 32:8
   36:2 37:3
   40:14 43:15
   61:23 62:2
**sort**   20:6 47:6
   64:22
**sound**   64:6
**space**   20:2,19
**speak**   7:10
   12:19 13:24
   14:13 19:23
   21:18,21 22:1
   22:9 47:14
**speaking**   49:6
**special**   29:20
   30:6 64:22
**specific**   18:3
   28:12 31:19
   41:6,24 42:4
**specifically**   8:7
   12:12 14:11
   29:16 31:24

32:2 34:16
   40:8 47:14
   48:15 50:24
   53:17 55:18,20
   60:10
**specifics**   13:24
   15:3
**specified**   57:22
**specifies**   19:16
**speculate**   63:2
**spell**   4:8 12:12
   12:13
**spelled**   12:24
**spelling**   68:21
**spells**   33:12
**spent**   7:4
**spoke**   40:11
**spoken**   7:18,20
   7:21 14:19
**spreadsheet**
   3:15 61:17
**ss**   70:1
**staff**   11:22 12:5
   12:6,6,6 14:13
   14:17,18,22
   15:9 18:24
   19:2,22 29:7
   31:11 44:13,14
   44:19,22 45:12
   45:20,22 48:22
   49:6,9 50:9
   55:4 58:15
   65:22 68:3
**stamped**   9:21

standard  64:8
  64:20
start  32:24
  61:22
started  17:10
starts  9:21
  24:10 33:3
  34:4 42:10
  50:12
state  4:8 70:1
state's  2:9
stated  22:16
  40:18 43:13,24
  52:14
statement
  31:10 48:19
states  1:1,18
  43:8
static  41:13,20
  65:13
stenographer
  70:13
step  16:5
stillman  2:15
  68:16
stop  61:3
street  2:4,15
  71:8
strength  33:9
stress  55:2
strike  8:4 39:6
  47:2
structure  41:18
stuff  5:22

subject  43:14
subjective
  33:20
subjects  24:18
subordinates
  5:19
subsection
  10:16 24:17,19
  25:4 34:13,20
  34:20 35:1
  42:19,21
subsequent
  5:13,15
subsequently
  5:2,5,8
suggest  59:21
suggests  15:12
  15:16
suite  2:5,16
  71:8
summer  17:19
superintende...
  41:15
superseded
  11:18
supersedes
  51:17
supervisor  15:8
  27:2 28:3,17
  29:8,14,19
  30:14 31:6
  49:18,20
supervisor's
  29:20

supervisors
  27:12 29:9
  30:12 44:23
  46:11
supposed  48:13
sure  4:10 9:2
  17:21 20:17
  38:21 40:16
  43:7 45:7,20
  48:11 49:4
  55:7,10 58:12
  58:19 59:2,6,8
  59:12,14 60:8
  60:9,11,16,17
  62:21 65:23
suspects  67:2
swell  21:19
swelling  21:2,5
  21:7,13,23
  23:20 55:16
  56:4
switch  24:8
sworn  4:3,19
  4:20 10:19,23
  24:24 27:1
  28:1 29:7
  42:20,21 44:19
  44:22 45:12
  46:10,10 48:13
  48:17 49:15
  50:8 57:13
  70:10
system  12:3,9
  16:18 17:2,11
  17:16 18:13

  30:19 35:20,21
  36:17 44:7,21
  46:19 52:15,16
  53:1 62:22
  63:9,12
systems  41:20
  44:17 45:19
  52:21

t

take  16:5 24:24
  41:18,19 45:17
  60:23 61:8
taken  1:16 3:2
  61:10 70:5,12
takes  13:16
  57:12
talked  44:11,13
  44:14 49:8
  53:19 57:11
  64:7
talking  48:24
task  32:11
tasked  30:2
taught  19:22
  19:24 20:7,9
  22:12 48:17
  50:10 55:18,20
  57:21 58:4,7
  58:12,20 59:3
  59:7,8,12,14,18
  59:23,24 60:2
  60:5,9,11,11,14
  60:19
teaching  55:8
  55:10

| | | | |
|---|---|---|---|
| **team** 16:6 | **thing** 53:8 | **time** 1:20 4:24 | **treated** 46:23 |
| **technical** 33:19 | 68:19 | 7:6 10:15 13:8 | **treating** 45:21 |
| **technique** | **things** 9:16 | 13:14 17:22 | **trip** 53:4 |
| 54:18 | 27:14 29:9 | 34:24 35:7,12 | **triweekly** 41:20 |
| **technological** | **think** 22:1,16 | 35:23 36:8,15 | **true** 18:6 20:10 |
| 62:20 | 33:18 43:5 | 46:14 47:12 | 34:16 70:14 |
| **technology** 7:5 | 67:13 | 48:9 51:7 | **try** 9:16 |
| 18:13,15,22 | **thomas** 1:7,15 | 61:22 62:17 | **trying** 53:4,6 |
| **tell** 15:2 19:14 | 2:13 | 68:11 69:2 | 56:13,15,16 |
| **telling** 53:8 | **thought** 17:5 | 70:6,16 | **two** 7:3 22:3,11 |
| 59:18 67:12 | 36:2 47:22 | **times** 6:20,22 | 23:6 31:8 35:2 |
| **tells** 45:11 | **three** 23:6 | 31:8 38:5 | 35:19 55:8,11 |
| **tendered** 8:24 | 41:12 55:9,11 | 41:12 | 55:24 57:21 |
| 32:21 | 55:24 57:22 | **title** 5:23 | 58:4,7,19,21 |
| **terminal** 17:13 | 60:5 | **today** 8:1,6,13 | 59:3,7,12,20,20 |
| 36:21 | **threshold** | 29:13 55:10 | 59:24 60:2 |
| **terminals** 63:7 | 26:19 55:22,23 | **told** 45:23 | 65:15 |
| 63:8,10 | 56:2 | **ton** 52:21 | **types** 25:2 |
| **terminology** | **tight** 20:4 | **trained** 8:15 | 65:15 |
| 30:1 | 21:23,24 22:14 | 9:10 17:19 | |
| **terms** 7:7 10:6 | 23:22 54:19 | 55:4,6 | **u** |
| 32:6 47:6 | 56:3 59:1,10 | **training** 19:20 | |
| **test** 58:19 | 59:16,22 60:1 | 19:21,22,23 | **under** 12:23 |
| **testified** 4:4 | 60:12,17 66:15 | 20:6,16 50:9 | 39:18 63:12 |
| **testify** 8:6,13 | 66:18 67:12 | 53:20 57:12 | **undersigned** |
| 9:9 10:4 | **tighter** 65:19 | 58:15 60:15 | 70:13,20 |
| **testimony** 31:5 | 65:20,22 66:2 | **trainings** 57:17 | **understand** |
| 58:5 | 66:7 | **transcript** | 8:18 10:9 |
| **thank** 5:18 9:13 | **tightly** 19:16 | 68:20 | 22:20 27:13 |
| 27:18 28:7 | 21:12,14 23:4 | **transit** 35:7 | 31:12 38:17 |
| 34:2 53:11 | 53:17 54:9,13 | 36:1 | 39:13 58:9 |
| 60:21 63:24 | 56:18,23 57:2 | **transported** | 62:23 |
| 68:11,24 | 57:6 | 64:9,23 65:13 | **understanding** |
| **thesis** 55:12 | **tightness** 57:9 | **treat** 45:9 | 8:5,12 12:17 |
| | 57:16 | | 14:20 17:3 |
| | | | 18:9 23:11,11 |
| | | | 27:15 29:5 |

31:14 50:12
55:21 57:4
67:19,22
**understands**
23:17
**understood**
6:17 22:17
23:1 29:12
**undue** 55:2
**unit** 7:5 18:22
29:5 35:8 36:5
36:24 38:5,8,8
47:9
**united** 1:1,18
**units** 17:14
35:15 36:7
37:16 41:15
43:3,11
**universal** 27:7
28:24 54:18
55:5,21 57:4
**unwritten**
22:22 23:10,23
24:5 39:4
54:16
**update** 17:21
19:4
**updated** 18:1,8
**updates** 17:22
**usage** 58:16
**use** 3:12 11:16
12:2,8 15:16
15:18 16:3
20:17 22:18
23:5,7 24:10

24:18,23 30:2
33:8,9 34:23
38:11 40:2,21
40:21 41:1,3
43:14 48:4,23
48:24 49:2,5
50:1 58:7,22
60:15 62:17
66:23
**used** 13:13 25:2
54:23 55:2
63:10 65:12,24
**using** 60:10
65:3 66:20
**utilize** 11:12,20
38:24
**utilized** 27:17
33:10 48:2
**utilizing** 23:3

**v**

**v** 4:11
**value** 62:22
**variance** 48:10
**verbal** 38:13
**verbatim** 68:1
**verify** 18:18
19:7
**verifying** 18:20
18:23
**victor** 4:11
**videoconfere...**
2:3,8,14
**viewed** 62:21
**violation** 45:7,8
57:1,7

**violations** 47:1
**visibility** 10:22
**visible** 17:7,10
**visit** 47:15
**visitation** 8:23
8:24 47:13,24
**visiting** 47:2
**visitors** 47:9,10
47:18 48:5
**visits** 27:13
29:12
**visually** 24:22
**voice** 46:24
**vs** 1:6

**w**

**waist** 11:4
**wait** 6:10
**waive** 68:22,23
**waived** 70:18
**waiver** 68:17
**walk** 16:15
25:16 33:9,23
39:11 43:10
45:12,16,23
46:16,16 49:10
50:1 54:14
66:22
**walker** 33:10
**walking** 8:9
10:19 16:11
33:13
**walks** 11:14
15:11
**want** 47:18
63:1

**wanted** 37:20
37:20 49:4
65:22
**wants** 26:1
**washington** 2:4
**watched** 25:16
**watts** 1:16 70:5
71:6
**way** 6:14 12:16
18:15,17,18,20
18:23 20:13
22:13 23:19
25:6,18 27:7
29:1 31:9
35:13 42:3
43:8 49:5
51:12 58:8
60:8 62:20
63:10
**ways** 53:7
**we've** 44:10,11
**wearing** 66:4
**web** 63:9
**week** 32:21
41:12
**weekly** 41:19
**went** 17:11
63:12
**west** 2:4,15
**wheelchair**
33:10
**wish** 68:20,21
**witness** 4:2
22:9,24 24:1,3
24:7 26:5,11

26:16 37:11
38:18 39:14
43:13 46:7
47:22 51:6
56:11,22 61:3
63:24 68:13,23
70:5,10,16,18
71:1
**word**  41:10
49:23
**words**  23:21
**work**  38:6
56:13
**working**  7:1
20:11 30:20
31:14 32:4
50:18
**works**  31:11
**worth**  20:1
**wrist**  20:19
21:1,19 58:8
**wrists**  55:14
**written**  12:24
17:20 22:10,21
31:17 39:3,7
40:7 42:12,14
50:23 51:20,24
52:10,17 53:16
54:8,12 57:3
58:23 67:16,18
67:23

---

**y**

**y**  4:11
**yard**  25:17

**yeah**  21:18
22:9,24 24:1
24:15 26:11
32:9 34:11
38:18 47:22
51:6 53:13,23
56:11 59:18
61:3,8 63:8
**year**  57:12
**yearly**  57:17
**years**  7:3,4
25:15 32:9
**yep**  6:7

---

**z**

**zach**  68:14
**zachary**  2:15
**zstillman**  2:17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.